1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF TEXAS
2               BEAUMONT DIVISION

3

   UNITED STATES OF AMERICA   |  CAUSE NO. 1:21-CV-00008
4  EX REL. BROOK JACKSON      |
                              |
5                             |  MARCH 1, 2023
   VS.                        |
6                             |  2:06 P.M.
                              |
7  VENTAVIA RESEARCH GROUP,      BEAUMONT, TEXAS
   LLC, ET AL.
8
   ------------------------------------------------------
9
           VOLUME 1 OF 1, PAGES 1 THROUGH 127
10
           REPORTER'S TRANSCRIPT OF MOTIONS HEARING
11
       BEFORE THE HONORABLE MICHAEL J. TRUNCALE
12              UNITED STATES DISTRICT JUDGE

13 ------------------------------------------------------

14
   APPEARANCES:
15
   FOR THE PLAINTIFF:     ROBERT E.  BARNES
16                        LEXIS ANDERSON
                          BARNES LAW
17                        700 S. FLOWER STREET
                          SUITE 1000
18                        LOS ANGELES, CA 90017

19                        WARNER MENDENHALL
                          LAW OFFICES OF WARNER MENDENHALL
20                        190 NORTH UNION STREET
                          SUITE 201
21                        AKRON, OH 44304

22

23

24

25

2

```
 1  FOR THE DEFENDANT
    VENTAVIA:                ANDREW GUTHRIE
 2                           TAYRN MCDONALD
                             HAYNES AND BOONE
 3                           2323 VICTORY AVENUE
                             SUITE 700
 4                           DALLAS, TX 75219

 5  FOR THE DEFENDANT
    PFIZER, INC.:            CARLTON WESSEL
 6                           DLA PIPER LLP
                             500 EIGHTH STREET NW
 7                           WASHINGTON DC 20004

 8
                             ANDREW HOFFMAN
 9                           DLA PIPER LLP
                             2000 AVENUE OF THE STARS
10                           SUITE 400 NORTH TOWER
                             LOS ANGELES, CA 90067
11
                             JACK CARROLL
12                           ORGAIN, BELL & TUCKER
                             470 ORLEANS
13                           SUITE 400
                             BEAUMONT, TX 77704
14
                             MEAGAN SELF
15                           DLA PIPER LLP
                             1900 NORTH PEARL STREET
16                           SUITE 2200
                             DALLAS, TX 75201
17
18  FOR THE DEFENDANT
    ICON:                    EALI KATZ
19                           CAHILL GORDON & REINDEL
                             32 OLD SLIP
20                           NEW YORK, NY 10005
21
                             SCOTT DAVIS
22                           HUSCH BLACKWELL
                             1900 NORTH PEARL STREET
23                           SUITE 1800
                             DALLAS, TX 75201
24

25
```

3

 1   COURT REPORTER:          RUTH C. WEESE, RDR-CSR
                              FEDERAL OFFICIAL REPORTER
 2                            300 WILLOW, SUITE 104
                              BEAUMONT, TEXAS  77701
 3

 4

        PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
 5     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           (OPEN COURT, ALL PARTIES PRESENT)

2              (P R O C E E D I N G S)

3           THE COURT:  The Court calls the case of *Brook*

4  *Jackson versus Ventavia Research Group, LLC, Pfizer,*

5  *Inc., and Icon PLC* in Cause No. 1:21-CV-0008.

6           We are here on an oral hearing on Pfizer's

7  motion to dismiss the Relator's amended complaint, Icon's

8  motion to dismiss the Relator's amended complaint and

9  Ventavia's corrected motion to dismiss.

10          I would ask that the attorneys introduce

11  themselves to the Court and state your name on the record

12  and introduce your clients and announce if you are ready

13  to proceed.

14          MR. BARNES:  Yes, Your Honor.  Attorney Robert

15  Barnes here on behalf of Brook Jackson here with

16  co-counsel Warner Mendenhall and Lexis Anderson, Your

17  Honor, and we are ready to proceed.

18          THE COURT:  Thank you.  And for the Defendant?

19          MR. CARROLL:  Your Honor, for the record, Jack

20  Carroll, Orgain, Bell and Tucker, for Pfizer, along with

21  Carlton Wessel, Meagan Self and Andrew Hoffman.

22          THE COURT:  Okay.  You are here for?

23          MR. CARROLL:  Pfizer.

24          THE COURT:  We also have for I believe Icon,

25  correct, Mr. Davis?

5

1          MR. DAVIS:  Yes, sir.  Scott Davis together
2  with Eali Katz on behalf of Icon.
3          THE COURT:  Very fine.  And Icon is present
4  too; is that correct?  I mean, excuse me, Ventavia.
5          MR. GUTHRIE:  Andrew Guthrie with my colleague
6  Taryn McDonald for Ventavia Research Group.
7          THE COURT:  Guthrie?
8          MR. GUTHRIE:  With my colleague Taryn
9  McDonald.
10          THE COURT:  Very good.  And I take it everyone
11  is ready to proceed, announced and ready?
12          MR. BARNES:  Yes, Your Honor.
13          THE COURT:  The Defendants are ready to
14  proceed?
15          MR. CARROLL:  Yes, Your Honor.
16          THE COURT:  Okay.  That's fine.  Couple of
17  things I want to go over before we get into the
18  arguments.  I don't in most cases have oral arguments on
19  motions to dismiss and other dispositive motions.
20  However, it is my practice whenever a party requests an
21  oral hearing as a matter of practice, I grant that.  I
22  feel that that is what due process is about, having an
23  opportunity to be heard.  So if a party feels that they
24  need to be heard, I give that opportunity.
25          After I agreed to have a hearing, in reviewing

6

1  the matters before the court, it did occur to me that

2  perhaps an oral hearing would be helpful to help clarify

3  some of the issues.  I am inclined to simply let the

4  attorneys present their arguments to me with perhaps

5  little or no interruption by me with questions or

6  comments unless I feel inclined to do so at a specific

7  point.

8        I will want to ask Mr. Barnes a couple of

9  questions that might streamline things, perhaps.  But I

10 know that this case has gotten some attention through

11 various means that a lot of cases don't get.  And I think

12 we need to be clear from the get-go this is a process and

13 the Court will not rule from the bench a decision on

14 these motions today.  That's not what the Court does on

15 something like that.

16       Instead, the Court issues a reasoned opinion

17 based upon the pleadings, the facts that are presented

18 and the law.  And I might add we have already done our

19 own independent research on the law.  Found some cases

20 that have actually not been cited by the parties.  But we

21 do appreciate the fine efforts and clear writing of the

22 parties.  But some of you may wonder why it takes time to

23 issue opinions.  Well, the notebook that's on my desk

24 contains just pleadings associated with these motions,

25 not all the pleadings that have been filed.  And this is

7

1  just one of over 600 civil cases that I have, plus

2  20 percent of the criminal docket in the Beaumont

3  Division.  And every case is important no matter the size

4  of the case.  It is important to the litigants and so we

5  take each case and handle each case with the greatest

6  care that we possibly can.

7          So I just wanted not to disappoint anyone who

8  may have traveled a distance to be here to watch this

9  hearing.  There will not be a decision rendered from the

10  bench today.

11         I also want to remind everyone from our

12  previous comments that were made in telephone conferences

13  that I do insist upon certain decorum and dignity in the

14  court.  That is, lawyers with opposing counsel and

15  lawyers to the court, and any comments that I may make or

16  questions that I may make are not to be interpreted as

17  leaning one way or the other of the Court.  That would be

18  a wrong assessment and I think the lawyers probably know

19  that, but some others who may not be experienced in legal

20  matters, that's not to -- just because I ask a question

21  of one counsel doesn't mean that I'm against him or her

22  or for him or her or make a comment.  It may be simply to

23  clarify something; it may actually be something, oddly

24  enough, to confirm something in my mind.

25         So I just wanted to say that and I would

1    caution anyone that they should not take any actions of

2    the Court and pronounce to the public as leaning one way

3    or the other.  So are we all clear on that?

4                MR. BARNES:  Yes, Your Honor.

5                MR. CARROLL:  Yes, Your Honor.

6                THE COURT:  All right.  Very good.  Now, Mr.

7    Barnes, why don't you just take the podium.  And I will

8    advise everyone for 34 years I tried cases in this

9    courthouse.  And I had federal judges tell me counsel,

10   get on the microphone, get on the microphone.  And I

11   thought why in the world, what is with that?  And until I

12   became a judge, and realized that the acoustics are not

13   good.  You may be speaking in a tone of voice that you're

14   confident the people around you can hear and that I can

15   hear, but around that jury box and around here, I mean

16   the sound just goes away.  And, in fact, when I remind

17   lawyers of that, I often get several jurors smiling at me

18   saying thank you.  They want to hear, but they couldn't

19   hear.  So please speak into the microphone so we can --

20   you can be heard.

21               What I wanted to ask you, Mr. Barnes, the

22   reason I pulled you out of order, is because this might

23   streamline some things.  As you are aware, in a

24   cross-claim case essentially there are three theories

25   that are used, an express false certification, an implied

9

1  false certification, those I think were part of your

2  complaint, but in reply, not really pled in your

3  complaint, but certainly articulated in your reply, with

4  even a mention that, you know, you would like to have an

5  opportunity if you needed to amend to assert a fraud in

6  the inducement.

7          Have you pulled back from the first two

8  theories, that is, express false certification or implied

9  false certification and tend to be relying more on the

10 fraud in the inducement?

11         MR. BARNES:  No, Your Honor.  We are pursuing

12 all three.

13         THE COURT:  We can probably expect to hear

14 argument on all three then.  I just wanted to clarify.

15 So that I am sure I see, I have a couple of things that I

16 pulled and I'm sure there are other documents and perhaps

17 some of you have some things, I don't know, what's called

18 a statement of work, there is in Section 1.1.2 something

19 called activities undertaken without government funding.

20 These activities are described solely for background and

21 context for the government funded deliverables itemized

22 in Section 4 and then it goes on with the regulatory

23 planning and it says that Pfizer will meet quote

24 necessary FDA requirements close quote for conducting

25 ongoing and planned clinical trials.

3-1-23 Motions Hearing

10

1        And then if you go to scope 1.2, there is a

2   section that says the parties acknowledge and agree that

3   such activities not related to large scale manufacturing

4   are out-of-scope for this prototype project for Pfizer.

5   And Pfizer, rather, will fund these activities without

6   the use of government funding.  So it is not that there

7   was any attempt to elicit money for the funding; is that

8   correct?

9        MR. BARNES:  Yes, Your Honor.

10       THE COURT:  All right.  Now, the question is

11  on Section 5.0 it says provided the FDA has granted

12  approval or authorization, just read that part again,

13  provided the FDA has granted approval or authorization,

14  100 million doses will be provided by Pfizer to the

15  government.

16       So now, that provided the FDA has granted

17  approval, that goes back, does it not, to what I -- the

18  portion that I talked about from the very beginning in

19  this Section 1.1.2 (a), that Pfizer will meet necessary

20  FDA requirements?

21       MR. BARNES:  Yes, Your Honor.

22       THE COURT:  And it assumes, does it not, it

23  doesn't specify, but it assumes that whatever information

24  would be reliable; is that correct?

25       MR. BARNES:  Yes, Your Honor.

11

1          THE COURT:  Kind of an assumed implied term of

2   the contract so to speak?

3          MR. BARNES:  Yes, Your Honor.

4          THE COURT:  Now, my next question is I see

5   something called looks like a bill for $154,091,920.  Are

6   you familiar with that?

7          MR. BARNES:  Yes, Your Honor.

8          THE COURT:  And it's a bill from Pfizer looks

9   like to Advanced Tech International.  Who is that?

10          MR. BARNES:  That's the consortium that was

11   contracting on behalf of the Defense Department, Your

12   Honor.

13          THE COURT:  Okay.  So that's the DoD

14   essentially?

15          MR. BARNES:  Yes, Your Honor.

16          THE COURT:  Okay.  Says I certify that the

17   amounts invoiced are for costs incurred quote in

18   accordance with the agreement.  I use the word quote in

19   accordance with the agreement and that the work reflected

20   has been performed and prior payment has not been

21   received.

22          What do you think that means "in accordance

23   with the agreement"?

24          MR. BARNES:  Our understanding, Your Honor, is

25   that that meant that they complied with the agreement's

1  requirements in terms of what the deliverable was.  So in

2  this context they were going to deliver something that

3  met the FDA's requirements for clinical testing that

4  produced a safe, effective vaccine for the prevention of

5  Covid-19.  And that's what "in accord with the agreement

6  means" in our understanding.

7              THE COURT:  Is that what I -- to go back to

8  what I read earlier, I want you to tell me if you think I

9  am on the right page or the wrong page, okay?

10             MR. BARNES:  Yes, Your Honor.

11             THE COURT:  I see something here, go back to

12  5.0, provided the FDA has granted approval with the

13  implied terms, proper approval, doesn't say that, but

14  approved, FDA has granted approval, 100 million doses

15  will be provided, is that what is referenced in this in

16  accordance with the agreement?

17             MR. BARNES:  Yes, Your Honor.

18             THE COURT:  Is that your position I should

19  say?

20             MR. BARNES:  Yes, Your Honor.

21             THE COURT:  Is there anything else I am

22  missing from your standpoint to tie those things

23  together?

24             MR. BARNES:  No, Your Honor.  The only thing I

25  would say is that throughout the statement of the work,

13

1   there was a lot of repetition of what the Court is

2   talking about.  There's schedules of deliverables about

3   FDA documents this, FDA clinical trial that, so on and so

4   forth, but I think the Court has highlighted what we

5   consider the two most critical parts of the contract.

6              THE COURT:  All right.  So you are still

7   pursuing three theories, although one would require an

8   amendment to -- an amended complaint in order for you to

9   really pursue that; is that correct?

10             MR. BARNES:  Yes, Your Honor.

11             THE COURT:  All right.  So we don't have

12  anything that's not -- that narrows the scope.  We can

13  talk about some other things that may come up later in

14  due course, materiality, and maybe everybody can kind of

15  be thinking about this as if you don't have other things

16  to think about.  Who decides materiality?  Is it the

17  Court or is that a fact for a jury?  I'm not asking for

18  an answer right now.  I am aware of Fifth Circuit

19  authority that I think has been cited that perhaps

20  suggests that that's a decision for the Court to decide,

21  but I'm open to discussion about that.  Talking about

22  Rule 9(b)'s heightened pleading requirements for fraud,

23  whether those have been met and later we may talk a

24  little bit about ADR and also the scienter requirement I

25  am interested in particularly on the Defendant's side

1  because could there be a difference in scienter amongst

2  the Defendants.  Namely, does Icon get a pass on that one

3  or not.  Just a question we may want to talk about.

4           So those are just a few of the things that are

5  kind of on my mind, which you all feel free to address

6  any of those as we go.  Mr. Barnes, I believe that's all

7  I have as a preliminary matter.

8           MR. BARNES:  Thank you, Your Honor.

9           THE COURT:  Okay.  Who wants to present?  Mr.

10  Carroll, are you going to start for us?

11           MR. CARROLL:  Just briefly, Your Honor.

12           THE COURT:  Of course.

13           MR. CARROLL:  First of all, good afternoon.

14           THE COURT:  Good afternoon.

15           MR. CARROLL:  Before -- the Court has noted,

16  before the Court today are the motions to dismiss for

17  Defendants Pfizer, Icon and Ventavia.  And before you

18  hear the three Defendants' arguments on those issues, we

19  note that the Defendants have three pending motions that

20  are somewhat time sensitive regarding the extension of

21  stay of discovery that currently expires on March

22  the 15th.  Obviously, we are here today to argue the

23  motions to dismiss, but at the conclusion of those

24  arguments if the Court has any questions with respect to

25  those motions, we are prepared to address those with the

15

1  Court today as well.  With that, I will turn things over

2  to Mr. Wessel who is going to argue for Pfizer.

3            THE COURT:  Very fine.  Mr. Wessel, you have

4  the floor.

5            MR. WESSEL:  Good afternoon, Your Honor, and

6  thank you.  Your Honor, this is a very unusual case as

7  you might have gotten familiar as you read through all of

8  the briefing materials and the background.  But here all

9  of the parties in interest, the Defendants Pfizer,

10 Ventavia, Icon, and the United States of America, which

11 is the Plaintiff and the real party in interest on the

12 Plaintiff's side, all of those parties --

13            THE COURT:  You noticed I did not mention them

14 when I called the style of the case because they have

15 refused to participate in this.

16            MR. WESSEL:  Yes.  I wasn't aware that they

17 refused.  I know they made their submission, but I wasn't

18 sure whether they had recorded anything as to the

19 argument.

20            THE COURT:  I believe too, that Mr. Lockhart I

21 think has been terminated, if I am not mistaken, as

22 counsel.  Am I wrong?  No, it's not.  It is just Dykeman

23 has.

24            Well, the Court has been advised they are not

25 going to join.  But that if and of itself doesn't

16

1  automatically mean there's no materiality, does it?

2          MR. WESSEL:  No, no.  Of course, Your Honor.

3  And, in fact, I think the Government's focus is really

4  more on plausibility under *Iqbal* rather than materiality.

5  We have a clear view on materiality.  I think it's

6  crystal clear that all of Relator's claims weren't

7  material to the Government's decision to pay.  But I can

8  get into that at length, and, Your Honor, feel free to

9  interrupt me.  I can sort of give you our sense of the

10 background in the case if that's helpful.

11         THE COURT:  Yes, please.

12         MR. WESSEL:  Great.  So, really, as I

13 mentioned, all of the parties in interest agree the case

14 should be dismissed.  The person who doesn't disagree is

15 the Relator, Brook Jackson, and she brings her claim on

16 behalf of the United States.  So it's not her claim.

17 It's the United States claim.  And, really, what's

18 happening here is by bringing this case under the False

19 Claims Act, Ms. Jackson and her lawyers are trying to

20 substitute their judgment about the safety and efficacy

21 of Pfizer's vaccine for the judgement of the experts, the

22 FDA.  That's the Government agency, the policy agency,

23 that's charged with making a decision on whether a

24 vaccine or other drugs are safe or effective.

25         So that's really our sense of what's going on

1  here.  We feel there's sort of three points here why

2  dismissal is appropriate, three key points.  One is what

3  I have mentioned, all parties in interest agree it should

4  be dismissed.  And then the Relator's claims really

5  aren't plausible and this is what the government has

6  weighed in on in their statement of interest.  They are

7  not plausible as required by the Supreme Court in the

8  *Iqbal* decision.

9        And then, finally, materiality which your

10  Honor highlighted, and it's crystal clear that Relator's

11  allegations just weren't material to the government's

12  decision to pay for the vaccine.  The Fifth Circuit has a

13  case that's virtually on all fours here, *U.S. ex rel*

14  *Harman versus Trinity Industries*.

15        And as the Fifth Circuit recognized in that

16  case, where the interests of the government and the

17  Relator diverge from each other, as we obviously have

18  here, that kind of case is particularly ill suited to a

19  False Claims Act case.

20        THE COURT:  And in this instance, Ms. Jackson

21  as I understand it from the facts that have been alleged,

22  notified the FDA that certain protocols had not been

23  followed, I think at least was it 1,700 of the test

24  subjects as opposed to the total of over 40,000, I may be

25  a little off on the number, but --

1          MR. WESSEL:   Yes.  Basically what the

2 government ultimately concluded, when they got to their

3 point about how the allegations were not plausible, they

4 arrived at it basically by saying only three percent of

5 the study subjects were in the sites that Ms. Jackson

6 worked at.  She worked at two sites, I guess out of that,

7 for a matter of three weeks, less than three weeks.

8          THE COURT:   If -- there are many times that in

9 these types of cases that a Relator will go it alone.

10 The government says not interested in pursuing it.  And

11 that doesn't mean we just say well, we do whatever the

12 government tells us to do and therefore we throw the case

13 out, do we?

14          MR. WESSEL:   No.  Agreed, Your Honor.  In

15 fact, the government declining to intervene, which I

16 think is what Your Honor is referring to, is very common.

17 It happens a lot and sometimes the Relator will dismiss

18 after that and sometimes the Relator will go forward and

19 litigate.  That's very common.

20          What's really unusual here is the statement of

21 interest.  So we -- I mean the government will sometimes

22 file a statement of interest in support of Relators like

23 Ms. Jackson, that's fairly common.  We haven't been able

24 to find one case where the government has filed a

25 statement of interest in support of Defendants.  Not one

1  case; maybe it's out there.  You mentioned you guys have

2  gotten some more research beyond the pleadings and maybe

3  you will find one, but we certainly weren't able to find

4  one.  So that's what's really unique about the case.  Not

5  that the government is not moving forward with it

6  themselves, it is that they're saying we agree that the

7  facts and the law merit dismissal of this case.

8            THE COURT:  My question is, assume as I think

9  I have to assume at this stage of the pleadings, that the

10  allegations are correct.  They may be completely false.

11  They may be hocus-focus.  I don't know.  But given

12  inferences, I have to give them all inferences that

13  support their allegations at this point, correct?

14            MR. WESSEL:  Yes.  No, I agree with that,

15  Your Honor.  We are obviously not conceding that what

16  they are saying is correct, but that's what the law

17  requires.

18            THE COURT:  If she -- if her claims -- assume

19  they are accurate, that there were some protocols that

20  were not followed in the testing procedures, and then she

21  notifies the authorities at the FDA and they just for

22  whatever reason they decide not to pursue it.  Does that

23  necessarily mean that her claims are not valid?  In other

24  words, it could be under one of the three theories I

25  talked about earlier, a false claim was made in the

20

1   inducement for example.

2          And just because maybe for political reasons

3   or otherwise a governmental agency decided to ignore her

4   complaints, does that mean then that her complaints are

5   invalid?

6          MR. WESSEL:   Well, I'm not quite following

7   what Your Honor might mean by "political reasons."

8          THE COURT:   Well, I just said that.  It could

9   be other reasons.  They felt a need to move on.  Could be

10  they said look, we have I think it was 44,000 test

11  subjects and numbers she had from a scientific standpoint

12  is not material enough and therefore we know and

13  scientists agree it is not important and those minor

14  violations in protocol don't matter.  It's still valid

15  test results.  We can get approval for this.

16         MR. WESSEL:   Right.  That's essentially what

17  they have said.  They have said her allegations are not

18  plausible because even if they were true, it wouldn't

19  have impacted the study.  And it wouldn't have impacted

20  the approval or authorization.

21         THE COURT:   So here we are in court after the

22  fact.  Who makes that decision on materiality now?

23         MR. WESSEL:   Well, materiality, Your Honor, I

24  believe --

25         THE COURT:   That's what you are talking about

1    if you are going to cite the *Trinity Industries* case.

2             MR. WESSEL:   Yes.   That's the materiality

3    piece.   What I was just referring to there was the

4    government's statement of interest which is the

5    plausibility issue.

6             THE COURT:   Okay.

7             MR. WESSEL:   So materiality I think is

8    crystal clear that the Court decides that.   I think it's

9    pretty clear in *Trinity Industries* and I think the Fifth

10   Circuit and Judge Higginbotham were sort of trying to be

11   kind to the trial judge, but basically what they told him

12   is you got it all wrong and here's the law and we are

13   reversing.   And that case, it was even a jury verdict.

14            So that it is crystal clear that that's a

15   decision for the Court.   I think there's no question

16   about it.   Plausibility as well under *Iqbal*, but I do

17   agree with you it's a little more squishy, right?   It is

18   not quite as clear there.

19            THE COURT:   So you are talking more on a

20   12(b)(6) analysis now?

21            MR. WESSEL:   Yes, exactly.   Exactly.   Under

22   *Iqbal* and 12(b)(6) and there what is unique about this

23   case, the government itself, so that's the Plaintiff in

24   interest, the party that has the actual claim, is saying

25   hey, Relator's theory, it just isn't plausible.   It just

1  wouldn't have mattered, even assuming everything she said

2  is true, which again, we are not conceding, but the law

3  requires you to do, that would not have impacted our

4  decision to grant an EUA, the emergency use

5  authorization, or approve the product.

6          THE COURT:  And you are telling me the Fifth

7  Circuit says that decision is simply a matter of law

8  essentially?

9          MR. WESSEL:   Well, I believe, Your Honor,

10  that the Supreme Court says that.  Plausibility under the

11  *Iqbal* decision the district court is required to assess,

12  you know, if it's a well pleaded claim whether it is

13  plausible.  That's what *Iqbal* says.

14          And, again, what's unique here is the Court

15  and the rest of us have the help of the government to

16  weigh in on plausibility.  So this again is very, very

17  unique.

18          THE COURT:  So the FDA gets it wrong.

19          MR. WESSEL:   Yes.

20          THE COURT:  They just get it wrong and we live

21  with it?  There's no oversight by a court; is that

22  correct?

23          MR. WESSEL:   That's correct, Your Honor.  On

24  materiality, that's exactly what the *Harman* court held

25  because there was a dispute there going back and forth.

23

1 That case involved guardrails, not a vaccine, but that's

2 exactly what the *Harman* court said.

3          If I might, Your Honor, maybe I could just

4 read you Judge Higginbotham's reasoning there because I

5 think it is right on point.  Again, *Harman*, there was a

6 disconnect and a dispute between the Relator and the

7 government just like we have here.  It is really on all

8 fours.  It involved guardrails, not a vaccine, but it is

9 really the same issue.

10          And here's what Judge Higginbotham reasoned in

11 that case.  And I think it's on all fours here.

12          What Judge Higginbotham said is, "For the

13 demands of materiality adjust the tension between

14 singular private interests," right, that's the Relator

15 here, "and those of the government and cabin the greed

16 that fuels it," basically what he is saying here, private

17 interest.  "As the interests in the government and the

18 Relator diverge, this Congressionally created enlistment

19 of private enforcement," that's the False Claims Act, "is

20 increasingly ill served.  When the government, at

21 appropriate levels, repeatedly concludes that it has not

22 been defrauded, it is not forgiving a found fraud.

23 Rather, it is concluding there was no fraud at all."

24          And that's exactly the situation we have here,

25 Your Honor, which is a Fifth Circuit precedent decided by

3-1-23 Motions Hearing

24

1  the Court and right on all fours with this case.  So

2  that's the materiality issue.

3          THE COURT:  Well, and I guess you would also

4  cite that in conjunction with *Universal Health versus*

5  *Escobar* too which comes out of the Supreme Court.

6          MR. WESSEL:  Yes.

7          THE COURT:  Now, that came out the year

8  before.  Did the Fifth Circuit -- the year before, I call

9  it Trinity Industries only because I once represented

10 Trinity Industries and I think of it better that way, but

11 you call it the *Harman* case, which I will go with you on

12 that.  Does the *Harman* case cite the Supreme Court

13 decision in *Escobar*?

14         MR. WESSEL:  Does it cite the *Escobar*

15 decision?  I believe it does, but we can double check

16 that.  But my recollection is yes, Your Honor.

17         THE COURT:  Okay.  So what you are telling me

18 is the Supreme Court and the Fifth Circuit say that if

19 the government says we are not defrauded then --

20         MR. WESSEL:  End of story, Your Honor.

21         THE COURT:  Even though there's a lady here

22 who says I saw the problems.  I reported it, and that was

23 not in compliance and then we go back to what I talked

24 about before, you know, drawing the line, to the payments

25 of 154 plus million dollars.  After a while it gets to be

3-1-23 Motions Hearing

25

1  real money, doesn't it?

2          MR. WESSEL:   Yes, Your Honor.  And that was

3  exactly the situation in *Harman*.  That was exactly the

4  Relator there was disputing whether the government bought

5  the right guardrails.  It's the exact issue and the

6  government kept saying over and over again, we know what

7  we are doing.  We know what we are buying.  We bought

8  them.  We continue to buy them.  Just like here we

9  continue to pay for the vaccine.  And we weren't

10  defrauded.  That's really -- in some ways, Your Honor,

11  that really should be the end of the story.

12          The government is the supposed victim of this

13  fraud.  And they're saying we weren't defrauded.  So it

14  is very difficult to see how you can make out a fraud

15  case with those facts.

16          THE COURT:  Well, unless -- not to sound

17  cynical -- there might be some overriding reason why the

18  government wouldn't want this to come to light.

19          MR. WESSEL:   But, Your Honor, we have no

20  evidence of anything like that.  I realize there is

21  various kinds of conspiracy theories and things of that

22  nature out there, but Your Honor, everything in the

23  complaint, all the allegations here, so I have heard, I

24  have seen the Relator's briefing and this talk about the

25  Biden administration and things like that.

26

1          THE COURT:  I am not talking about any

2    specific administration.  This came out over two

3    different administrations.

4          MR. WESSEL:  I have said nothing about

5    administrations in our briefs, but that has been raised

6    in this matter.  And, Your Honor, the critical

7    information that went to the FDA when Relator went to

8    FDA's hotline, the FDA was under the Trump

9    administration.  When Relator sat down as she says in her

10   complaint for several hours with the FDA, that was under

11   the Trump administration.  And when the EUA, that's the

12   operative approval here, the EUA was granted by the Trump

13   administration.  So this is not a political issue.  It is

14   just not.  And to try to make it into one as Relator's

15   counsel has done in the briefing, it's completely

16   inappropriate, frankly.  It is just not a political

17   issue.

18          The vaccine is not a political thing.  The FDA

19   knows that the product works.  The medical community

20   knows the product works.  There's just no question.  It

21   is not political.  It just isn't.  And the government has

22   continued to buy the vaccine under this contract and

23   throughout the pandemic.  There is nothing political

24   about it.  There's no secret motive here or anything like

25   that.  It is just --

3-1-23 Motions Hearing

27

1          THE COURT:  Let's take a hypothetical

2  situation, though, where a governmental agency, I am not

3  specifically referring to the FDA or anything necessarily

4  on point with this case, but could there be a situation

5  where a governmental agency for political reasons would

6  just push something under the rug, the complaints of a

7  whistleblower or somebody like that and they just don't

8  want to have this come to light so they just cover it up

9  for political or otherwise reasons and under these

10 standards there's not a darn thing a court can do about

11 it.

12          It is that kind of --

13          MR. WESSEL:   I think that's probably what the

14 *Harman* case says, Your Honor, but just to be clear, that

15 didn't happen here, because as I mentioned --

16          THE COURT:  I wasn't tying it to this case.

17 Hypothetically, you're saying that even under those

18 circumstances courts are frozen out.

19          MR. WESSEL:   That is what the *Harman* case

20 effectively says.  But just to be clear, as I mentioned

21 to you, there was numerous information conveyed by the

22 Relator, all of the information she had was conveyed to

23 the government.  It was conveyed to both the Trump

24 administration and it was conveyed to the Biden

25 administration.  So there's no big conspiracy boiling

1   here or someone is trying to hide things.  It is just not

2   happening, Your Honor.  It is conspiracy theories.  It is

3   unjustified conspiracy theories is what we are hearing.

4           THE COURT:  All right.  Go ahead and let you

5   get back to your -- I interrupted you there and maybe

6   jumped the gun on you.

7           MR. WESSEL:   No, I am happy to engage there,

8   Your Honor.  Perhaps -- I think you did put your finger

9   on several of the key provisions of the contract between

10  Pfizer and the government.

11          Let me just say one thing on that.  The

12  parties to the contract are Pfizer and the United States

13  Government, specifically the DoD branch is the one that

14  executed the contract.  They are in full agreement on

15  what the contract says.  They don't dispute it.

16  Everything in our briefing and everything in the

17  government's statement of interest is completely in

18  agreement of what the contract says.

19          So, yes, could Mr. Barnes or someone else

20  speculate, you know, pick apart and try to say it means

21  this or that.  The two parties that entered into the

22  agreement have already agreed on what it says.  Your

23  Honor kind of hit -- put your finger on the key

24  provisions.  So I just wanted to address that up front.

25          I can go through some more of the background,

1  I think it might be helpful and obviously interrupt me

2  if --

3            THE COURT:  Go ahead.

4            MR. WESSEL:    -- if I am just going on too

5  long here.  But so we mentioned this, early on in the

6  pandemic, this was in May of 2020, and this was under the

7  Trump administration they launched what was called

8  Operation Warp Speed.  And this was an interagency

9  partnership that was designed to accelerate the

10  acquisition of Covid-19 medical products, including

11  vaccines.

12            While Pfizer's product was still being

13  studied, the government entered into this agreement with

14  the company as part of Operation Warp Speed, and you

15  talked about it, to purchase the first one hundred

16  million doses of the vaccine, and the key there is if it

17  was approved, because it wasn't approved at this point,

18  or authorized by the FDA.

19            So the contract provides that the government

20  will pay $19.50 a dose for the first hundred million

21  doses of the vaccine and again that's contingent on the

22  company first securing FDA approval or what they call an

23  EUA.

24            An EUA is a little bit unique.  It is not the

25  full approval that many of us are familiar with.  It is

1  something that the FDA uses to make vaccines and products

2  available during public emergencies when they may be

3  effective in fighting disease and they can make the

4  product available to the public based on the best

5  evidence available without waiting for full approval.

6          And in October of 2020, the FDA issued some

7  guidance, and this is all -- everything here, by the way,

8  Your Honor, is either cited in the amended complaint or

9  in the government's statement of interest.  But based on

10  -- this guidance provided that based on the totality of

11  scientific evidence that you could grant -- the FDA could

12  grant an EUA if it was reasonable to believe that the

13  vaccine may be effective to treat a serious or

14  life-threatening disease or a condition that can be

15  caused by Covid-19.

16          The second provision was that the known and

17  potential benefits of the vaccine when used to prevent or

18  treat a disease or condition outweigh the known and

19  potential risks.  So that's the guidance that the agency

20  provided on granting an EUA.

21          As Your Honor pointed out, the contract

22  explicitly states, and again both parties to the contract

23  agree with all this.  The contract explicitly states that

24  Pfizer's clinical trials are out-of-scope and they are

25  not related to the contract.  That gets to the point Your

3-1-23 Motions Hearing

31

1  Honor was raising before.  The government didn't fund the

2  clinical trial.  This was just a contract to buy the

3  vaccine.  That's what it was for.  It was not to fund the

4  clinical trial.  Pfizer funded the clinical trial.

5            THE COURT:  Except for the bill.

6            MR. WESSEL:   No, that's for doses of the

7  vaccine, Your Honor.  Just to clarify.

8            THE COURT:  I understand.  But it makes

9  reference to in accordance with the agreement and that

10  was -- if you look at the agreement, and I am looking at

11  Section 5.0 of the agreement, it says provided the FDA

12  has granted approval or authorization, which it did, but

13  if it did so under false pretenses, then you see the

14  problem, potential problem.

15            MR. WESSEL:   Yes, I do see that potential

16  problem and that's something that the government talked

17  about in their statement of interest, Your Honor.  What

18  the government says is yes, if there was any information

19  that somehow subjects ended up in the placebo category

20  that should have been in the category that got the

21  vaccine.

22            THE COURT:  They didn't warm it correctly,

23  they warmed it in their hands.

24            MR. WESSEL:   Well, that's what the

25  allegations are.  But what the government is saying is

1  warming in the hands is not going to impact the results
2  of the study necessarily.  What the government is saying
3  is you need an allegation that somehow there was some
4  hidden safety factor here, right, something that people
5  hid or something -- or you miscategorized subjects into
6  one category that should have been in the other category.
7  Obviously, that could impact the outcome.  What the
8  government has clearly said is that's not an allegation
9  that's here.  And that's why they conclude that Relator's
10 claims just aren't plausible.

11          So that's not what is happening here.  So that
12 would be -- that's that fraud in inducement theory which,
13 by the way, has not been recognized.  I think is really
14 questionable.  This is in our briefing.  I think after
15 *Escobar* I think it's very questionable whether it is a
16 valid theory.  But assuming arguendo it is, the
17 government has come to this conclusion that those
18 allegations just weren't there.  There are no plausible
19 allegations that Relator could make with regards to that.

20          So I think the important thing, Your Honor,
21 about the contract, it's an acquisition agreement.  It's
22 a purchase agreement.  It's not the funding of a clinical
23 trial.  We would be in a totally different situation.

24          THE COURT:  Agreed with that.

25          MR. WESSEL:   So that's really important

3-1-23 Motions Hearing

33

1  because that gets mixed up a lot.  So that is crystal

2  clear.  The agreement goes on to say, again, this is all

3  in the briefing, the pleadings, that the government has

4  no right to withhold payment for delivered doses for any

5  reason unless the FDA has withdrawn approval or

6  authorization of the vaccine.  That just didn't happen

7  here, Your Honor.  It didn't happen.  Again, just I'm not

8  trying to be political, but that's what this has kind of

9  turned into.

10         THE COURT:  They never withdrew their

11  authorization, but the question is should they have

12  granted it in the first place.

13         MR. WESSEL:   Well, they made that decision.

14  They granted it and they knew they granted it and they

15  never withdrew it.  So, again, that is what the *Harman*

16  case says.  It's a policy decision for the government.

17  It's not for me to make.  It's not for the Relator to

18  make.  It's not for Mr. Barnes to make.  It's the

19  government's decision.  They are the policy making body.

20  We can't have everybody else in the world weighing in.

21  They are the experts who are charged, whether you like

22  them or not, they are charged with deciding whether the

23  vaccine is safe and effective and they did decide that

24  and they have continued to support it and express

25  confidence in the data and the government has continued

34

1  to buy it.

2          THE COURT:  I think you haven't really

3  discussed it, but there may actually be a little bit

4  stronger quote out of the *Escobar* Supreme Court decision.

5  If the government pays a particular claim in full,

6  despite its actual knowledge that certain requirements

7  were violated, that is to say, they had actual knowledge

8  of what Ms. Jackson has told them, that is very strong

9  evidence that those requirements are not material.

10          MR. WESSEL:   Yes.  And that's exactly the

11  language that Judge Higginbotham quoted in the Fifth

12  Circuit case.  Precisely the same language.  I jumped

13  ahead to the conclusion there, but obviously that's

14  exactly the language that the judge put forth and that's

15  obviously from *Escobar* and from the *Harman* case.

16          So I think it's important, Your Honor, just to

17  kind of understand all the touch points and all the

18  instances where Relator made the government fully aware

19  of all of her claims.  Because, again, this gets to that

20  whole materiality issue which is from the *Harman* case.

21          So shortly after the contract was entered

22  into, Pfizer launched what became known as the landmark

23  study for the vaccine.  This was a placebo controlled

24  randomized study to evaluate the safety and efficacy of

25  the vaccine against Covid-19.

3-1-23 Motions Hearing

35

1           I'm sure most of us are familiar with what

2   placebo controlled means, but essentially what happens is

3   one arm gets the vaccine and the other arm gets a saline

4   injection and that's how it worked.  As Your Honor

5   mentioned, there were about 40,000 participants and it

6   was conducted by doctors and staff at 153 clinical

7   research sites across six countries.

8           THE COURT:  Including three in Texas that Ms.

9   Jackson was involved with.

10          MR. WESSEL:   Yes, there were three in Texas

11  that were run by Ventavia.  I think she actually worked

12  at two of those three, but, yes, there's three Ventavia

13  sites in Texas, three out of 153, just to be clear.

14          Ventavia managed these clinical sites.  Those

15  are the places that subjects would go to receive the

16  vaccine or receive the placebo.  As you are well aware,

17  she claims that Ventavia committed a number of clinical

18  protocol violations and then she listed those throughout

19  her complaint and in the briefing documents.  The

20  clinical trial protocol is a document that describes how

21  the study, a clinical trial, is going to be conducted.

22  And the protocol was not part of this contract.  That's

23  crystal clear again.  All parties agree.  As we talked

24  about, clinical trials were out-of-scope and not related

25  to the contract.

3-1-23 Motions Hearing

36

1           THE COURT:  Again, I asked Mr. Barnes and I

2    guess I will ask you the same question, contracts often

3    have implied terms, do they not?

4           MR. WESSEL:   They certainly might.  But there

5    are specific terms --

6           THE COURT:  The question is --

7           MR. WESSEL:   Absolutely.

8           THE COURT:  First year law school.  Contracts

9    can have implied terms.

10          MR. WESSEL:   No question about that, but here

11   the contract had specific terms saying this is not

12   included.  This is not included.  Because, again, this

13   gets back to our discussion before, the government --

14          THE COURT:  It was not included in terms of

15   payment because Pfizer was going to pay for that out of

16   their own pocket, the developmental cost, but when you

17   get to that other section that I read, 5.0, it talks in

18   terms of provided the FDA has granted approval, and I

19   asked Mr. Barnes, and his position was there's an implied

20   term there, that FDA granted approval based upon valid

21   test data.

22          MR. WESSEL:   Well, there's nothing in the

23   contract that talks about that.  Obviously --

24          THE COURT:  It would be inconceivable to have

25   a contract that would say provided FDA has granted

1  approval based upon fraudulent test data.

2           MR. WESSEL:   Agreed, Your Honor.  And that is

3  not what anyone is arguing here.  That's what the

4  government specifically addresses in their statement of

5  interest.  I mean, they talk about that and they

6  basically say hey, those allegations aren't here.  Those

7  allegations aren't made.  Now, maybe in another lawsuit

8  Relator can come up with those allegations.  But they're

9  not here.  They are just not in the complaint.  Which is

10 the things that the government was told, right?  So they

11 are just not there.

12          So as I mentioned, you know, so her last day,

13 she worked there for roughly three weeks, less than three

14 weeks.  On September 25th of 2020, her last day at

15 Ventavia, this is all from her complaint, she called

16 FDA's hotline to report the clinical trial protocol

17 violations and patient safety concerns that she

18 witnessed.  The FDA contacted her shortly thereafter and

19 according to the complaint spoke to her for several hours

20 regarding the violations she witnessed at Ventavia.  This

21 is in the amended complaint, paragraphs 262,

22 paragraphs 266.

23          THE COURT:  And after she made that complaint

24 I think a few hours later she was fired, was she not?

25          MR. WESSEL:   That's the allegation, Your

38

1  Honor.  Of course, Pfizer had nothing to do with her

2  firing, but she says that -- I don't remember exactly

3  when she says it, but she does say she was fired after

4  communicating with FDA.

5            THE COURT:  Okay.

6            MR. WESSEL:   So that's kind of what was told

7  -- she told the FDA and, again, it's the Trump FDA.  I am

8  not trying to get political, but some people are, so this

9  is the Trump FDA.  And on November 18th Pfizer announced

10 the initial results from the landmark study.  And

11 essentially what that said, there was more than 36,000

12 trial participants demonstrated the vaccine was 95

13 percent effective and safe.  The safety data from 38,000

14 participants suggest a favorable safety profile and raise

15 no specific safety concerns that would preclude issuance

16 of an EUA.

17           Based on that Pfizer asked the FDA to grant

18 the EUA.  That's the condition.  That is the one

19 condition of the contract is it's got to be approved or

20 authorized.  And, in fact, the Trump administration

21 issued the EUA on December 11th of 2020.  As I pointed

22 out, prior to issuing that EUA the FDA was well aware of

23 what Relator was claiming.  And then the government began

24 to purchase the vaccine, you have seen one of the

25 invoices, I think the first one was sent in the end of

1   December of 2020.  You have quoted for us the exact

2   language in the invoices.  It's fairly simple.

3            The government has continued to purchase the

4   vaccine throughout the pandemic and even after the EUA

5   was issued, there are numerous other ways that the

6   Relator told the government about her concerns.  All this

7   is really important to that materiality question.  Before

8   the complaint was filed, and again this all comes out of

9   her amended complaint, before the complaint was filed,

10  she had submitted a prefiling disclosure statement

11  describing her concerns to the Department of Justice.

12  She also sent a prefiling disclosure statement to the

13  Department of Defense which as we talked about was the

14  government entity that actually entered into the

15  contract.

16           THE COURT:  What is your cite in the record

17  for that?

18           MR. WESSEL:   That's in the amended complaint

19  paragraph 38.  I can go through each one of them.

20  Amended complaint paragraph 38 talks about the prefiling

21  disclosure, paragraph -- that goes to the DOJ, same

22  paragraph talks about the prefiling disclosure that goes

23  to the Department of Defense, and again before filing her

24  complaint, and if Your Honor would like I can give you

25  some time to look for this, but, again, this is in

40

1   paragraph 38 of the amended complaint.

2          THE COURT:  Which would be page -- well,

3   Document 17?

4          MR. WESSEL:   Let me just try to get you the

5   exact cite, Your Honor.

6          THE COURT:  Is that it?  It is.

7          MR. WESSEL:   So this is all in there.  And I

8   will tick through it.  So kind of going back to the

9   beginning.  So before the complaint is filed, right, she

10  submits a prefiling disclosure statement describing her

11  concerns to the DOJ.  A prefiling disclosure statement to

12  the DoD, which that's the government entity that entered

13  into the contract.  Before filing the complaint she

14  submitted an original disclosure statement.  And then

15  quote as well as substantially all material evidence and

16  information.  All material evidence and information.

17  This is according to the complaint.  She submits that and

18  then she submits that to the DOJ and then she submitted

19  all material evidence information to the U.S Attorney

20  right here in this district.  This is according to her

21  complaint.

22          And then on January 8th of 2021 she files the

23  complaint which has all of her allegations in it.  So the

24  government gets all of this information even -- they get

25  the information before the EUA is granted and after the

1    EUA is granted.  They have gotten all this information.

2            The complaint remained under seal, as Your

3    Honor is aware, after it was filed.  That's a standard

4    thing under the statute.  The complaint was filed under

5    seal.  Relator's counsel suggests in their briefing that

6    somehow the sealing of the complaint and the extension of

7    the seal show that the government initially recognized

8    the merits of Relator's claim but somehow changed its

9    mind.  I'm sure Your Honor is aware that the sealing of

10   the complaint --

11           THE COURT:  That's not an issue for me.

12           MR. WESSEL:   It's really just not an issue.

13   So the FDA granted full approval.  So having known all

14   this, all of this, I can tick through it all again and

15   kind of wear it out, but the FDA knew all of this and

16   they granted full approval of the product on August 23rd,

17   2021.  So they had the EUA and then they had full

18   approval.

19           And when they granted full approval, they

20   explained that it went beyond the EUA.  It was based on

21   quote, this is again ECF 70 at page five, it was based on

22   incredibly thorough and thoughtful evaluation of the

23   vaccine which included review of updated data from the

24   clinical trial which supported the EUA and included

25   longer duration followup in a larger clinical trial

42

1  population.  So now you are going well beyond what was

2  even considered in the EUA, the number of subjects.

3          THE COURT:  I would assume Ms. Jackson would

4  disagree there has been an incredibly thorough and

5  thoughtful evaluation of the vaccine by the FDA.

6          MR. WESSEL:  She might, Your Honor.  But

7  again, getting back to the *Harman* case --

8          THE COURT:  But she's not the FDA.

9          MR. WESSEL:    That's what the *Harman* case

10  says.  What the *Harman* case says is that the government

11  -- it's a classic policy decision.  Deciding whether to

12  purchase a guardrail or whether to purchase a vaccine,

13  they are classic policy decisions to be made by the

14  United States Government, not for the Relator, not for

15  their counsel, not for a jury.  That is what *Harman*

16  says.

17          So then there was additional information out

18  there.  The Relator spoke to the *British Medical Journal*

19  and there was some articles published by the *British*

20  *Medical Journal* in November of 2021.  And in response to

21  that the FDA responded and said quote, "FDA has full

22  confidence in the data that were used to support the

23  Pfizer vaccine's authorization and approval."

24          That's ECF 70 at page six.

25          THE COURT:  So they doubled down on it.

43

1           MR. WESSEL:   Yeah.  I wouldn't say double

2    down.  I would say they were consistent time after time

3    with expressing their support for the efficacy of the

4    vaccine and purchasing the vaccine.

5           And importantly, Your Honor, they looked at

6    every single allegation she made.  They sat with her for

7    hours.  She filed her complaint.  Everything went to

8    them.  And they still kept the authorization and approval

9    of the vaccine.

10          So, again, there's our classic policy

11   decision.  People may not agree with them.  You are

12   certainly entitled to disagree, but you are not entitled

13   to bring a False Claims Act case, Your Honor.  You can

14   disagree.  That's what we are entitled to do as U.S.

15   citizens, but you can't bring a False Claims Act case

16   based on it.  That's what the *Harman* case says.

17          So I think I have hit most of those things.

18   The key thing, Your Honor, is right here.  This is key,

19   right here, this is the government's statement of

20   interest that we have been talking about.  This is very

21   unusual as I have said.  We have never seen this done in

22   support of the Defendant.  It has happened many, many

23   times in support of Relator.  But practically never.  We

24   have talked about the two key legal issues here, right,

25   plausibility under *Iqbal*, the government has weighed in

1  very strongly there.

2         We could go back and forth, Your Honor, on

3  where Relator is with their legal theories because I know

4  Mr. Barnes has taken a position here earlier, but I will

5  tell you that their opposition to the motion to dismiss

6  says Relator's opposition -- it concedes and it says the

7  invoices do not contain false statements.  So that's what

8  they say.

9         THE COURT:  That's why I asked that question

10 of Mr. Barnes if he had given up theory number one and

11 theory number two.

12        MR. WESSEL:   That's what ECF 35 at 10 says.

13 But I guess he has decided he has changed his mind here,

14 but that's what it does say.

15        Again, that really should be the end of the

16 analysis.  We talked about fraud in the inducement.  I

17 think there's a real question whether that's good law in

18 light of the Supreme Court's *Escobar* decision.

19        THE COURT:  I mean if you -- again, it's not

20 your position, but under the inducement to make the

21 payment for the hundred million units of the vaccine or

22 154 million and some change, is based upon it would be, I

23 know you don't agree with this, but the only thing that

24 the Court would look at would be this one sentence that

25 says the certification that all costs incurred in

45

1  accordance with the agreement, in accordance with the

2  agreement, having that implied term that they are going

3  to seek FDA approval.

4          MR. WESSEL:   Yes.

5          THE COURT:   Is there anything else that you

6  know of that would tie?

7          MR. WESSEL:   Well, there's a lot of things in

8  the agreement, Your Honor, so I don't think there is one

9  thing.  I mean, the key thing in the agreement, right, as

10 we talked about is that Pfizer needs to get an EUA or

11 full approval.  That's really the key, right?  And that's

12 the only way that the government doesn't have to pay.

13 That's clear.  That's in the briefing.  That's what the

14 government says in their statement of interest.  So they

15 talk about that.  So it is not really they're not -- when

16 they basically -- and the government, you know,

17 concededly is supportive of this fraud in the inducement

18 theory.  Although I think there's a real question if you

19 look at our briefing whether it's valid.

20          But what they say is that that theory is

21 implausible here because what you would need under that

22 theory, I talked about this before, you need to show that

23 a person went into the placebo group that should have

24 gone into the vaccine group or something of that nature

25 or that there was some safety risk out there that they

1   covered up.  They erased it.  They did something like

2   that.  And, again, that's just not there.  So that's why

3   the government says that's implausible.

4              THE COURT:  Go ahead.

5              MR. WESSEL:   Again, for materiality purposes,

6   I don't think any of that would matter.  Even if the

7   fraud in the inducement theory is a good one, and

8   probably even if she had pled it, which she didn't, and

9   pled it accurately and pled, it was well pleaded --

10             THE COURT:  I was going to ask you about that.

11  I understand your *Iqbal* analysis under 12(b)(6).  I'm not

12  really hearing you argue their 9(b) component.

13             MR. WESSEL:   Yes.

14             THE COURT:  Because there is a lot, and I want

15  to know if you feel, I often ask myself, when you are

16  doing an *Iqbal*/*Twombly* analysis, don't just give me a

17  bunch of legal allegations.  Give me some who, what,

18  when, where, give me some meat to it.  And her amended

19  complaint is -- you have to admit -- is jam packed with a

20  lot of facts.

21             MR. WESSEL:   It has a lot of stuff in it, I

22  will agree with that.

23             THE COURT:  Allegations for purposes of where

24  we are in these proceedings I have to assume are true.

25             MR. WESSEL:   There is a lot of stuff in

1  there.

2          THE COURT:  Whether they are or not, I don't

3  know, but I have to assume they are true.  Would the

4  amount of facts they have alleged satisfy 9(b)?

5          MR. WESSEL:   On 9(b), if it's okay with Your

6  Honor, we have sort of split up the argument among the

7  Defendants.  So maybe we could hit that after me.

8          THE COURT:  Got it.

9          MR. WESSEL:   As I said, the fact -- we think

10 this concession should be the end of the analysis.

11 Obviously Mr. Barnes has now changed his mind or

12 something is happening here that we don't understand, but

13 anyway, we will continue here.  And, again, we don't

14 think the fraud in the inducement theory is a good

15 theory, but assuming arguendo it is, the government has

16 already weighed in and said that they don't think the

17 allegations of fraud in inducement are plausible here.

18          And we talked about those things.  We can

19 just quickly go through those again.  In their statement

20 of interest the government points out that the Relator

21 makes no allegation that the data from the Ventavia sites

22 caused the FDA to authorize the vaccine or that the FDA

23 would have revoked authorization had it known about the

24 alleged clinical trial violations by Ventavia.  This is

25 the government saying this.  They further point out

48

1  Relator has made no allegation that the alleged

2  violations resulted in the FDA receiving fabricated,

3  inaccurate or misleading data about safety or efficacy.

4  This is where they go on to reason that Relator's

5  conclusion that the criteria for issuing the EUA would

6  not have been met without the Ventavia data is

7  implausible.  This is under *Iqbal*, because one, the

8  decision to grant the EUA was based on the totality of

9  the evidence.  So even if you get to a point that the

10  Court needs to accept her allegations as true, even

11  though we don't concede that, but that's not what the

12  approval is based on.  The EUA is based on the totality

13  of the evidence.  That's what I talked about before.  Not

14  just the Ventavia data.

15         And then the complaint -- and the complaint

16  alleges Ventavia enrolled only about three percent of the

17  patients in the study.  So this is the reason the

18  government, not me, concludes that her allegations are

19  just not plausible.  That's what they say.  And I think

20  we went through this before, but they sum it up.

21         They say, "In sum, Relator's complaint lacks

22  factual allegations that would support a plausible claim

23  that Ventavia's clinical trial violations masked problems

24  with the vaccine that were so serious that FDA would have

25  withheld or withdrawn its authorization of the vaccine

1  had it known the truth such that Pfizer's subsequent

2  claims for government payment for the vaccine could be

3  rendered false."

4          So I think they are saying, Your Honor, that

5  as you sort of pointed out, there could be a theory here,

6  but it is just not -- her allegations aren't plausible.

7  This is the government, right?  This is the supposed

8  victim of the fraud saying all this.  So, again, not me.

9          Maybe briefly we can hit materiality.  I think

10 we have talked about that, but just to reiterate sort of

11 my points there.

12         It is really crystal clear that the

13 allegations by the Relator weren't material.  I went

14 through sort of step by step and I will just tick those

15 off again.  The government, the scientific community

16 knows the vaccine is safe and effective.  The real world

17 data shows that.  The government has continued to express

18 full confidence in the data underlying the vaccine

19 despite being aware of Relator's allegations and they

20 have continued to purchase the vaccine.

21         Again, just reiterate some of the points I

22 hit, the amended complaint, and this is all in there, the

23 Relator called the FDA hotline, sat with the FDA for

24 several hours, filed this prefiling disclosure with DOJ,

25 filed the same thing with DoD, submitted the original

1  disclosure statement, and I went through and gave you the

2  cites for all this, to the DOJ, submitted substantially

3  all material evidence and information to the U.S.

4  Attorney here in this district and then filed her

5  complaint which again has all of her allegations.  And

6  despite knowing all this, the government issued the EUA

7  and issued full approval, the conditions of the contract

8  and they have continued to express full confidence in the

9  data.  And most importantly for our purposes, they

10  continue to purchase the vaccine.  This is exactly what

11  happened in the *Harman* case.  Exactly what happened.

12          So as I said in the beginning, what Relator

13  and her counsel are trying to do is argue that their

14  views on the safety and efficacy of the vaccine should be

15  substituted for the views of the FDA.

16          Your Honor, that's very dangerous territory.

17  We can't allow everybody in the world to weigh in.  That

18  is for the experts at the FDA.  Whether you like them or

19  not, whether you agree with them, you can express your

20  view, but what the *Harman* case says is you can't bring a

21  False Claims Act case that way.

22          It is a classic policy decision for the

23  experts, not for the Relator, not for her counsel, not

24  for a jury.  There is this extreme disconnect between the

25  two, right?  The Relator wants to move forward with the

1  case.  The government says the case should be dismissed.

2  So you couldn't get more of an extreme disconnect.  I

3  read the language from *Harman*.  I think it's just right

4  on point.  It's up here on the screen again.  And that is

5  precisely the situation that we are facing here.  So I

6  don't know if Your Honor has more questions, but I can

7  kind of sum up.

8             THE COURT:  You may go ahead.

9             MR. WESSEL:   In conclusion, Your Honor, the

10  case should be dismissed because all the parties in

11  interest agree, the U.S. Government has pointed out that

12  Relator's claims are simply not plausible and Relator's

13  allegations were clearly not material to the U.S.

14  Government which has continued to express full confidence

15  in the vaccine and pay for it.  The Court should heed the

16  United States Government's request to dismiss the case.

17  And, most importantly, the Court should follow the

18  reasoning and precedent of the Fifth Circuit in *Harman*.

19  And the Court should dismiss Counts I and II of the

20  complaint.

21             THE COURT:  All right.  Thank you very much.

22  I'm going to go ahead and let the other defendants speak,

23  and I understand there may be three other issues that

24  have not really been touched on.  Well, we talked about

25  9(b) so that's fine, but the ADR component of this, I

1  don't know if that's going to be discussed or that's even

2  important.  I don't know that it is, but you all may want

3  to address that and also the scienter element.  There may

4  be other issues.  What else would you like to talk about?

5          MR. DAVIS:  I would like to talk about a great

6  deal more, Judge, but first I want to return to the

7  discussion you just had about *Trinity*.  Because that case

8  is not only controlling, it's determinative of the

9  outcome here.  And the language the Court used in the

10 *Trinity* decision should provide guidance to you in your

11 decision here.  The Court noted in *Trinity* that,

12 "Congress enacted the False Claim Act to vindicate fraud

13 on the federal government, not second-guess decisions

14 made by those empowered through the Democratic process to

15 shape public policy."

16          In other words, when the government makes a

17 decision and perpetuates that decision despite being

18 presented with the evidence of alleged fraud by a

19 Relator, in that case after a trial verdict, in that case

20 after a case involving public safety in which the

21 specifics of the alleged fraudulent statements were far

22 more specific than anything that has been alleged in the

23 entirety of this complaint, the court deferred to the

24 federal agency in that instance because that deference

25 was due based on the public policy choices that had been

53

1  made.  And the government's decision not to pursue the

2  claim in *Trinity* was as you noted quote very strong

3  evidence.  It is not they did not conclude in *Trinity*

4  that it is an irrebuttable presumption.  It is a

5  strong presumption.

6           THE COURT:  I simply cited language out of the

7  Supreme Court decision in *Escobar*.

8           MR. DAVIS:  That is correct.  And *Trinity* was

9  decided, Judge, not only after *Escobar*, that was a

10  question you asked, but after the *Escobar* decision that

11  was final in the First Circuit following a remand and

12  contains the discussion and a survey of other sister

13  circuit's laws regarding similar issues.  And came to the

14  conclusion in that particular case that -- remember, this

15  was a trial judge, "The judgment before us falls short of

16  the FCA's true setting and fails to account for its

17  Congressional purpose in drawing upon private litigation

18  to protect public coffers.  The government has never been

19  persuaded that it has been defrauded."

20           And because of that, the Court overturned the

21  jury verdict and rendered as a matter of law that there

22  could be no recovery in that case.

23           The statement that you were shown a moment ago

24  from the U.S. in this case, that there was no

25  plausibility to the claims that had been asserted, is a

1  statement just as it was in *Trinity* that the government

2  has never been persuaded that it has been defrauded.  And

3  that is strong, compelling evidence that can only be

4  overcome by specific allegations strong enough to

5  overcome the deference due to that public decision.

6          THE COURT:  I'm sure you will appreciate I am

7  obligated to follow the rulings of the opinions of the

8  Fifth Circuit as well as the Supreme Court, and the Fifth

9  Circuit did as I recall in the *Harman versus Trinity* case

10 rely upon rulings from the First, Third, Seventh, Ninth

11 and DC Circuit courts.  My question to you is --

12         MR. DAVIS:  That's correct.

13         THE COURT:  -- are there any other circuits

14 that might take a differing view on this?

15         MR. DAVIS:  I don't believe there are.  No.  I

16 believe while the specific context of the legal

17 discussion in those other circuits sometimes varied

18 because sometimes as the *Trinity* court noted it is

19 difficult to distinguish between plausibility and

20 materiality and causation.  They exist as I think the

21 Court noted at a conceptual juxtaposition.  And some of

22 the cases talked about one, some talked about the other.

23 But the courts all shared the fundamental view that a

24 government decision to continue to make payments despite

25 knowledge of the alleged falsity at issue in a particular

55

1   False Claims Act case was at a minimum strong evidence of

2   a lack of one of those legal concepts, materiality,

3   plausibility or causation, or perhaps all three.

4           THE COURT:  Let me just ask a question.  It's

5   strong evidence as the courts have said, but at this

6   phase, at a motion to dismiss phase, perhaps not at some

7   other phase or proceeding, I am to presume and assume

8   that all the allegations of the Plaintiff are correct.

9           MR. DAVIS:  Well, Judge, you noted that.  And,

10  yes, you are as a general proposition, but you are

11  actually only required to give that assumption to facts

12  that are well pled, that are specific, that are not

13  speculative.

14          THE COURT:  These are specific, would you

15  agree with that?

16          MR. DAVIS:  No, not at all, as we are going to

17  see in just a moment if we can go to the Elmo.

18          THE COURT:  Go ahead.

19          MR. DAVIS:  They are not specific.  They are

20  speculative.  They are conjectural.  They are --

21          THE COURT:  Based on her personal knowledge,

22  aren't they?

23          MR. DAVIS:  No, Judge.  They are not.  Because

24  her personal knowledge is limited.  That's a critical

25  point here.  She worked for three weeks at two sites

1    among 160 sites worldwide.  She doesn't have personal

2    knowledge of what happened in the details of the study

3    after her departure after only three weeks.  She doesn't

4    know or have personal knowledge other than what she may

5    have read in reports that are published or government

6    websites, but she doesn't have personal knowledge of

7    anything that happened after her departure.  And her

8    tenure was so limited in scope and time that she cannot

9    have the sufficient specificity required to meet

10   Rule 9(b) standards.  And she certainly can't meet that

11   standard in regard to Icon which is an entirely

12   extraneous party to this proceeding.  You alluded to that

13   earlier in connection with the case.  Icon did not

14   contract with the government.  It was hired by Pfizer.

15   Icon did not receive payment from the government.  It

16   received payment from Pfizer.  Icon did not, could not

17   have and never would have submitted certifications for

18   payment to the government false, true or otherwise.  Icon

19   did not, could not and would never have made statements

20   directly to the government in support of a payment to be

21   made by the government because it wasn't a government

22   contractor.

23              THE COURT:  I was -- I mentioned before that

24   perhaps your client Icon might have perhaps a stronger

25   defense than the other Defendants perhaps, with -- and I

57

1  recognize you all are sitting at counsel table and

2  probably want to cooperate as much as possible, but with

3  the scienter element, Icon was the middleman in this

4  process, correct?

5          MR. DAVIS:  It is not even the middleman.  It

6  wasn't directly -- it wasn't the contractor for Ventavia.

7  They were both contractors to Pfizer.  It is more akin to

8  an owner's representative or a safety inspector at a

9  construction project who is there to help manage,

10  coordinate and supervise the work being performed on

11  behalf of other people and that was necessary here

12  because of the size and the scope of the global trials

13  that were occurring all over the world at 160 different

14  sites.

15          And so Icon is more of an inspector, of a

16  manager, a coordinator, than it is a middleman in

17  connection with this case.  And to your question about is

18  our argument stronger, well, Judge, I think the argument

19  on behalf of all three or all the Defendants is at least

20  a ten.  And if you are familiar with the phrase, in

21  Icon's case it goes to 11 because it had no role

22  whatsoever in anything to do with presenting a false

23  claim.

24          THE COURT:  Even though the Plaintiff claims

25  you should have used more due diligence I guess I should

1  say to investigate the underlying data for the

2  information that was being sent up to you?

3          MR. DAVIS:  Well, Judge, fortunately we do not

4  even have to characterize what the allegations were

5  because in the Relator's opposition to motion to dismiss

6  at pages 15 and 16, they helpfully summarize for us what

7  those allegations were.  And they list nine.  Icon is

8  barely mentioned in the complaint.  Mentioned even less

9  frequently in the exhibits that are attached to the

10 complaint.  Here at these -- in these nine numbered

11 paragraphs, the Relator identifies those allegations of

12 false claims and false statements made by Icon.

13          And if you look at them, Judge, the first five

14 don't involve statements of any sort.  Certainly not

15 false statements.  Certainly not false statements made

16 with scienter.  There are for example, the fact that Icon

17 had access to all trial data.  Icon had access to

18 electronic diary data.  Icon and Pfizer are responsible

19 for data management.  Those are background facts.  Those

20 are not allegations of fraudulent conduct.  Those are not

21 allegations of false statements.  Those are details.

22          The next four -- and that's true of all of the

23 paragraphs I through V.  Beginning in VI, there are three

24 alleged violations of various statutory provisions,

25 regulatory requirements, that are generic.  There is

1  nothing specific again in regard to a specific statement

2  that was made.  No who, what, when, where and how.  Any

3  particular communication.  It's simply the bold and

4  conclusory allegation that Icon violated 21 CFR Section

5  312.64(b).

6          Even if that were true, which it is not, even

7  if that was true, that wouldn't qualify under the False

8  Claims Act.  As we have cited to in our brief, there are

9  a number of cases and specifically the *Thompson versus*

10 *Columbia Health Care Corporation* decision from 1997 when

11 the Fifth Circuit held that alleged regulatory violations

12 don't qualify as false claims, false statements under the

13 FCA.  And they noted there in coordinating the approach

14 with a Ninth Circuit decision that, "The Ninth Circuit

15 has taken a similar approach concerning the scope of the

16 FCA.  In *United States ex rel Hopper versus Anton*, the

17 Court held that violations of laws, rules or regulations

18 alone do not create a cause of action under the FCA.  The

19 Court concluded, however, that false certifications of

20 compliance create liability under the FCA when

21 certification is a prerequisite to obtaining a government

22 benefit."

23          And when I said earlier that these allegations

24 lack specificity, it is not merely that in regard to Icon

25 they are conclusory, they are arguments, they are legal

1   conclusions rather than factual bases, it's that there's

2   no connection.  There is no allegation, we will see the

3   only one that exists in a moment, that this alleged

4   failure to comply with these regulatory provisions, it

5   was a prerequisite to obtaining a government benefit.

6           First of all, as I noted, Icon didn't obtain

7   government benefits.  Second of all, there's no link

8   between these alleged violations and the subsequent

9   payments that were issued to any other party, nor is

10  there any indication that these alleged violations were

11  in any way material or caused the government to make a

12  payment it would not otherwise have.  And, in fact, that

13  argument is contradicted by the allegations in the

14  complaint that were discussed with you earlier regarding

15  the disclosure to the FDA.  Whatever the Relator in this

16  instance is alleging that Icon did in failing to

17  immediately report all adverse incidents to Pfizer, she

18  did when she reported it to the FDA.  So there can be no

19  causation.  Her allegations are contradicted by the

20  details contained in her complaint.

21          That lack of specificity, that lack of

22  scienter, that lack of fraud, is similarly true for

23  enumerated paragraphs seven and eight from the Relator's

24  response.  Eight in particular is -- seven in particular

25  is interesting.  It says Icon and Pfizer violated a CFR

1   provision by electing not to properly secure compliance

2   or discontinue shipments of the vaccine.

3          First of all, it is hard to imagine a greater

4   speculative leap than assuming that the information which

5   Ms. Jackson obtained during her brief tenure at Ventavia

6   and its small portion of the global trials that were

7   being conducted here justified halting work on a vaccine

8   in the midst of a global epidemic.  But it's even more

9   ridiculous when you consider the fact that she herself

10  reported that information to the FDA and they chose not

11  to act.

12         Again, nothing in this allegation, none of the

13  eight we have seen so far involve falsity, presentment, a

14  knowing statement, the requisite scienter, none of it

15  satisfies Rule 9(b).  None of it -- by the way, none of

16  these allegations identify who made the alleged

17  statement.  Of course there are no statements.  They were

18  either background facts or alleged regulatory violations,

19  so there can't be any specificity as to who said what,

20  when, to whom, how and why because they are not

21  statements.  And that's nowhere more apparent than in

22  paragraph 9, the last, the last allegation made against

23  Icon.  And that is that Icon failed to follow up on 100

24  outstanding inquiries about missing or inconsistent data.

25  That isn't a statement.  That isn't false.  And to my

1  point earlier, Ms. Jackson does not even allege a basis

2  on which she could know that to be true.  That is a

3  speculative allegation.  She was there three weeks.  She

4  doesn't know that the day after she left follow ups were

5  done.  Maybe they were, maybe they weren't.  She can't

6  know it and she doesn't allege it.  She just comes to

7  this conclusion regarding Icon's conduct, none of which

8  has any application or scope within the False Claims Act.

9          Perhaps in recognition of that deficiency,

10  though it is not an enumerated paragraph, the Relator

11  does in the opposition go on to talk about a form that

12  was submitted.  Form FDA 1572.  And it says that Icon

13  certified in its form FDA 1572 it would abide by those

14  protocols and regulations.  And then it goes on and says

15  in the same paragraph that it wasn't submitted to the

16  government.  It was submitted to Pfizer.  Pfizer may have

17  packaged it and submitted it to the government as part of

18  its overall application for the emergency approval, but

19  Icon didn't submit it.  It is not required to be

20  submitted to the government.

21          And the only case we have ever found that even

22  references Form 1572 was a decision called *Gross versus*

23  *Aids Research Alliance* from 2005.  It was one of several

24  forms cited by the Relator in that particular case which

25  was I believe a Medicare fraud case that was being

1  brought.  The Court in the *Gross* decision said, "In our

2  view the insufficiencies in Gross's second amended

3  complaint relate instead to the first element of the

4  claim which in a nutshell requires that the fraudulent

5  statement's purpose must be to coax a payment of money

6  from the government."

7          And that's language I would like the Court to

8  remember in just a moment when we look at this form.

9          The form that you submit has to be submitted

10 or prepared or at least signed for the purpose of coaxing

11 payment from the government.  Well, there was no coaxing

12 here by Icon.  We weren't paid by the government.  There

13 was no allegation that we were paid by the government.

14 There's no allegation anywhere in the complaint that

15 Form 1572 was in any way central to a payment made to us

16 by anyone for that matter.  We are going to see the form

17 in just a minute.

18         The Court went on and said, "As the statute

19 itself puts it, liability attaches only when a false

20 statement is used to get a false or fraudulent claim paid

21 or approved by the government.  Gross failed to plead

22 this element with the specificity required by 9(b)."

23         Ms. Jackson has failed to plead that element

24 with the specificity required under Rule 9(b) certainly

25 in regard to Icon, but in regard to any of the

1   Defendants.  That's the missing link.  That's what is not

2   contained anywhere within what you identified as a very

3   lengthy complaint with a lot of words, lot of paragraphs,

4   lot of pages.

5          But nowhere in there is there any specific

6   allegation demonstrating that the alleged false

7   statements, some of which are not even statements and

8   none of which in regard to Icon are false, but there's no

9   connection between those alleged statements and getting a

10  false or fraudulent claim paid or approved by the

11  government.  That's what's missing in the entirety of the

12  complaint.

13         And by the way, that Form 1572 talking about

14  Rule 9(b), it's interesting to note the Icon Form 172 is

15  attached as Exhibit 5 to Plaintiff's amended complaint

16  except Exhibit 5 of the amended complaint is blank.  It's

17  a representative sample the Relator alleges.  But without

18  demonstrating again who made an allegedly false

19  statement, to whom, for what purpose and how it relates

20  to a payment to be made by the government, there is no

21  False Claims Act liability and that's particularly true

22  of this particular form which actually isn't even signed

23  by the company.  It is signed by a clinical investigator

24  on behalf of the company.  It is to certify their

25  qualifications and experience before they begin working

1    on the project, not after, not in connection with the

2    payment.  It is not a certification of compliance.  It is

3    a certification that I have the requisite required

4    experience and attached is a copy of my curriculum vitae.

5           THE COURT:  But with regard to this form, the

6    Plaintiff may not have the completed form because they

7    don't have it, that's not made available to the public;

8    and second, the Defendants in this case asked for an

9    abatement of discovery pending these motions so they

10   haven't been able to find it.  The actual document might

11   very well have information that might --

12          MR. DAVIS:  It would --

13          THE COURT:  -- substantiate a claim.

14          MR. DAVIS:  It would not.  And that's my

15   point.  If you look at it, if you look at the information

16   that's being requested, none of it would substantiate a

17   claim.  Discovery would not be warranted.  The curriculum

18   vitae of the doctor who signed this particular form would

19   not connect to a false presentment of a claim for payment

20   from the government.  It's a form that is signed before

21   the investigation begins.  That's my point.  Their

22   representative sample alone, even without the details,

23   demonstrates that Form 1572 not only is not, cannot be

24   the basis for a False Claim Act as that was decided in

25   the *Gross* case because it doesn't have any connection, it

1    doesn't have as the court there put it, a connection to

2    coaxing a payment from the government.

3            This is a statement of qualification

4    equivalent to filling out a bar application to appear

5    before you here in the Eastern District of Texas.  The

6    fact that I may subsequently violate one of the court's

7    local rules or those of the Eastern District doesn't mean

8    that at the time I filled out my form saying I would

9    follow those rules in which I do and which I did, I

10   filled out a form just like this to become a member of

11   the Eastern District.

12           The fact that I subsequently failed to do so

13   doesn't mean that at the time I signed that document it

14   was fraudulent.  It was as -- the degree of specificity

15   that is required here was described by the Fifth Circuit

16   in *Longhi versus Lithium Power Technologies* in which the

17   court there discussing a case, fraud claim that was

18   pursued by the U.S., by the way brought by Relator but

19   picked up by the U.S. and ultimately successfully, but in

20   discussing the law the Court said that in order to

21   prevail on its claims the U.S. must "demonstrate both the

22   statements or omissions were literally false at the time

23   they were made and that LBT," the Defendant in that case,

24   "actually knew of and was willfully blind to or acted

25   with gross negligence plus regarding the falsity of those

1 statements or omissions."

2          This form can't qualify as the basis for the

3 imposition of liability under the FCA and there are no

4 allegations in the complaint, nor could there be,

5 regarding the person who signed it on behalf of Icon or

6 Ventavia for that matter, had knowledge of the falsity of

7 those statements at that time that they were made.

8          They couldn't have predicted the future.  They

9 couldn't have anticipated what might have occurred at

10 some point in the future and, you know, in one of the

11 Fifth Circuit cases that is particularly controlling, I

12 think the Fifth Circuit put it really well.

13          In *Johnson versus Kaner Medical Group*, the

14 Fifth Circuit said, "Under the FCA a lie is actionable,

15 but not an error."

16          And that's what the Relator is claiming.

17 Setting aside the question and the fact that she

18 disclosed all of those alleged errors to the FDA which

19 continued regardless to approve the drug and make payment

20 for it, what we are talking about, what is required at

21 its heart in a False Claims Act is a case.  This form --

22 I am sorry -- is a lie.  This form is not a lie.  It

23 can't be a lie.  Doesn't matter who signed it.  Doesn't

24 matter what the curriculum vitae was or their home

25 address was.  It wasn't a lie.  There may have been

1  errors in the subsequent prosecution of the trial,

2  although I would note for the court that identifying

3  those errors which are inevitable in any large scale

4  study of this nature was the purpose of hiring Icon in

5  the first place.

6           Finding errors, trying to address them, trying

7  to correct them in the management of the study is what

8  Icon was hired to do.  But if it made a mistake in

9  connection with that process, that's not a lie.  It may

10  or may not be a regulatory violation.  It wasn't.  And

11  the government has never suggested otherwise.  It may or

12  may not have been a mistake.  It may or may not have been

13  an error, but it was not, it cannot be a lie.  And the

14  Relator attempts to evade that.  In paragraph 277 of the

15  amended complaint which is in essence the only allegation

16  in the entire complaint in all of these hundreds of

17  paragraphs regarding the alleged scienter of Icon, what

18  they say is in connection with that Form 1572, they say

19  the acknowledgement and certification, and they mean the

20  Form 1572, was rendered false by Ventavia and Icon's

21  violations of the clinical trial protocol, FDA

22  regulations and fraudulent conduct described supra.

23           Rendered false is not actionable under the

24  FCA.  As I noted a moment ago in the *Longhi* case, you

25  have to show that at the time a statement was made it was

1  false, the Defendant knew it was false or acted with

2  gross indifference to its falsity at the time the

3  statement was made.  Because as the Fifth Circuit has

4  noted, the FCA sanctions lies, not errors.  Nothing can

5  be rendered false subsequently.

6        Judge, it's the equivalent of taking a breach

7  of contract case and claiming that every breach is a

8  fraud.  It is not.  The fraud, the knowledge of a false

9  statement has to exist prior to the execution of that

10  contract.

11        That wasn't the case here.  It can't be the

12  case here.  It could never be the case here regarding

13  that claim.  All of the allegations, even if you assume

14  they are true, every single allegation regarding Icon and

15  to the most part Ventavia as well and Pfizer, they are

16  allegations of errors.  Not allegations of lies.  And not

17  only do they need to be allegations of lies, those lies

18  have to connect.  Those lies have to have a causal

19  connection to a payment that was received.  And that's

20  what the False Claims Act boils down to.  Those two

21  elements.  There are all kind of details, all kinds of

22  ramifications, but that's it.  You got to have a lie and

23  that lie has to be connected to a payment.  And despite

24  the plethora of allegations and innuendoes that are

25  contained within this complaint, there are no lies,

1   certainly not as to Icon, and there's no allegation of

2   how that connected to a payment.

3            And when you take those two facts, those two

4   inevitable conclusions, and couple that with the

5   materiality issue that's indicated by the decision by the

6   United States not only to not pursue this claim, but to

7   file the notice of interest that it did, there's no

8   question that this claim should be dismissed and it

9   should be particularly so in regard to Icon.  Which, and

10  I'm not exaggerating, we have just reviewed Relator's own

11  characterization and summary of all of the alleged false

12  statements by Icon.  None of them were even statements.

13  They were certainly not lies.  And there was no

14  allegation of how they related to a claim for payment

15  submitted to the government.

16           The question then becomes whether or not the

17  dismissal should be with prejudice.  And I submit to you

18  that it should, Judge, because certainly in regard to

19  Icon, and we believe in regard to the other Defendants as

20  well, amendment would be futile because of what I just

21  discussed.  Errors cannot give rise to a basis.

22  Subsequent errors cannot render a previous statement

23  actionable under the False Claims Act and the Fifth

24  Circuit recently addressed that in the *Ex Rel Porter*

25  *versus Magnolia Health Care Plan* in which the court dealt

1 again, I think this was Medicaid this time payment

2 violations, in a really remarkably analogous situation.

3 It was a Mississippi case involving a nursing home care

4 provider who was rendering and billing for services which

5 the Relator claims could only be rendered or provided by

6 registered or licensed nurses.  That was the fundamental

7 issue in the underlying case.  And that just like here,

8 just as the Relator here asserts, that those regulatory

9 violations gave rise to false claims, but that case was

10 stronger.  Because in that case there were actual

11 certifications that were submitted to the government in

12 connection with actual payments regarding regulatory

13 compliance.  That was after the fact.  That was when I

14 send my bill, not when I get hired as is the case with

15 the Form 1572.  And in the *Porter* case the Fifth Circuit

16 said, "A misrepresentation cannot be deemed material

17 merely because the government designates compliance with

18 a particular statutory, regulatory or contractual

19 requirement as a condition of payment."

20          That's what they are alleging here in regards

21 to 1572.  It isn't true in regard to 1572.  But even if

22 it were, under the *Porter* case a generic requirement that

23 you follow the laws, that you comply with the FDA rules

24 and regulations, is not sufficient to give rise to

25 liability under the FCA.  The court -- here the district

1    court concluded that the contracts between Magnolia and

2    Mississippi can, "Contain broad boilerplate language

3    generally requiring a contractor to follow all laws,"

4    which is the same type of language.

5         In that situation, the Fifth Circuit, the

6    district court found and the Fifth Circuit ruled the

7    same, that when the alleged reliance was on this broad

8    regulatory compliance that was contained within the

9    contracts, and this is in a case where they actually paid

10   money to people who probably did not comply with the

11   applicable regulatory scheme, they concluded that it

12   would be futile to allow them to amend because those

13   allegations can never give rise to liability under the

14   False Claims Act.  And though they did not say so, the

15   rationale was clearly what they had said earlier in the

16   other case I referenced you to, and that is the False

17   Claims Act only governs a lie, not an error.  And that

18   can never be different here for us or for any of the

19   other Defendants and we, therefore, ask that you dismiss

20   the claim against Icon and that you do so with prejudice.

21        THE COURT:  Thank you very much, Mr. Davis.

22   Let me just ask the question about how much time will

23   Ventavia need?

24        MR. GUTHRIE:  I think I can probably get

25   through it in 10 or 15 minutes.

```
 1              THE COURT:  That's fine.  And then I'm going
 2   to give Mr. Barnes an adequate opportunity to respond as
 3   well.  But we have been going a pretty good time here.
 4   And I think that it is appropriate that we all take a
 5   ten-minute comfort break.  So we're going to be in recess
 6   for ten minutes and we will resume.
 7              (Recess, 3:50 p.m. to 4:05 p.m.)
 8              THE COURT:  Are you ready to proceed?
 9              MR. GUTHRIE:  Yes, Your Honor.  Thank you,
10   Your Honor.  May it please the Court.  I am going to try
11   to not replow all the same ground that you have just
12   heard.  I will say I just want to add to the last point
13   that Mr. Davis was making on the *Porter* case, I just
14   wanted to kind of throw that on the pile for materiality
15   because that is a recent Fifth Circuit case where the
16   court affirmed the dismissal of a pleading at the Rule 12
17   stage based on a materiality consideration.  You have
18   heard all about it.  I am not going to go into it.  I
19   would just note that for your reading that the court
20   there said when the government continues to pay despite
21   knowing about these allegations, that's this very strong
22   evidence of materiality and the court said the Relator
23   there did not meet it.  This Relator has not met it.  I
24   said I wouldn't talk about it.  I'm going to move on.
25              THE COURT:  Let me just add one thing.  I have
```

1    heard the term strong evidence.  But I haven't read a

2    case yet, maybe you are aware of one, that says

3    conclusive evidence.  Is there?

4              MR. GUTHRIE:  And that's the point that I am

5    making from the *Porter* case, Your Honor, is that when you

6    have got continued government approval.

7              THE COURT:  That's not conclusive.

8              MR. GUTHRIE:  It's not conclusive, but what

9    the Fifth Circuit says is that's very strong evidence and

10   the Relator there did not meet his increased burden, I

11   think it might even say substantially increased burden,

12   to plead materiality in the face of that fact.

13             So I'm agreeing with you, it is not

14   conclusive.  But the Relator still has a burden to meet

15   her pleading burden in the face of that really high bar.

16   Look at the *Porter* case.  The *Porter* case says the

17   Relator didn't meet it.  This Relator hasn't met it.

18             What I am going to do in my time and what I

19   have been tasked with doing is focus on two issues that

20   pertain just a little bit more closely to my client,

21   Ventavia.  The first issue is the Relator's failure to

22   allege causation for her theories of False Claims Act

23   liability against Ventavia.  You heard a little bit about

24   that from Icon.  I really am going to try to edit and not

25   overlap.  But that claim requires dismissal as to

1  Ventavia.   Second, I'm going to focus on the retaliation

2  claim which only goes to Ventavia because only we were

3  her employer.   But that claim also fails as a matter of

4  law under settled Fifth Circuit precedent and even if you

5  take everything that she says at face value.

6           So those are the two things that I'm going to

7  hit.   Let me start with causation.   As I said, I think,

8  it's important to frame that we agree with everything

9  that Mr. Wessel and Mr. Davis said, that this claim fails

10  as to every Defendant.   For the failure to plead the

11  details of a false claim, for lack of materiality, I'm

12  skipping past that and I am going straight to this

13  causation element.

14           And the reason why this matters is the False

15  Claims Act is a penal statute.   The Relator has an

16  obligation to plead every essential elements of her claim

17  against every individual Defendant.   She doesn't just get

18  to lump a bunch of Defendants together.   And she has not

19  pled that Ventavia itself violated the False Claims Act.

20  Why is that?   Two points.   One, there's no dispute

21  Ventavia did not directly submit any claims for payment

22  to the government, did not receive any government funds,

23  and the Fifth Circuit has said time and time again that

24  false claim for government payment is the core element of

25  a claim under the False Claims Act.

1           She cannot get there as to Ventavia.  She

2    can't get there as to Icon as you just heard.  The only

3    even arguable false claim here is Pfizer's invoices to

4    the government.  So we are two layers removed and that's

5    not false for all the reasons that you have heard.

6           But when we are talking about Ventavia, we are

7    two layers removed from that so she's got an uphill

8    battle.  Now, it is possible to have what we have called

9    indirect theories of False Claims Act liability, but to

10   do that, she has got to allege again with the

11   particularity required by Rule 9(b) that Ventavia caused

12   Pfizer to submit a false claim or that Ventavia made or

13   used a false record or statement that caused the

14   submission of a false claim.  So this is a causation

15   standard.  It's a proximate causation standard.  The

16   Relator has not challenged us on that.  This is a

17   standard that says to show that you caused the submission

18   of a false claim requires more than just even knowledge

19   that a false claim was being submitted or passive

20   acquiescence.  There must be an affirmative act on the

21   part of the indirect Defendant that was a substantial

22   factor in inducing the submission of a false claim for

23   government payment.  And she cannot get there.

24           And if you read her response, I don't even

25   think she argues that she can get there.  Because in her

1  response, all she does is allege this but-for chain of

2  causation.  Right?  She says but for the alleged clinical

3  trial violations at Ventavia the FDA would have never

4  granted this approval, there never would have been any

5  payments.  That's wrong.  You have heard a lot about it.

6  I will talk about it in a second.

7          But even if you took that at face value,

8  that's a but-for standard, not a proximate causation

9  standard.  I mean, every first year law student knows

10  but-for is a lower standard than proximate causation and

11  she hasn't tried to meet that proximate causation

12  standard.  She certainly hasn't done so with the who,

13  what, when, where, why required by Rule 9(b).

14          Let's take her allegations at face value just

15  for now.  I don't even think she has alleged but-for

16  causation as a matter of pleading under the federal

17  pleading rules.  You have heard this.  I won't go over it

18  again.  The participants at Ventavia sites were less than

19  three percent of the overall clinical trial.  I think she

20  says 1,500 in her complaint.  I think the real number is

21  1,100.  We can use whichever number you want.  It's less

22  than three percent.  And there is no allegation anywhere

23  in the complaint that any of those data points, much less

24  all of them, were the defining factor in the FDA granting

25  approval of this vaccine.  And that wouldn't make sense,

1  right?  There's 42,000 other data points to go off of.

2  And the United States in its statement of interest, Mr.

3  Wessel touched on this briefly, I'm not going to go over

4  it again, but the United States said on page 11 and 12 of

5  the statement of interest that first of all, she hasn't

6  connected up her alleged violations of the clinical

7  protocols with problems of the safety and reliability

8  data, but we can put that to the side for a second.  The

9  United States says even if, even if she had alleged

10  problems in the data, it would not have changed the

11  approval decision because it's based on the totality of

12  the scientific evidence and there are these 42,000 other

13  data points.  So this does overlap to some extent with

14  materiality, but causation is an independent element.  It

15  is one that she has not pled with particularity under

16  Rule 9(b).

17          At a minimum, at a minimum that means that her

18  claims against Ventavia, probably Icon as well, fail on

19  the merits.  That's Counts I and II under the False

20  Claims Act.

21          I want to say more, I am going to move on to

22  respect your time and talk about the retaliation claim

23  which is the only claim that on the defense side I can

24  talk about because we at Ventavia sort of stand alone

25  because only we were her employer.  We were her employer

1   for all of 18 days, but that's 18 days more than any

2   other Defendant.  So we are the only Defendant she could

3   even conceivably bring a retaliation claim against.  But

4   that doesn't mean it's viable, not even close.

5           And in some ways, Your Honor, this is the most

6   straightforward claim for dismissal because it does not

7   require you to wade into all of the merits of her False

8   Claims Act theory.  We think we are right, we think we

9   should have dismissal on the merits, but for the

10  retaliation piece, the only question that is relevant,

11  and this is under Fifth Circuit authority that I'm going

12  to talk about in a second, the only question is whether

13  Ms. Jackson was engaged in protected activity under the

14  False Claims Act at the time of her termination.  She was

15  not as a matter of law, and even taking her allegations

16  at face value, and so in some ways the retaliation claim

17  is a quintessential claim for dismissal.

18          THE COURT:  If we apply the McDonnell factors,

19  how would that -- even assuming they were true, how would

20  it affect Icon or Pfizer?

21          MR. GUTHRIE:  On the retaliation claim I don't

22  think it would, only Ventavia, and I believe in her

23  complaint, Your Honor, she has only alleged this claim

24  against us.  So this really does go to us.  Counts I and

25  II go to everybody.  We think you should dismiss as to

1  everybody, and we have sort of allowed the other

2  Defendants to take the lead on the argument today, but we

3  have got our own arguments in our brief.  Count III only

4  goes to us; that's what I am to going to focus on just to

5  divide up our argument time.

6          So I think this is sort of the most important

7  fact, that the Fifth Circuit, and most especially in the

8  *Patton* case, P-A-T-T-O-N, not patent.  The *Patton* case

9  has drawn a clear line between the kinds of internal

10  reports that do qualify as protected activity under the

11  False Claims Act and the kinds of internal reports that

12  do not qualify.  So to be protected activity to give rise

13  to a retaliation claim, the Relator must have complained

14  about false claims to the government, not merely

15  criticized the company's business practices.  And this is

16  not just a technical distinction.

17          So what the Fifth Circuit explained in *Patton*

18  is as an employer I am entitled to take a suggestion for

19  improvement as what it is and not as a precursor to

20  litigation.  So if you tell me you think I'm doing things

21  the wrong way, that doesn't give rise to a retaliation

22  claim because you haven't told me that you think I am

23  committing fraud on the government.  And that's important

24  because what the Fifth Circuit says is the only way that

25  an employer can have the retaliatory intent necessary to

1   give rise to a retaliation claim is the employer must

2   know that the employee is raising concerns about false

3   claims for government payment.

4           We don't have that here.  Ms. Jackson does not

5   allege, if you go look in her response, what she says is

6   I complained repeatedly about violations, alleged

7   violations, of the clinical trial protocols and about FDA

8   regulations.  Those are not complaints about false claims

9   for government payment.  That's what goes to the heart of

10  an FCA claim.  That's what's required for protected

11  activity and it makes sense that she wasn't talking about

12  false claims for government payment because Ventavia

13  didn't get any government payment.

14          THE COURT:  Payments hadn't been made yet.

15          MR. GUTHRIE:  Say that again?

16          THE COURT:  The payments had not been made

17  yet.

18          MR. GUTHRIE:  Ventavia never got any money

19  from the federal government.  The trial was privately

20  funded.  So the only party who ever asked for money from

21  the federal government was Pfizer, so she wouldn't have

22  even been thinking about false claims for government

23  payment.

24          And so that failure, and I'd commend you to go

25  look at the *Patton* case.  The *Patton* case from the Fifth

1    Circuit was a Rule 12 stage dismissal.  The district

2    court dismissed the retaliation claim.  The Fifth Circuit

3    affirmed because there was no protected activity.  And

4    what happened in that case is the Relator said I was

5    fired because I complained about fraudulent construction

6    mistakes on a project funded by the federal government.

7    He called it fraudulent.  At least that's what he said.

8    And the Fifth Circuit said that's not protected activity.

9    Because the substance of his complaints were about the

10   construction mistakes.  They were not about false claims

11   for payment to the government.

12           Here's what the court said at page 372.  "Mere

13   criticism of Shaw's construction methods without any

14   suggestion that *Patton* was attempting to expose

15   illegality or fraud within the meaning of the FCA does

16   not rise to the level of protected activity."

17           And that's what we have got here.  Because

18   what she was complaining about was these alleged protocol

19   violations.  She says, hey, I am different from *Patton*

20   because I have complained about FDA regulations.  That's

21   irrelevant.  That misses the point.  Because go look at

22   the *Escobar* case, right?  I think Your Honor might have

23   cited the language earlier.  The False Claims Act is not

24   this like generalized regulatory enforcement mechanism.

25           So even if we had violated FDA regulations, we

1  did not, even if we had, that doesn't give rise to a

2  claim under the False Claims Act.  What matters is were

3  there false claims for government payment.  And for the

4  retaliation claim what matters, did you complain about

5  false claims for Government payment.  She does not allege

6  that.  She doesn't allege it in her complaint.  She

7  doesn't try to clean it up in her response.

8          I will say because Your Honor asked about this

9  earlier, about this alleged call to the FDA.  Go look at

10 what she says in her complaint specifically.  I don't

11 think it's an accident how precise the terminology is.  I

12 believe it's paragraphs 263 and 264 of the complaint.

13         All she says is she called the FDA the day she

14 was fired.  She doesn't even allege that she told

15 Ventavia she had called the FDA.  The reason she doesn't

16 allege that is because it didn't happen.  She didn't tell

17 us.  We didn't know.  That's the other requirement here,

18 is that she must be engaged in protected activity.  The

19 employer must know that she was engaged in protected

20 activity.  Those elements were not met here and for that

21 reason the retaliation claim needs to be dismissed.

22         I would just point you to two other opinions.

23 I think I promised settled Fifth Circuit law.  So I

24 better cite you to at least one more Fifth Circuit case.

25 The *Robertson* case from the Fifth Circuit, that's a 1994

84

1  case.  That was a case where the Relator raised

2  complaints about billing charges to the federal

3  government and the Court said that's not protected

4  activity as a matter of law.  Because it was his job to

5  raise concerns about bills.  He didn't say I'm going to

6  bring a qui tam action.  He didn't say this is fraudulent

7  or illegal or unlawful.  He just raised concerns about

8  the bills.

9           At best her job here was to raise concerns

10 about the clinical trial protocol.  That's what she was

11 doing.  Even if we take her allegations at face value.

12          I will also point you to the *Reddell* opinion

13 from this division.  Judge Crone dismissed the

14 retaliation claim at the Rule 12 stage because, again,

15 the Relator there raised a billing concern, did not raise

16 any concerns about illegality within the meaning of the

17 False Claims Act.

18          So agree with everything that they have said,

19 counsel went into should be dismissed as to everybody,

20 but on retaliation, where we stand alone, she just has

21 not met the elements of pleading a violation.

22          THE COURT:  While I have you here, and perhaps

23 you can speak for all of the defendants here, there is

24 this issue about whether or not this agreement needs to

25 go to some sort of Dispute Resolution Procedure.  Is that

85

1   really a non-issue?

2           MR. GUTHRIE:  Your Honor, we were not a party

3   to the contract and so I'm not an expert like Pfizer is.

4           THE COURT:  That's one of the points I was

5   going to make.

6           MR. GUTHRIE:  What I would say is I think

7   Pfizer has made the point, I think there's valid grounds

8   for that.  I think there are stronger maybe even public

9   interest-type grounds that come in the analysis before

10  you even got to the ADR piece.  And so not being a party

11  to the contract I am not going to tell you how to read

12  it.  I would just say I think there are stronger grounds

13  here for dismissal.

14          MR. CARROLL:  Your Honor, if I can, Mr.

15  Hoffman -- I think that's the only point that you raised

16  in the early stages of the hearing that we had yet to

17  cover on the defense side.  And Mr. Hoffman was going to

18  give you a few minutes on that.

19          THE COURT:  Okay.  That's fine.

20          MR. GUTHRIE:  Your Honor, if you have no

21  further questions, I'm happy to sit down.  We would ask

22  you to dismiss all three complaints as to Ventavia.

23          THE COURT:  Thank you.  Mr. Hoffman, I will

24  let you address this dispute resolution procedure issue.

25          MR. HOFFMAN:  Thank you, Your Honor.  It is a

86

1  real hurtle for the Relator in this case, the ADR

2  provision.  We have been going for almost two and-a-half

3  hours.

4             THE COURT:  Now, she's not a signatory to this

5  contract.

6             MR. HOFFMAN:  She is not, but --

7             THE COURT:  How can it apply to her?

8             MR. HOFFMAN:  It certainly applies to her

9  because she stands in the shoes of the United States

10  Government.  This is not a personal cause of action to

11  her.  Set aside the retaliation piece.  The ADR provision

12  does not apply to the retaliation claim.  That's her only

13  claim that's personal to her.  Counts I and II are claims

14  brought on behalf of the United States Government.  And

15  she stands in the government's shoes and any defense that

16  could be raised against the United States apply equally

17  to the Relator.

18             And in this case there is clear contractual

19  language in the contract for the initial purchase of the

20  vaccine where the government agreed that before they

21  brought any claim, that's extremely broad language, any

22  claims arising under the agreement, that they had to take

23  those to an administrative proceeding before they could

24  pursue an action at law.

25             THE COURT:  Is this a claim under the

1   agreement?

2          MR. HOFFMAN:  It absolutely is.  I would like,

3   Your Honor, if you would -- with your leave here, to

4   please focus on the actual language of the Dispute

5   Resolution Procedure which is paragraph 7.02, base

6   agreement.  That's Exhibit A to Pfizer's motion to

7   dismiss, document 37.

8          THE COURT:  I have it.

9          MR. HOFFMAN:  If you go to paragraph 7.02, it

10  says that the ADR provision applies to, "Any

11  disagreement, claim or dispute among the parties

12  concerning questions of fact or law arising from or in

13  connection with the agreement," and this is the key

14  language, "and whether or not involving an alleged breach

15  of the agreement."

16          To give the language effect, that means it is

17  not just breach of contract action, it is not just

18  contract based actions.  It's any claim, contractual or

19  statutory, that relates back to this agreement.  This is

20  extremely broad language between the real parties in

21  interest in this case, the federal government and Pfizer.

22  And any claim that relates to this agreement has to go to

23  a mandatory administrative process before there can be an

24  action in federal court over the dispute.

25          And it's not unusual for these sorts of

1    provisions to be in government contracts.  Courts have

2    enforced similar Alternative Dispute Resolution

3    provisions in government contracts to block the United

4    States from pursuing False Claims Act claims when they

5    fail to first pursue ADR.  We cite this in our brief in

6    the Pfizer brief, docket 37, page 29.  There is the

7    *Bankers Insurance* case.

8              There the Fourth Circuit said, "We do not

9    share the trepidation of the government regarding

10   arbitration of its FCA claim.  The government should

11   comply with its contract obligations and it cannot avoid

12   them merely by invoking a statutory civil claim such as

13   one contemplated under the FCA."

14             And I would also inform Your Honor or ask Your

15   Honor to take note that when the Relator filed her

16   opposition brief on this point they never say that the

17   contractual ADR provisions don't apply to us because I

18   wasn't a signatory to the contract.  That's not what they

19   say.  They say oh, that's a permissive provision.  It

20   says may.  That's a complete distortion of what the

21   contract says.  I would -- what it really says is, "Any

22   disagreement, claim or dispute among the parties

23   concerning questions of fact arising from or out or in

24   connection with the agreement, whether or not involving

25   an alleged breach of the agreement, may be raised only

 1  under this article."

 2          THE COURT:  Well, the way you read that, you

 3  kind of de-emphasized the word "may."

 4          MR. HOFFMAN:  Well, I can read it with full

 5  emphasis, Your Honor, but you have to give effect to the

 6  word "only."

 7          THE COURT:  But there is a difference between

 8  "may" and "shall."  Is there not?  Doesn't say it shall

 9  be.

10          MR. HOFFMAN:  I think that saying may only and

11  shall are synonymous.  That's the argument they actually

12  make to try to get out of this pickle.  But it's actually

13  a controlling pickle.  They can't get out of it.

14          The ADR provision has to be satisfied before

15  this action can proceed before Your Honor.

16          THE COURT:  Okay.

17          MR. HOFFMAN:  With that, unless you have any

18  other questions.

19          THE COURT:  Thank you very much.  Mr. Barnes,

20  we have not forgotten about you.  Would you like to be

21  heard?

22          MR. BARNES:  Yes, Your Honor.

23          THE COURT:  Please.

24          MR. BARNES:  We are going to break up the

25  arguments as follows, Your Honor.  I'm going to deal with

1   sort of a general overview on the materiality question

2   and the express and implied fraud claims.  Mr. Mendenhall

3   will address fraudulent in the inducement and the ADR

4   claims and anything that I fail to cover.

5           And then last, Lexis Anderson is going to be

6   addressing the retaliatory discharge claims.  As we have

7   provided notice, she is a newer attorney and actually

8   this will be her first oral argument in any matter.  I

9   just wanted to say I appreciate the Court having those

10  kind of protocols available.  It is increasingly

11  difficult to get opportunities for newer attorneys.

12          THE COURT:  One of the first things I did

13  after assuming the bench was to put that as a general

14  order.  I have noticed that a lot of new lawyers did not

15  have an opportunity to get into court as they did when I

16  got out of law school.  I tried my first lawsuit a week

17  after I was licensed.  That's the way it was.  And

18  there's no better way to learn the craft of being an

19  advocate or a lawyer than actually getting into the

20  courtroom and do it.

21          And so I put in a general order that for new

22  lawyers, even if we don't need a hearing, they can

23  request -- a new lawyer can request a hearing and we will

24  give a hearing to any new lawyer.  So how long have you

25  practiced?

1          MS. ANDERSON:  A little over a year.

2          THE COURT:  Good.  Well, I am glad to see you

3     take advantage of it.  You may proceed.

4          MR. BARNES:  Thank you, Your Honor.  As we

5     look at the overarching aspect, I really like Justice

6     Thomas's opinion in *Escobar* because he kind of breaks

7     down the brass tacks.  It's a unanimous decision of the

8     Supreme Court.  Defendants agree it's the most important

9     in this context.

10          And Justice Thomas is trying to explain

11    materiality.  He is like okay, why are we deciding that

12    there is actually -- we are going to allow an implied

13    theory, we are going to allow people to pursue false

14    claims when there has been no express condition of

15    payment, when there has been no overt false comission

16    statement, when it's only been by omission?

17          And Justice Thomas gives an example.  He says

18    imagine the government bought firearms.  And it turned

19    out when they got the firearms the firearms didn't fire.

20    They didn't work to actually be able to shoot anything.

21    He goes imagine that there was no express condition of

22    that anywhere.  Imagine there was no regulation or

23    statute that said hey, by the way, if you sell the

24    government a firearm it's got to actually fire.  He goes

25    we all recognize that goes to the very essence of the

3-1-23 Motions Hearing

92

1    bargain.

2         And when we are looking at these False Claims

3    Acts, we should step back and look at what is the essence

4    of the bargain?  What is being negotiated here?  What is

5    being sought here?

6         Here, the reason why this statement of the

7    work has all these references over and over again to the

8    clinical trial process and FDA approval and FDA

9    authorization is because what the federal government is

10   buying is as it describes in the statement of work, a

11   safe, effective vaccine for the prevention of Covid-19

12   that Pfizer is going to get on extraordinary scale and

13   speed.  Now, why was there doubt about the speed function

14   of it?  Why is the government even involved in this?  Why

15   isn't it something Pfizer is doing on its own?

16        It's because no vaccine had ever been produced

17   in such a record time frame.  Hence the label Operation

18   Warp Speed.  And that's why what Pfizer was proposing,

19   the statement of work keeps talking about is hey, we have

20   a unique way to get through the clinical trials in

21   incredible speed.  We have a new MRNA platform delivery

22   mechanism that will allow us to race through this process

23   and yet still get a safe, effective vaccine for the

24   prevention of Covid-19.  Not for its diagnosis, not for

25   its treatment, but for the prevention.

1           And it is in that broader context that is the

2    scam being disclosed in the amended complaint by Brook

3    Jackson.  They focus a lot that she only saw one little

4    piece of it in a period of time.  But it was enough to

5    witness disturbing violations of the most elemental

6    rules.  Indeed, the statement of work actually says what

7    kind of clinical trial Pfizer is going to do.  It refers

8    to it on page 4 of the statement of work which is for the

9    court reporter at docket 17-1, Exhibit 10 to the second

10   amended complaint.

11          It talks about it being a multi-stage, this is

12   about middle under the clinical and regulatory approach,

13   that Pfizer will be doing a multi-stage and multi-phase

14   trial, including the pivotal efficacy portion designed to

15   generate the data needed to achieve FDA approval or

16   authorization for use of one of the vaccine candidates.

17          This is a randomized placebo controlled

18   observer blind dose finding and vaccine candidate

19   selection study in healthy adults.  The study is

20   evaluating the safety of the vaccine.  Indeed, that will

21   be repeated, I mean I thought about going through all of

22   them, but that would be probably duplicate of time.  But

23   I have over a dozen instances where the statement of work

24   is referencing either FDA authorization, FDA approval,

25   safety of the process, clinical trials, we need the

94

1  clinical trial data.  They are even required to produce
2  to the Defense Department what they are also giving to
3  the FDA to include them in audit inspections, to notify
4  them of any risk or any problems or any warnings or any
5  issues.  That's there because that's the essence of the
6  bargain.  We are going to have this incredible clinical
7  trial process that is going to uniquely achieve speed and
8  scale that will give you a safe, effective vaccine for
9  the prevention of Covid-19, words that are used I think a
10 half dozen times.
11         As we stand here today, when Brook Jackson
12 filed this, she had just witnessed every clinical
13 protocol violation that she could have ever seen in all
14 of her work all happened at once.  She saw it at every
15 level.  She saw it at such scale, at such severity, she
16 reported it to everyone she could.  And when she went up
17 the food chain, she was ultimately fired after she
18 reported it to the FDA.
19         What she was witnessing is what we now know
20 and what the world now knows, according to the
21 government's own vaccine adverse event reporting system,
22 this particular drug turns out not to be very safe, not
23 to be very effective, not to even be a vaccine, because
24 it doesn't even prevent Covid infection which is what the
25 statement of work was all about obtaining.  That's why we

1  claim that the invoice is false because the invoice uses

2  the language about we attest, we certify, that this is --

3  I think the exact words are in accordance with the

4  agreement and right after that it says the work reflected

5  has been performed, the work in the statement of the

6  work.  That language is not coincidental.  That invoicing

7  language comes from the statement of works reference back

8  to the base agreement which is at document in the docket

9  37-1.  And in provision 5.04 (a) which is under 5.04

10 invoicing instructions, and it talks about payment method

11 types.  And what are they talking about?  They have all

12 these different ways you can invoice, but in each one the

13 same language keeps coming back.  Provided that it has

14 verified compliance with the statement of work, provided

15 it has verified compliance with the statement of work.

16 It says that I think a half dozen times in that section.

17          Indeed, that exact language, I have certified

18 that the amounts invoiced are for costs incurred in

19 accordance with the agreement, that the work reflected

20 has been performed, that language is required by the

21 contract.  It also requires that they contain the date of

22 the invoice and contain what agreements that they are in

23 agreement, what agreements that they are in compliance

24 with.  They say the base agreement and the project

25 agreement number, the invoice that Your Honor identified,

1  I believe it's docket 37-2, has that right at the top.

2  It says this is billing for complying with these

3  agreements.

4          What's in these agreements all the way through

5  is as it says as Your Honor identified at the very

6  beginning, regulatory planning, it doesn't say Pfizer

7  will try, doesn't say Pfizer may.  It says Pfizer will

8  meet the necessary FDA requirements for what?  For just

9  getting authorization?  No, it says for conducting

10 ongoing and planned clinical trials.  It makes further

11 clear that the only reason there isn't a bunch of the

12 additional clinical trial language in it, it says here is

13 why.  By the way, it says assuming the clinical data

14 supports the application, that's all the way through

15 there as well, they constantly say the clinical data has

16 to support what you are doing.  It says, "Given that

17 these clinical trials are regulated by the FDA and HHS,

18 there is no need for separate regulation by the U.S. Army

19 medical research and material command."

20         Here everything about this, going back to

21 Justice Thomas's provision where he talks about what

22 materiality is, about the firearm that didn't fire, where

23 here we had the vaccine that wasn't a vaccine, that

24 wasn't safe and it wasn't effective, that it didn't work

25 as designed, which is a big difference between this case

1  and some of the cases cited by the Defendants, is he

2  talks about does it have the potential to influence, the

3  capacity to influence a decision maker.  Do we have any

4  doubt that if Pfizer had come to the FDA and the Defense

5  Department and said by the way, this drug, we can't tell

6  you it is safe because our clinical data has been

7  compromised.  We can't tell you its effective.  We can't

8  tell you that it's even a vaccine.  We can't tell you it

9  will actually prevent Covid at all.  Does anybody believe

10 that that could not have influenced the Defense

11 Department in writing those checks up to $1.9 billion?

12 Or couldn't have impacted the FDA?

13         And that's the critical issue here.  Now, to

14 the degree that there's ambiguity in the contract, then

15 that's reasons for discovery.  If there is a need for

16 more particularity, that's a reason for an amendment

17 rather than dismissal.  Indeed, I think the words of the

18 Fifth Circuit is there has to be certainty there could

19 never be a claim for dismissal with prejudice to be the

20 remedy.

21         But to give just one illustration, they cite a

22 case from the First Circuit, *Depuy*, I think they used a

23 different word for it, but it's at 865 F.3d 29, First

24 Circuit 2017.  What they fail to mention in that case

25 even though the FDA continued to pay, the Court found

1  that the violation of FDA regulations such that it led to

2  the device not being the same as the one that was

3  supposed to be the deliverable made it a sufficient claim

4  to get past the motion to dismiss stage.

5          Indeed, *Escobar* is a perfect example of this.

6  In *Escobar*, the government was apprised and the relevant

7  agencies were notified of the allegations.  Yet the First

8  Circuit on remand said the claim survived at the pleading

9  stage.  Because unlike the *Trinity* case, which went all

10 the way through trial, the court emphasized that at the

11 pleading stage, it has to be assumed it is material

12 unless there is evidence to the contrary presented in the

13 discovery stage.

14         So it might be a summary judgment, maybe the

15 evidence will overwhelmingly come in that the FDA will

16 come and say we agree that everything Brook Jackson

17 alleged is true, we have actual knowledge that is true,

18 it doesn't change our position whatsoever.  And the

19 Defense Department may say the same.  But that's not part

20 of the four corners of the pleadings at this stage of the

21 case.  Indeed in *Escobar*, even though they had -- the

22 U.S. Government had not intervened, even though the

23 government had continued to pay the bills at issue, both

24 the Supreme Court and the First Circuit said the claim

25 survives a motion to dismiss.  That is for the same

99

1   reason as here.

2          In the end, the statement of work references

3   the FDA will meet these standards because the entire

4   essence of this bargain was a safe, effective vaccine for

5   which the best metrics were clinical trials that complied

6   with the best rules for that safety and efficacy.  We now

7   know, Brook Jackson saw, they weren't complying with it.

8   And now the whole world has the consequences.  Tens of

9   thousands of recorded deaths according to the

10  government's own vaccine adverse event reporting system,

11  millions of people reporting disabilities and it's

12  because -- not because the FDA has said what Brook

13  Jackson said is true, right now the FDA and the

14  government is taking Pfizer's word for it.  They are

15  saying we can't prove it.  That's not an argument for

16  dismissal, that's an argument for discovery.  Thank you,

17  Your Honor.

18          THE COURT:  Thank you very much, Mr. Barnes.

19  We have more argument.

20          MR. MENDENHALL:  Thank you, Your Honor.

21          THE COURT:  I am just curious, Mr. Mendenhall,

22  you are not in the same law firm; is that correct?

23          MR. MENDENHALL:  That is correct, Your Honor.

24          THE COURT:  But you all work together on

25  cases?

3-1-23 Motions Hearing

100

1        MR. MENDENHALL:  We do, yes.  Thank you.

2        THE COURT:  Go ahead, Mr. Mendenhall.

3        MR. MENDENHALL:  Mr. Barnes was very expansive

4   in his comments and I think covered a lot of the ground

5   that I was thinking about covering.  Nevertheless, the

6   fraudulent inducement issue, I want to make sure that we

7   do emphasize that.  And I do -- before I get going on

8   that, I want to talk about some of the cases.  I was

9   writing these down as they were being mentioned.  *Cimino*

10  *versus IBM* was one that came up.  And the IRS had

11  continued to pay on that case.  I just want to go over

12  these cases real quickly.  That case did not get

13  dismissed on 12(b)(6).  It went into discovery.  And it

14  got dismissed after that.  Then *U.S. versus Aerodex*,

15  which Attorney Barnes mentioned.  They had a generator

16  that they delivered, they were supposed to deliver.  Then

17  they had another generator that would do the same thing

18  and they slapped a label on it claiming it was made by a

19  different company.  So even though it was the same -- it

20  did the same thing, that lie, that lie, which is the

21  basis of these claims, caused it to be a false claim.

22        In *Thompson versus HCA*, which I believe was

23  claimed to be very similar to this, I think it was on all

24  fours, they cited that a regulatory violation does not

25  equal a false claim, which we agree with.  But this case

1 did go through discovery again.  So it got into discovery

2 as to whether some precursor to the regulation which we

3 have here, the request for an EUA, some precursor

4 activity had occurred.  And that did again, it went into

5 discovery.  I am arguing against the 12(b)(6) dismissal.

6          *Magnolia Health*, that *Porter versus Magnolia*

7 *Health* is curious to me as well because in reading that

8 case, whether you can use an RN versus an LPN for your

9 staff, you find out that there was no regulation in that

10 case.  There was no regulation that they had signed off

11 on.

12          Here there were regulations and I'm going to

13 move on from these, but most of these cases it turns out

14 they went beyond this stage that we are at now, the

15 12(b)(6).  That's my point.  I think we need to get into

16 discovery and to explore particularity, materiality and

17 we also need to explore this issue of fraudulent

18 inducement and what the FDA knew and when it knew it.

19          And my point with the FDA itself is that Ms.

20 Jackson's complaint, the actual complaint, was filed

21 after the approval.  It was filed on January 8th, 2021,

22 whereas the approval came out in December.

23          And, Your Honor, my experience with the

24 government, and our filings, I hate to say, we submit

25 documents to the government in preliminary disclosures

1    and they are rarely dealt with in a serious manner.

2           Only when you get that complaint filed and

3    you're pushing to get their attention do you get those

4    AUSAs in a room to really discuss what's going on.  I am

5    just talking about what's going on in the background

6    here.  So our federal bureaucracy does not pay much

7    attention to those preliminary filings.  Once you have

8    put your name on a complaint and you filed it, that's

9    where you get the attention.

10          So for me to -- for the FDA to approved it

11   prior to really reviewing Ms. Jackson's complaint, I get

12   that.  It fits what I know how our bureaucrats proceed.

13   And then there was a little bit of discussion about the

14   year that went by in terms of the investigation.  I think

15   the year does show that some people at the FDA were

16   concerned about what was happening here.  And why were

17   they concerned?  Because there was apparently a

18   fraudulent inducement to the FDA to grant this EUA.  The

19   data that was submitted was fabricated, altered and

20   compromised.  And we know from Brook Jackson who was in

21   that site for a little over two weeks what happened

22   there.  And some of these may seem minor, some of these

23   may seem more major.  But let's just go down the list

24   that she has in her complaint.

25          Fabrication and falsification of blood draw

1  information, vital signs, signatures and other clinical

2  trial data.  Your Honor, signatures were not on the

3  informed consent forms.  They didn't do the informed

4  consent until sometimes after the person had been

5  injected with either a placebo or a vaccine.  That

6  informed consent came later.  That's not how this works.

7            Enrollment and injection of ineligible

8  clinical trial participants, including employee's family

9  members.  They were paid to come in and participate in

10 this trial.  They brought people in who had conflicts of

11 interest, had improper relationships.  That is not the

12 type of person that you want to have in a trial.

13            Failure to maintain temperature control.

14 Basic stuff for the vaccines.  And part of that has to do

15 with the failure to hire competent people.  People as

16 Your Honor may know who had worked at a taco stand a few

17 weeks before.  Failure to monitor patients after

18 injection.  Principal investigator oversight failures.

19 They weren't even present.  They weren't doing the

20 oversight that they were supposed to do to review and

21 make sure that the clinical trial participants were being

22 treated properly and that this was being managed

23 properly.  It just goes on and on.  Improper injection of

24 the vaccine, over diluting it, under diluting it, using

25 the wrong needle size, putting it in the wrong place, not

1  aspirating the needle.  It goes on and on.

2           Safety and confidentiality issues, including

3  HIPAA violations.  And I think one of the biggest things

4  that happened that is most important here in any clinical

5  trial is that this was unblinded.  There was general

6  unblinding with the patients.  This is critical to having

7  proper data that can be analyzed that it is blinded.

8           And this was generally unblinded.  So another

9  criticism that I heard over here was the but-for issue.

10  Well, but-for does have a role to play.  But for the

11  false data this EUA would not have been granted.  And

12  there's a lot of but-fors that actually matter here.

13  There's the investigational new drug application that had

14  to be submitted.  There's the Form 1572 that had to be

15  submitted.  There's the IRB reporting requirements that

16  had to be fulfilled.  And the DoD as Attorney Barnes

17  mentioned is relying on the FDA and relying on these

18  processes to be carried out properly.  It says it right

19  in the statement of work.  That's critical.  These are

20  all things, but for the failure to follow the IND

21  requirements, the 1572 requirements, the statement of

22  work requirements and the institutional review board

23  requirements, but for that, I mean, all of those things

24  they wouldn't have gotten an EUA unless they had lied

25  about the fact that they weren't following those

105

1   requirements.

2         These regulatory violations destroyed the

3   integrity and scientific value of the data that was

4   submitted to the FDA.  That's what all of these

5   requirements are to do, is to maintain that integrity.

6   And the violations caused that integrity to lapse.

7         The other thing that I want to point out, the

8   other transactional authority contract with ATA, and I

9   think this is really interesting.  The government has --

10  you know, they are talking about payment, how payment

11  keeps going on and on.  They won't stop the payments,

12  right?  The government under that contract has no right

13  to withhold payment.  Come on.  No wonder it is

14  continuing.  The government has no right to withhold that

15  payment.

16        One of the things with a national emergency is

17  -- the False Claims Act was passed during a national

18  emergency, the Civil War, and what Lincoln really cared

19  about was the truth and the integrity of our contractors.

20  And that's where we are having a problem here.  The truth

21  and integrity has been destroyed in this process and it's

22  resulted in an EUA that is now injuring one out of every

23  20 people who takes the shot apparently.

24        I wanted to say a couple of things about the

25  Alternative Dispute Resolution.  First of all, I don't

1    agree that the alternative dispute is arising from the

2    agreement.  In fact, when you have a fraud in the

3    inducement, what happens is the agreement becomes

4    voidable, and we think that with the facts that Brook

5    Jackson has brought forward that that agreement can be

6    voided and that requirement for ADR within that agreement

7    then is no longer valid.

8               The second thing is, this is not pled in our

9    -- or is not briefed, but I want to raise an issue of

10   executive versus legislative power.  And I think there is

11   an issue in terms of the legislature, our Congress laying

12   out a process for recovery under the False Claims Act and

13   for a recovery for whistleblowers, and they are not

14   saying anything about ADR.  And I think that the

15   executive, this is not a private company now, this is the

16   government, so the executive and the government coming in

17   and signing a contract that gives away a right that

18   Congress created for the whistleblower and for the

19   American taxpayer, I think that's a violation of the

20   separation of powers, Your Honor, and just as I was

21   sitting here listening to the statements that really

22   struck me and I want to make sure the Court is aware of

23   it.  I know the Court can take judicial notice of it's --

24   our legislative versus executive power.  The separation

25   of power.

1          I have a note here about the statement of

2    interest by the federal government as well.  You know,

3    it's not whether or not the fraud did influence the

4    decision, which we do think it did.  But the standard of

5    the court at this point under 12(b)(6) is could the fraud

6    and the falsity have potentially influenced the decision.

7    We don't have to have -- prove at this stage that it did

8    influence the decision, just that it could have

9    potentially influenced that decision.  So I think that's

10   the standard on that and thank you very much, Your Honor.

11          THE COURT:  I just want to ask you, you

12   touched on something and I asked it by way of questions.

13   Under -- what's been suggested is the law that I must

14   follow is set forth by the Supreme Court and the Fifth

15   Circuit, that notwithstanding all these things that you

16   mentioned, that these variations, these failures to abide

17   by procedures, policies, procedures, et cetera, add all

18   that together, assume it is all true, once the government

19   says or an agency says we got that, we are just ignoring

20   that, we are going to go a different route.  That's a

21   decision that's not reviewable by the courts and

22   typically we have a series of checks and balances in our

23   Constitution, but apparently under what's been argued,

24   case law says that in this area I as a judge don't have

25   that authority to check and balance on that particular

1  point.  What is your response to their legal arguments?

2         MR. MENDENHALL:  Are you particularly focused

3  on the *Harman versus Trinity* case?

4         THE COURT:  Yes, I am.

5         MR. MENDENHALL:  I think that first of all, if

6  the U.S. Government, if it wants this case dismissed, it

7  can come here and dismiss this case.  And it did not do

8  that.  So it has allowed the case to continue for

9  whatever reason.  I don't pretend to understand what

10  they're thinking.  But we have been allowed to continue,

11  and if it wants to dismiss it, it can do it tomorrow.

12  Your Honor is aware of that.  And they have been doing

13  that more and more in recent years under the False Claims

14  Act.  It is not doing that.  Instead, what it did, it

15  said hey, Relator, your fraudulent inducement theory

16  actually is correct, that is one of the ways to go after

17  this, but we think maybe you lack some materiality here.

18         Guess what?  I think what needs to happen then

19  is we need to have discovery, not just against these

20  companies, we also need to have discovery with the

21  federal regulator and the FDA and talk to them about what

22  the standards are.  And, Your Honor, I can tell you I

23  have done that in other cases.  And it is very

24  interesting to talk to the bureaucrats about what their

25  decision-making is and what the standard should be.  And

109

1    that's what I think we should be able to do here.

2              And if the government wants this case gone,

3    why, they can come in tomorrow and get it gone, Your

4    Honor.  But for us, I want to say one other thing about

5    that because I think this is something that gets lost a

6    lot.  It's been a concern throughout my career.

7              I think Your Honor and I, Robert, we have seen

8    the power of the jury be diminished over the last several

9    decades.  And I think that the sovereign in this country,

10   it is not the FDA.  Guess what?  It is not even President

11   Biden or President Trump.  The sovereign are the people

12   and the people are who sit on that jury and they decide

13   whether our regulations were properly applied, whether

14   our bureaucrats did the right job and whether there were

15   lies told in order to get an EUA in order to get three or

16   $4 billion out of the U.S. taxpayer.  That's who needs to

17   make this decision and that's who sovereign is and that's

18   the interest that's material here, is the interest of the

19   people.

20             THE COURT:  I appreciate your comments.

21             MR. MENDENHALL:  Thank you.

22             THE COURT:  All right.  Ms. Anderson.

23             MS. ANDERSON:  Good afternoon, Your Honor.

24   May it please the Court.

25             THE COURT:  Yes, indeed.

110

1          MS. ANDERSON:  And to re-emphasize what Mr.

2  Barnes said, I do appreciate the encouragement and

3  opportunity to participate in oral argument like this.

4  So I will be discussing --

5          THE COURT:  If lawyers don't develop the

6  craft, we might as well take our Seventh Amendment right

7  to a trial by jury and rip it out of the Constitution

8  because we don't have any lawyers who can effectively

9  assert their clients rights in front of the jury and

10  diminish the right of the people to exercise a right of a

11  trial by jury.  So I commend you on your joining a great

12  profession and I hope you will continue to develop.

13          MS. ANDERSON:  Thank you, Your Honor.  So as

14  was mentioned, I will be discussing the retaliation claim

15  which is exclusively against Ventavia Research Group.

16          Now, just to start off, I want to emphasize

17  that a retaliation claim is its own entity.  A Relator

18  does not have to bring a winning, although Ms. Jackson

19  has sufficiently alleged claims for fraud against the

20  government under the FCA, she would not have to bring

21  those claims or have a winning claim in order to maintain

22  a retaliation claim against Ventavia, her employer.

23          Now, as was mentioned, to satisfy a

24  retaliation claim she does need to prove that she was

25  engaged in protected activity, that Ventavia knew of that

 1  activity and that she was retaliated against as a result

 2  and she has more than sufficiently pled all three of

 3  those claims.

 4          Now, Defendant Ventavia focuses primarily on

 5  two distinct cases which are both distinguishable from

 6  the case at hand and not determinative for a variety of

 7  reasons.  Now, primarily they do not sufficiently address

 8  the 2009 and 2010 amendment to the FCA which expanded the

 9  retaliation provision to include acts done by the

10  individual in furtherance of an action under this section

11  or other efforts to stop one or more violations of this

12  subchapter.

13          So the *Patton* case that was referenced, first

14  of all, is distinguishable on its facts because it was

15  brought by a carpenter against his employer, a

16  construction company.  And he complained primarily about

17  faulty construction that was unrelated to certifications

18  or contractual provisions required for government

19  payments, did not reference any federal regulation

20  violations, unlike this case at hand.

21          Secondly, the *Patton* case perhaps because it

22  failed on the merits to begin with did not address the

23  amendments to the FCA in 2009 and 2010.  Similarly, the

24  *Robertson* case was decided before those amendments were

25  even implemented and so should not be determinative here.

3-1-23 Motions Hearing

112

1          Now, we do have some guidance from *Thomas v.*

2  *ITT Education Services* which is a Fifth Circuit case that

3  expands on the rule for protected activity.  Stating, "A

4  protected activity is one motivated by a concern

5  regarding fraud against the government."

6          This is certainly what we have in this case

7  now.  And other circuits have also provided guidance for

8  the Fifth Circuit and shown that to qualify as protected

9  activity, an employee's actions must be aimed at matters

10  that could have reasonably led to a viable claim under

11  this act or shown a distinct possibility of litigation

12  under the FCA.

13          Now, the Fifth Circuit does not have a

14  published opinion explaining in detail or emphasizing

15  their position on this new amendment and so we can look

16  to other circuits and the unpublished opinion in *Thomas*

17  for guidance on that.

18          Now, turning to this case at hand, there have

19  just been a bevy of examples of Relator reporting all of

20  the violations that she saw to her employer, Ventavia.

21  From the enrollment and injection of ineligible trial

22  participants, falsification of data, unblinding of the

23  study, issues with adverse event reporting, use of

24  unqualified staff as vaccinators and many other

25  violations that my co-counsel have mentioned; these are

1 not light allegations. They go to the very heart of

2 clinical trial practice and Ms. Jackson as an expert in

3 this field for a very long time recognized these

4 violations and gave them the weight they deserved and

5 tried at every opportunity through personal

6 conversations, phone conversations, texts, e-mails to

7 communicate these issues to her employer. And she was

8 terminated as a result.

9        Now, it was clear that Relator was attempting

10 to expose the illegal activity which she knew was going

11 to be used -- these clinical trials were going to be used

12 for the basis of all of the vaccine rollouts coming out

13 and the basis of a very -- I mean an enormous government

14 contract and something that was going to affect the

15 public health of every single citizen in this country.

16 So Ventavia knew that she was attempting to expose all of

17 these federal regulation violations and illegal activity.

18 It was clear that she was investigating these allegations

19 and these violations through photographs that she took,

20 through conversations she had with her employers and her

21 supervisors, through her efforts to contact Pfizer

22 regarding these violations and ultimately her phone call

23 with the FDA alerting them to these fraudulent

24 activities.

25        Now, Defendant wants to point to the fact or

1  allege that these do not rise to the level of indicating

2  that there could be a suit.  But when you have somebody

3  going to the FDA, a government agency, reporting these

4  violations, it is quite clear that there is more than a

5  distinct possibility of legal action in this case and

6  that she is trying to report illegal activity.  And this

7  is exactly the kind of whistleblower activity that

8  retaliation provision is designed to protect.

9          And as for the third prong that she was

10  retaliated against, I think it's very clear she was only

11  working there for 18 days.  She reported a numerous

12  number of violations.  On the exact same day that she

13  spoke to the FDA she was terminated.

14          Now, what Ventavia knew or did not know is

15  something that we have not been able to get into because

16  we haven't been able to engage in discovery, but at this

17  stage it is very clear that they took adverse employment

18  action against her, retaliated her because of all of her

19  complaints, and indeed, a lot of movement that she had

20  made in pausing enrollment and getting them to address

21  violations was essentially reversed as soon as Ms.

22  Jackson left her position.

23          So for those reasons that I have articulated,

24  Ms. Jackson has sufficiently pled a claim for retaliation

25  against Ventavia and it should not be dismissed.

1          THE COURT:  Very good argument.  Thank you.

2    Okay.  Is there anything else anyone wishes to bring to

3    the Court's attention?

4          MR. WESSEL:   Your Honor, if I just might

5    briefly respond.

6          THE COURT:  That hasn't already been

7    mentioned?

8          MR. WESSEL:   I will try not to go over

9    already well trod ground and just respond to Relator's

10   counsel's arguments here.

11         One I do see the courts potentially struggling

12   a little bit with are there sort of implied terms here,

13   right, to the contract and I think possibly the struggle

14   here is this kind of basic assumption, doesn't Pfizer

15   have to comply with the FDA rules and regulations, right,

16   the things that kind of govern clinical trials?  And the

17   answer to that is yes, they do.  This is an extremely

18   heavily regulated area.  And they need to comply with

19   those rules and regulations.

20         But that's not part of the contract.  That has

21   nothing to do with the contract.  Now, how could that

22   implicate the contract?  Well, if the FDA concludes

23   Pfizer didn't comply with the FDA rules and regulations,

24   they can pull the EUA.  They can pull the authorization

25   and then boom, they don't have to pay a nickel.  So

1  that's how that works.  But those are not implicitly kind

2  of built into the contract.  They are not there and as we

3  saw the clinical trial activities are specifically

4  excluded from the contract.  Both Pfizer and the

5  government agree with that.  So that's that point.

6          I hear Mr. Barnes saying his belief that the

7  vaccine isn't safe.  It is not effective.  It's not even

8  a vaccine.  He's entitled to have that belief.  That

9  belief is up to him as we talked about, but that doesn't

10  create a False Claims Act case.  Mr. Mendenhall talks

11  about how we should have jury trials and let the jury

12  kind of look at this.  Well, let me just go back --

13          THE COURT:  That stems to one of my first

14  questions, who decides materiality.

15          MR. WESSEL:  Yes, it is from the *Harman*

16  decision, crystal clear from the *Harman* decision that the

17  court decides that, not the jury.  It's fascinating

18  because they get right on that point and they kind of

19  gently chastise the trial judge for allowing the case to

20  go to the jury, so that gets to this whole issue of well,

21  that one got to trial.  They are basically saying, judge,

22  you messed up here, trial judge.  They say it nicely, but

23  that's what they say.

24          And then they talk about this policy

25  difference, the difference in opinions which is exactly

1  what you have here.  You have the difference of opinion

2  between Relator and the government.  The government has

3  been crystal clear in support of the vaccine, expressing

4  confidence in the data and continuing to pay.  Obviously,

5  Mr. Barnes and the Relator and others have different

6  opinions, which they are entitled to have, but they just

7  can't pigeonhole that into -- wedge it into a False

8  Claims Act case.

9          I am just going to read a little more from the

10  *Harman* case where the court says, "We can assume that

11  this and contrary views are debatable."  They are talking

12  about there the debates about the guardrails.

13          "But we must accept that the choice among them

14  lies beyond the reach of seven citizens of Marshall,

15  Texas, able though they may be.  As revered as the jury

16  is in its resolution of historical fact, its

17  determination of materiality cannot defy the contrary

18  decision of the government here said to be the victim."

19          Then we go on to the language we talked about

20  before.

21          "When the government at appropriate levels

22  repeatedly concludes that it has not been defrauded, it's

23  not forgiving of fraud, rather, it is concluding there

24  was no fraud at all."

25          And that's the binding precedent here.  As

1   much as they would love to get this to a jury, as much as

2   they have their own theories and disagreements with FDA,

3   all that is fine, but what the *Harman* case says is that

4   doesn't make it a False Claims Act case.  That doesn't

5   make it a fraud.  That is crystal clear and that is

6   binding precedent here.

7            Maybe just one other real quick point.  Mr.

8   Mendenhall talks about signatures not being on the

9   informed consent, family members being allowed in the

10  trial, temperature control violations, things of that

11  nature.  Again, this is where the government's statement

12  of interest is very good.  They say, and this is right in

13  the very first page of their statement of interest,

14  "In the instant case the complaint does not plead a

15  sufficient nexus between the alleged clinical trial

16  violations and the alleged request for payment from the

17  government to support such liability."

18            The lack of a signature just doesn't allow for

19  a sufficient nexus there.  So at the end of the day, the

20  government's position there that this is implausible I

21  think is very strong in light of their description of the

22  alleged violations.

23            THE COURT:  Thank you very much.  I will give

24  everybody a chance to get one last word in.

25            MR. DAVIS:  Very briefly, Judge.  In the

3-1-23 Motions Hearing

1  Relator's response, we heard two basic arguments.  One

2  was they would like to debate the relevant merits of this

3  vaccine as was just discussed.  That's not an appropriate

4  vehicle for discussion under the False Claims Act and the

5  *Trinity* case is clear in that regard.  That is one of

6  three Fifth Circuit decisions which we believe to be

7  binding, controlling and determinative in this particular

8  case and which we would direct your attention.

9          The second argument that we heard was in

10  essence well, you know what?  They're right about the

11  law.  One of the attorneys even conceded that regulatory

12  compliance -- a failure of regulatory compliance is not a

13  basis for a False Claims Act alone.  It is not.  The law

14  is clear on that.  But, they say we need to get past the

15  12(b)(6) motion stage and the courts tend to give us a

16  break.  That's the essence of the argument that we heard.

17          But, again, the Fifth Circuit has already

18  addressed this.  You were told for example, about the

19  distinction between the *Trinity* case and the *Escobar* case

20  on remand.  The Fifth Circuit specifically addressed that

21  when they were doing their survey of all of their sister

22  circuits in concluding that materiality was to be

23  determined by the court and was controlling and that

24  deference was to be given by the decision of the

25  government to proceed with full knowledge of the alleged

1  falsity.  The *Trinity* court says, "Our sister circuits

2  offer guidance on the impact of the government's

3  continued payment.  On remand the First Circuit in

4  *Escobar* applied the holistic approach to materiality laid

5  out by the Supreme Court in determining that the Relator

6  there had met its burden to pay in full despite actual

7  knowledge that requirements were violated.  Unlike in the

8  case we decide today, the court found no evidence that

9  the relevant government agency had actual knowledge of

10  any violations when it decided to pay the claims.  The

11  court did not decide whether the government's actual

12  knowledge alone disproves materiality."

13          In other words, in that *Escobar* case on

14  remand, there were no allegations from which it could be

15  determined that the government had full and actual

16  knowledge of the alleged false statements at the time

17  that it made the decision to continue payment.  That's

18  not true here.  In fact, the wrongful termination claim

19  that's been brought against Ventavia depends upon the

20  allegation that she complained to the FDA disclosing what

21  she now details in her complaint about these alleged

22  failures of the clinical trial.

23          You can't have it both ways.  If that's true,

24  and that disclosure was made, and I understand there's

25  reason to believe that it was not, but that is the

1 allegation, if that is true, then the government clearly

2 had full knowledge.  And it has full knowledge today as

3 represented in its statement of interest where it

4 describes the claims being brought as implausible.

5          The Fifth Circuit also specifically addresses

6 the question of materiality in the *Porter* case.  Mr.

7 Mendenhall told you that he looked at the *Porter* case and

8 determined there weren't any regulations at issue that

9 actually required the use of the licensed nurses.  That's

10 not true.  That is not what the case says.  We would

11 direct you to review it carefully.  In fact, quite to the

12 contrary, what the Fifth Circuit found was there was

13 nothing in the contract that required the use of the

14 licensed nurses, but they said specifically that they

15 accepted the Plaintiff's allegations regarding

16 Mississippi law to be true and that they would therefore

17 constitute material fraud.

18          "We assume arguendo that Plaintiff-Appellant's

19 characterization of the Mississippi statutes and

20 regulations is correct.  But the Supreme Court has

21 explicitly rejected the argument that any statutory,

22 regulatory or contractual violation is material so long

23 as the Defendant knows that the government would be

24 entitled to refuse payment were it aware of the

25 violation.  Indeed, a misrepresentation cannot be deemed

122

1  material merely because the government designates

2  compliance with a particular statutory, regulatory or

3  contractual requirement as a condition of payment."

4           That is the sum, substance and essence of this

5  case.  They are alleging that the obligation, the

6  contractual obligation, to comply with the generic and

7  general FDA regulations and statutory requirements

8  relating to clinical drug trials was the basis for the

9  false claim.  The Fifth Circuit has already said that's

10  not a basis for a false claim.  It can't be a basis for a

11  false claim.  And they went on and said in this *Porter*

12  case that, "Continued payment by the federal government

13  after it learns of the alleged fraud substantially

14  increases the burden on the Relator in establishing

15  materiality.  Plaintiff-Appellant has not met that

16  burden."

17          They went on to discuss as I told you earlier

18  in my argument that boilerplate language in a contract

19  requiring compliance with regulations is not a false

20  statement, it cannot be the basis of a False Claims Act

21  case and they found just recently that amendment would be

22  futile.  This is the controlling case.  This is the

23  determinative case that decides that this case should be

24  dismissed, and it should, and it should be dismissed with

25  prejudice.

1           One more note.  What I didn't hear in Realtor
2    counsel's response was any, among other things, the words
3    Icon or any refutation of the points that I made
4    regarding the supposed allegations of false statements
5    which they themselves have summarized at page 15 and 16
6    of their opposition brief.  Those aren't statements.
7    They are not false.  They are not alleged to have been
8    made with payment -- with knowledge of their falsity, and
9    they are not alleged anywhere to be made in connection
10   with the issuance of a payment.
11           As I think you were told by Ventavia, we
12   weren't paid by the government.  This was a privately
13   funded trial.  Ventavia and Icon were paid by Pfizer.
14   There is nowhere in the complaint, nowhere in the
15   opposition, nowhere in the argument that you heard today
16   any suggestion that there was any fraud on the part of
17   Icon.  And as I mentioned earlier, the Fifth Circuit
18   determined this too in the *Johnson versus Connor Medical*
19   *Group* case.  First of all, they noted there that,
20   "Mismanagement alone of programs that receive federal
21   dollars is not enough to create FCA liability," and
22   that's the essence of the complaint here, that's what
23   they are saying we did, was mismanagement of this
24   program.  That's not an FCA claim because as the Fifth
25   Circuit said, and I told you earlier, under the FCA a lie

124

1  is actionable, but not an error.  There's no allegation

2  of a lie.  You didn't hear any argument that there was a

3  lie.  There were no lies and, therefore, this claim

4  should be dismissed.  Thank you.

5          THE COURT:  Anything further?

6          MR. GUTHRIE:  I will go quickly, Your Honor.

7          THE COURT:  Yes.

8          MR. GUTHRIE:  Let me touch briefly on the

9  retaliation case.  You heard this reference to the 2009

10  and 2010 amendments to the retaliation provision.  That

11  doesn't fix anything.  We addressed this in our briefing.

12  What those amendments did at best is made clear that you

13  don't have to be bringing a qui tam lawsuit at the time

14  of your protected activity.  We have never alleged that

15  that's the problem here.  What those amendments do not

16  do, and we have cited the text in our brief, what they

17  don't do is they don't change the law on this internal

18  reporting that you have to report concerns about false

19  claims for government payment, not criticize business

20  practice.

21          The *Thomas* case that Relator's counsel cited

22  doesn't change that.  It says you still have to be

23  motivated by fraud on the government.  The *Melchior* case

24  out of the Western District that they rely on emphasizes

25  this point and again Judge Crone in *Reddell*, that came

1 after the amendments, the 2009 and 2010 amendments to the

2 retaliation claim.  Judge Crone applied the same law that

3 we have cited to you from *Patton* and *Robertson* about when

4 internal complaints can be protected activity and when

5 not.  So those amendments don't solve anything.

6          On the merits, I will just say briefly we

7 heard a lot of Judge, please just let us have discovery.

8 The Relator has a burden and it is a substantial burden

9 to even open the door to discovery when we are talking

10 about complaints of fraud when Rule 9(b) applies.  Your

11 Honor knows that law.  The Fifth Circuit has been

12 consistent about the screening function that Rule 9(b)

13 plays when we have got fraud complaints in the False

14 Claims Act context.  The *Nunnally* case, we have cited it

15 in our brief; the *Grubbs* case, I think you have seen that

16 in everyone's brief, that this is not just a matter of

17 oh, can I throw out some -- there is a lot of detail

18 required, and Your Honor is right.  There's a lot of

19 detail in the complaint.  What there is not, this is not

20 about detail for the sake of detail.  There is not the

21 who, what, where, when and why of the essential elements

22 of liability under the False Claims Act.  She does not

23 have the details of false claims submitted for payment to

24 the federal government that were material to the

25 government's payments decisions.  And she certainly

1  doesn't have it against all three Defendants.  So because

2  she can't meet that pleading burden under Rule 9(b) what

3  does the Fifth Circuit say in *Porter?*

4          "We apply Rule 9(b) with bite and without

5  apology," and that's what we ask Your Honor to do.  Thank

6  you.

7          THE COURT:  Thank you.  Anything further from

8  the defense?  Mr. Barnes, any last words?

9          MR. BARNES:  Just briefly we do think

10  materiality is a jury decision when there is a dispute in

11  evidence.  We think it's a summary judgment decision when

12  there is no dispute in the evidence.  But at the

13  pleadings stage it is not something that is grounds for

14  dismissal.  If they were right about their main claim

15  that there is an absolute rule that when the government

16  knows about an accusation and doesn't take action that

17  means the Relator cannot even pursue it past a pleading

18  stage, then *Escobar* itself would not have survived it and

19  it did.  Thank you.

20          THE COURT:  Thank you very much.  I just want

21  to make a comment to all the lawyers.  I want to

22  congratulate you for your presentation today on both

23  sides.  I also would like to point out I thought the

24  briefs were very well written on both sides and the Court

25  appreciates such fine workman -- quality of the lawyering

1  and also that you were prepared for today's hearing and

2  made good use of your time.

3            You advocated strongly for your clients.  So

4  my hat is off to all the lawyers who appeared in court

5  and I know there are others probably back at the office

6  who also worked on this, so my congratulations to you.

7            We will continue to take this case under

8  advisement and we will prepare a written opinion

9  regarding my decision.  With no further business to come

10 before the court, we are adjourned.

11           (Proceedings concluded, 5:22 p.m.)

12

13 COURT REPORTER'S CERTIFICATION

14           I HEREBY CERTIFY THAT ON THIS DATE, MARCH 10,

15 2023, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

16 RECORD OF PROCEEDINGS.

17

18

19

20           _____

21                RUTH C. WEESE, RDR, CSR

22           TEXAS CSR NO. 9493 Expiration Date: 07-31-2024

23

24

25