```
 1                   UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                         BEAUMONT DIVISION

 3    UNITED STATES OF AMERICA   )
      ex rel. BROOK JACKSON,     )
 4                               )  Case No.
               Plaintiff,        )  1:21-CV-00008
 5                               )
      vs.                        )
 6                               )
      VENTAVIA RESEARCH GROUP,   )
 7    LLC; PFIZER, INC.; ICON,   )  Beaumont, Texas
      PLC,                       )
 8                               )
               Defendants.       )
 9    ------------------------------------------------------
                   TRANSCRIPT OF MOTION HEARING
10                       May 1, 2024
           BEFORE THE HONORABLE MICHAEL J. TRUNCALE
11               UNITED STATES DISTRICT COURT
      ------------------------------------------------------
12    APPEARANCES:

13    For the Plaintiff:

14             MR. ROBERT E. BARNES
               Barnes Law
15             700 South Flower Street, Suite 1000
               Los Angeles, California 90017
16             robertbarnes@barneslawllp.com

17             MR. JEREMY L. FRIEDMAN
               Law Office of Jeremy L. Friedman
18             2801 Sylhowe Road
               Oakland, California 94602
19             jlfried@comcast.net

20             MR. WARNER MENDENHALL
               The Law Offices of Warner Mendenhall
21             190 North Union Street, Suite 201
               Akron, Ohio 44304
22             warner@warnermendenhall.com

23    ********************************************
               APRIL HARGETT, CSR, RPR, RVR
24            Federal Official Court Reporter
                   300 Willow Street
25              Beaumont, Texas  77701
```

2

```
 1  APPEARANCES (Continued):

 2  For the Defendant Ventavia Research Group, LLC:

 3          MS. TARYN M. MCDONALD
            Haynes and Boone, LLP
 4          2801 North Harwood Street, Suite 2300
            Dallas, Texas 75201
 5          taryn.mcdonald@haynesboone.com

 6
    For the Defendant Pfizer, Inc.:
 7
            MS. MEAGAN D. SELF
 8          DLA Piper LLP - Dallas
            1900 North Pearl Street, Suite 2200
 9          Dallas, Texas 75201
            meagan.self@dlapiper.com
10
            MR. CARLSON WESSEL
11          DLA Piper LLP - Washington
            500 Eighth Street Northwest
12          Washington, D.C. 20004
            carlton.wessel@us.dlapiper.com
13
            MR. JACK P. CARROLL
14          Orgain, Bell & Tucker LLP - Beaumont
            470 Orleans Street, Suite 400
15          Beaumont, Texas 77704
            jpc@obt.com
16
17  For the Defendant Icon, PLC:

18          MR. ELAI KATZ
            McDermott Will & Emery
19          One Vanderbilt Avenue
            New York, New York 10017
20          ekatz@mwe.com

21          MR. SCOTT L. DAVIS
            Husch Blackwell LLP
22          1900 North Pearl Street, Suite 1800
            Dallas, Texas 75201
23          scott.davis@huschblackwell.com

24

25
```

3

1   APPEARANCES (Continued):

2   For the Movant United States of America:

3           MR. JAMES G. GILLINGHAM
           United States Attorney's Office - Tyler
4           110 North College Street, Suite 700
           Tyler, Texas 75702
5           james.gillingham@usdoj.gov

6           MS. ERIN COLLERAN
           United States Department of Justice
7           175 North Street Northeast
           Washington, D.C. 20002
8           erin.colleran@usdoj.gov

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

Proceedings reported by stenotype.  Transcript produced by computer-aided transcription.

---O---

(The following proceedings were held in open court commencing at 2:14 p.m., reported as follows:)

(Call to order of the Court.)

THE COURT:  Thank you.  Please be seated.

Good afternoon, everyone.  It's good to see some familiar faces and welcome back to Beaumont, Texas.

We're here today in the case of *United States of America, Brook Jackson, plaintiff, v. Ventavia Research Group, LLC; Pfizer, Inc.; and Icon, PLC* in Civil Action 1:21-cv-8.  We're here on four matters: Pfizer's motion to dismiss the second amended complaint, which is Docket 119; Icon's motion to dismiss the second amended complaint, which is Docket No. 120; Ventavia's motion to dismiss the second amended complaint, Docket No. 121; and the government's motion to intervene and to dismiss, which is Docket 137.

Although I recognize lawyers from our previous hearings in this matter, I would like all of you to formally introduce yourselves on the record and your clients and also advise the Court if you're ready to proceed on these matters.

5

1          MR. FRIEDMAN:  Morning, your Honor, or

2 afternoon, your Honor.  Jeremy Friedman, attorney for

3 relator Brook Jackson.

4          THE COURT:  All right.  Thank you.

5          MR. MENDENHALL:  Yes.  Good afternoon, your

6 Honor.  Warner Mendenhall on behalf of Brook Jackson.

7                    Thank you.

8          THE COURT:  Thank you.

9          MR. BARNES:  Good afternoon, your Honor.

10 Robert Barnes on behalf of Brook Jackson.  And, yes,

11 your Honor, we are ready to proceed.

12          THE COURT:  Very good.  And Ms. Jackson is

13 with you?

14          MR. BARNES:  Yes.  Yes, your Honor.

15          THE COURT:  All right.  Let me just remind

16 everyone, if you would please, to -- if you're going to

17 address the Court -- and it may be easier ultimately

18 from the lectern -- but please speak into the

19 microphone.  I know you may think you're projecting and

20 you may well be, but the acoustics are not that great

21 here and -- for us, namely my court reporter, as well as

22 myself to be able to hear you, we're going to need you

23 to speak into the microphone.

24          Okay.  And for the defendants?

25          MR. GILLINGHAM:  Your Honor, actually,

6

1   James Gillingham on behalf of the United States.

2            THE COURT:  Okay.

3            MS. COLLERAN:  And Erin Colleran on behalf of

4   the United States.

5            THE COURT:  All right.  Thank you.

6            MR. GILLINGHAM:  And we're ready to proceed

7   on the United States's motion to intervene and dismiss.

8            THE COURT:  All right.  Just give me one

9   second, please.

10           Okay.  So, of course, you come from Tyler and

11  Washington, D.C.; is that correct?

12           MS. COLLERAN:  Yes.

13           MR. GILLINGHAM:  Yes, your Honor.

14           THE COURT:  All right.  And continuing down

15  this row.

16           MR. WESSEL:  Good afternoon, your Honor.

17  Carl Wessel with DLA Piper on behalf of Pfizer.

18           MS. SELF:  Good afternoon, your Honor.

19  Meagan Self on behalf of Pfizer.

20           THE COURT:  All right.  Thank you.

21           MR. CARROLL:  Your Honor, Jack Carroll,

22  Orgain, Bell & Tucker, on behalf of Pfizer.

23           THE COURT:  Thank you very much.

24           MS. MCDONALD:  Your Honor, Taryn McDonald on

25  behalf of Ventavia Research Group.

7

1         THE COURT:  All right.  Thank you very much.

2         All right.

3         MR. KATZ:  Your Honor, Elai Katz, McDermott

4  Will & Emery, on behalf of Icon, PLC.

5         MR. DAVIS:  Your Honor, Scott Davis on behalf

6  of Icon, PLC.  And we are ready to proceed.

7         THE COURT:  I would like to start with the

8  government's motion to intervene and their motion to

9  dismiss.  And I would go ahead and ask Mr. Gillingham

10  to -- I guess you'll be taking lead on this -- to

11  proceed.

12         MR. GILLINGHAM:  Thank you, your Honor.

13         And may it please the Court?

14         THE COURT:  Yes.

15         MR. GILLINGHAM:  Assistant United States

16  Attorney James Gillingham on behalf of the United

17  States.

18         Your Honor, we're here on the United States's

19  motion to intervene pursuant to 31 U.S.C. § 3730(c)(3)

20  and for purposes of dismissing this case over the

21  relator's objections pursuant 31 U.S.C. § 3730(c)(2)(A).

22  Because the United States has good cause to intervene,

23  it's provided the relator notice of its intent to

24  dismiss, and as we see here, the Court is affording the

25  relator a hearing.  All statutory prerequisites to

8

1   intervention and dismissal have been met, and the Court

2   should allow the United States to intervene and dismiss

3   this case pursuant to (c)(2)(A).

4            THE COURT:  Let me ask you -- well, before I

5   ask, I will say I'm allowing a hearing on all of these

6   motions today.  Frankly, the Court could probably decide

7   these without the benefit of a hearing.  However,

8   hearings were requested on these different motions, and

9   I do believe in giving everyone an opportunity to be

10  heard and to tell me what you feel like you need to tell

11  me either for your motion or in opposition to a motion.

12           One question that is not -- about the subject

13  of good cause, that's a phrase that's not defined in the

14  statute you cited.  I recognize there's some case

15  authority on good cause, but I want to hear from the

16  government what you think is good cause for intervening

17  in this case.

18           MR. GILLINGHAM:  Your Honor, the

19  United States's position on good cause is that although

20  it's not defined in the statute, it's been developed in

21  the case law.  And it's really, kind of, a -- it's not a

22  burdensome concept.  It's something that's a flexible

23  standard that really just boils down to whether or not

24  there's a legally sufficient reason.  And in this case,

25  your Honor, the legally sufficient reason is set forth

9

1   in the United States's motion.

2           And the good cause for intervention is -- is,

3   kind of, a number of factors that boil down to the

4   United States's decision here.  And these are the same

5   factors that support the motion to dismiss under

6   (c)(2)(A).  And, your Honor, as set forth in the

7   United States's brief on Page 7, it has investigated the

8   relator's claims in her complaint and all of her amended

9   complaints.  The FDA, as previously been discussed in

10  the prior motion to dismiss hearing in the statement of

11  interest, has -- it was aware of Ms. Jackson's

12  allegations prior to the EUA and has been aware of those

13  since issuing additional EUAs.  The new information

14  contained in the amended complaint is based on

15  information that's in the public record that the FDA is

16  aware of.  The FDA continuously monitors the market, the

17  incidents, the COVID results, and it's simply reached a

18  different conclusion than the relator's conclusion here.

19          And I think that that's summarized pretty

20  succinctly in the JAMA article that was cited in our

21  motion where the FDA's view is that the COVID vaccine is

22  effective and it has saved tens of millions of lives.

23  So the United States in that aspect has decided that the

24  likelihood of success here is small.  But

25  there's also --

1          THE COURT:  Likelihood of success in terms of

2    the relator continuing the action against the

3    defendants, the success is low?  Is that what the

4    government thinks?

5          MR. GILLINGHAM:  Your Honor, that's -- that's

6    the government's view, especially given the FDA

7    continuing to authorize these, monitoring the COVID

8    vaccine data.  It's our belief that the vaccine is safe.

9    It's protected tens of millions of lives.

10          But then the second factor here, your Honor,

11    that I think is important is that continuing this

12    lawsuit will impose a substantial burden on the

13    Department of Justice, the FDA, HHS, potentially even

14    DOD in the obligation to respond to discovery, to

15    continue to monitor this case.  As your Honor is aware,

16    this has been a litigious case.  The government's

17    already had to file a statement of interest in this

18    case.  We're seeking now to terminate our involvement to

19    avoid these continued burdens of discovery and the

20    potential for privileged documents to be disclosed as

21    part of that.

22          THE COURT:  Now, normally, you, the

23    government, certainly is given an opportunity to

24    intervene.  There are times the government decides that

25    they wish to join with a relator, help with the

1    prosecution expenses and work together against some

2    other person who allegedly -- a person or company that

3    has allegedly defrauded the government, correct?

4                MR. GILLINGHAM:  Correct, your Honor.

5                THE COURT:  There are other times the

6    government says, well, it's an interesting case, we are

7    not interested in investing resources in the case, but

8    we're not opposed to the -- a relator, in what is called

9    a qui tam action, going after someone for alleged fraud.

10   And, of course, if successful, the government would get

11   a recovery of money and out of that recovery pay the

12   relator and her attorneys money for their efforts in

13   pursuing that action, correct?

14               MR. GILLINGHAM:  Your Honor, mostly correct.

15   Although the obligation to pay attorney's fees doesn't

16   come from the government.  That would be a statutory

17   right to recover from defendants.

18               THE COURT:  All right.  But the bottom

19   line is -- that's fair.  But there would be money going

20   back to cover the litigation expenses, correct?

21               MR. GILLINGHAM:  Yes, your Honor.  The false

22   claims --

23               THE COURT:  So those are two scenarios that

24   the government could have had -- could have taken

25   advantage of in this case.  The government chose neither

12

1  one of those two, correct?

2          MR. GILLINGHAM:  The government initially

3  declined to intervene in this case, your Honor.

4          THE COURT:  All right.  Now -- then the

5  government came along and prepared a statement of

6  interest where they essentially said they did not want

7  this -- they didn't think this was an appropriate case.

8  It wasn't a valid case and scientific data didn't

9  support it -- many different things.

10          Is that a rare thing for the government to

11  do?

12          MR. GILLINGHAM:  Your Honor --

13          THE COURT:  In terms of all the qui tam

14  actions that are out there on all sorts of different

15  actions?

16          MR. GILLINGHAM:  Your Honor, I'd say -- I

17  wouldn't say it's a rare thing for the government to

18  take a position -- a statement of interest on a variety

19  of issues, but I wouldn't say it's also the most common

20  thing.

21          THE COURT:  Okay.

22          MR. GILLINGHAM:  I think it's really a

23  case-by-case basis depending how the issues present.

24          THE COURT:  All right.  So that's a third

25  option and that was done early -- well, not early on,

13

1    but some time ago in this case.  And now there's a

2    fourth option, which we have, which is your motion to

3    intervene, correct?

4           MR. GILLINGHAM:  Correct, your Honor.

5           THE COURT:  And, ultimately, a motion to

6    dismiss.  How often do you do that?

7           MR. GILLINGHAM:  Your Honor, the --

8           THE COURT:  In qui tam cases?

9           MR. GILLINGHAM:  The option of intervening

10   for the purpose of dismissing is probably the least

11   common of those -- those scenarios, your Honor.

12          THE COURT:  All right.  And even though the

13   government could stand to benefit financially in the

14   event Ms. Jackson and her team were successful against

15   these defendants; is that correct?

16          MR. GILLINGHAM:  Yes, your Honor.

17          THE COURT:  All right.  I didn't mean to

18   interfere with your argument, but go right ahead with

19   your comments.

20          MR. GILLINGHAM:  No need to apologize, your

21   Honor.

22          But to follow up on the last point, I think

23   that it's worth a little bit of additional discussion.

24   The mere fact that the government could recover

25   something down the road even -- even if it's projected

14

1  to be billions of dollars does not outride -- does not

2  outweigh the government's analysis of whether or not to

3  proceed here.  And the Supreme Court considered that

4  exact argument in the *Polansky* case, your Honor.

5          In the *Polansky* case, the defendant -- the

6  relator's position in opposing the government's motion

7  to intervene for purposes of dismissing was that it was

8  a strong case and the government was leaving billions of

9  dollars on the table for what it characterized as merely

10 a months' worth of time doing some discovery.  And the

11 Supreme Court said there it's not the relator's position

12 to make that, you know -- that cost benefit analysis.

13 The government always has the primary interest.  We're

14 the real party in interest, and the qui tam purposes of

15 the False Claims Act are to vindicate the government's

16 interests.

17         But for the reasons set forth in our brief

18 and what we've already articulated here, the

19 difference -- the different view of this COVID vaccine

20 by the FDA and the imposition of burdens on the

21 government to continue this litigation, those have

22 almost been uniformly held to support good cause for

23 intervention and dismissal.  And that's what happened in

24 *Polansky* and that's what should happen today, your

25 Honor.

1          THE COURT:  Now, was good cause actually

2    defined in the *Polansky* case?

3          MR. GILLINGHAM:  No, your Honor.  In

4    *Polansky*, the Court, again, looked to -- I think it

5    discussed the Third Circuit's language regarding it

6    being a flexible capacious concept that's really a low

7    bar.  And I think that's -- that's the most important

8    part of this, is that --

9          THE COURT:  But there are other cases that

10   discuss -- not this particular Supreme Court case -- but

11   there are other cases that define -- that put parameters

12   around what is good cause for the government to

13   intervene.  And you have essentially summarized some of

14   those points here in this hearing.

15          Is there anything else you wanted to add

16   about good cause?

17          MR. GILLINGHAM:  No, your Honor.  I think

18   that the biggest takeaway from my perspective and the

19   United States's perspective on good cause is that it's a

20   low bar.  And I think that *Polansky* cautioned that a

21   Court should think, not just once, not twice, but many

22   times before denying the opportunity for the government

23   to intervene for purposes of dismissal.

24          THE COURT:  Now, the *Polansky* case was

25   decided eight justices to one, and Justice Thomas wrote

1  a dissent in that case.

2          Why do you think *Polansky* applies in this

3  case and why isn't Justice Thomas's dissent worthy of

4  consideration by this Court?

5          MR. GILLINGHAM:  Your Honor, a few points.  I

6  think *Polansky* applies because it fairly well tracks the

7  situation here where the government offered concerns

8  about the viability of the case balanced against the

9  imposition on the government of continuing to monitor

10  the case and get involved in discovery.  And the Court

11  agreed that the government's decisions that -- analysis

12  was a rational reason for it to step in and dismiss.

13  That tracks exactly what the government is doing here,

14  your Honor.

15          And in both cases, the relator argued that

16  there was billions of dollars on the table and it was a

17  strong case; but the Court still affirmed the dismissal.

18  Now, Justice Thomas's involvement in False Claims Act

19  cases is interesting.  Justice Thomas, I think, has an

20  issue with the False Claims Acts relator -- relator

21  provisions altogether.  And so I think that there's a

22  reason that he was the outlier in that case.  And I -- I

23  don't think there is anything about Thomas's dissent in

24  that case -- in the *Polansky* opinion that guides this

25  Court's analysis here.

17

1          And as the Court's aware, that -- his dissent
2    doesn't have any precedential value and what the Court
3    should do is recognize that *Polansky* said that we could
4    intervene at any time.  And, in fact, we're doing it
5    much earlier in this case than *Polansky*, which was much
6    further into discovery at that point.  And that once we
7    do intervene for good cause, that the -- the Court
8    settled the debate on what the standard was for
9    dismissing the case.
10          THE COURT:  I think the *Polansky* case said
11    that the intervention could come some time during the
12    litigation.  So even though this case has been on for
13    several years -- of course, there's been a lot of
14    procedural issues that have made it last that long -- I
15    think it's probably the oldest case on my docket since
16    most of my cases are concluded within about -- or,
17    actually, less than 12 to 18 months.  But be that as it
18    may, it is what it is.  And here we are.
19          The timing of your intervention is not really
20    an issue?
21          MR. GILLINGHAM:  No, your Honor.
22          THE COURT:  All right.  Now, the -- the
23    *Polansky* decision did affirm a dismissal of the case
24    under Federal Rule of Civil Procedure 41(a), which is a
25    rule that allows a plaintiff to basically dismiss a case

18

1    if there hasn't been an answer on file by the

2    defendants.  For whatever reason, they decide we don't

3    want to pursue it anymore or we've gotten into it and we

4    don't feel comfortable pursuing it.  Maybe they settled

5    it.  Who knows?  There's just some reason.  And those

6    types of dismissals are routinely granted by courts,

7    correct?

8              MR. GILLINGHAM:  Your Honor, I would agree

9    with most of that.  I think that under 41(a)(1)(A),

10   there is no adjudicatory function of the Court.  It's

11   done by a notice and it's self-effectuating in a sense,

12   but --

13             THE COURT:  It really is, isn't it?

14             MR. GILLINGHAM:  Yes.  But, yes, your Honor.

15   They're very common.  They may be done for a variety of

16   reasons.  But, again, I think that the Court's -- the

17   Court did recognize that Rule 41 provides the proper

18   standard.  And as we know, 41, the standard would depend

19   on where we are in the litigation.

20             THE COURT:  And in this case -- the

21   defendants in this case have simply filed motions to

22   dismiss, not a motion for summary judgment, which if

23   they had done that, Rule 41(a) dismissal -- voluntary

24   dismissals would not be appropriate, correct?

25             MR. GILLINGHAM:  We would be under 41(a)(2),

19

1  your Honor, yes.

2          THE COURT:  All right.  So they haven't

3  answered.  They have filed a motion to dismiss.  Does

4  that then allow -- there is nothing in that rule -- that

5  would apply here that would prohibit a dismissal just

6  because they filed a motion to dismiss; is that correct?

7          MR. GILLINGHAM:  Your Honor, I'm not aware of

8  anything.  Given that there has been no answer and no

9  motion for summary judgment, I think we're squarely

10 within the ambit of 41(a)(1)(A).

11         THE COURT:  Okay.  All right.  Continue with

12 your evaluation of the case.

13         MR. GILLINGHAM:  And, your Honor, since we're

14 on the topic of 41(a)(1)(A), again, similar to the good

15 cause burden, this is extremely a low burden.  You know,

16 41(a)(1)(A) is a non-adjudicatory function that's done

17 on a notice.  However, it is subject to other applicable

18 rules.  Therefore, in this context, although 41(a)(1)(A)

19 applies, we still have to look to the False Claims Act

20 under (c)(2)(A), which does require notice to the

21 relator and the opportunity for a hearing.

22         And so -- so that's why we're here today,

23 your Honor.  Those two aspects, the notice and hearing,

24 aren't inherent in 41, but the catchall 41 does say we

25 have to make sure that we comply with other applicable

20

1   statutes.

2          THE COURT:  And the relator in this case

3   takes issue with your position and the government's

4   position that you have good cause?

5          MR. GILLINGHAM:  Yes, your Honor.

6          THE COURT:  All right.

7          MR. GILLINGHAM:  And I think that the -- the

8   reality is there's a very strong difference of opinion

9   on the ultimate issues relating to the COVID vaccine and

10  that's a big fight.  But it doesn't change the fact that

11  the reasons the government has provided to dismiss and

12  for intervention that the -- you know, that the agency's

13  aware of this, that it's continuing to prove the EUAs,

14  that it's aware of all the data that Ms. Jackson's

15  complaint -- amended complaint is based on, and that

16  we're trying to avoid the burdens of continued

17  litigation.  That -- those factors have been routinely

18  upheld here.

19         So the government -- the United States in

20  this case believes that it does have good cause for

21  those reasons and also satisfies all -- once

22  intervention has taken place, satisfies all of the

23  requirements under 41(a)(1)(A).  I don't believe that

24  the issue of notice is really at issue today.  I think

25  that's checked off.  And the hearing being provided

1  today satisfies the other element.  So at this point,

2  the government has satisfied all statutory requirements

3  and complied with the *Polansky* decision and the Court

4  should allow it to interview and effectuate a dismissal

5  pursuant to (c)(2)(A).

6          THE COURT:  All right.  Anything else?

7          MR. GILLINGHAM:  Your Honor, just a couple of

8  points, I think, on some issues that will likely be the

9  topic of the relator's presentation.

10         The United States's view of what's required

11  by the hearing for purposes of satisfying (c)(2)(A) is

12  merely what we're doing right here, is this hearing.

13  There is no requirement for an evidentiary hearing.

14  There's nothing in the rule that requires an evidentiary

15  hearing.  That would be inconsistent with the 41(a)(1)

16  standard that -- as we've discussed.  A notice -- the

17  Court doesn't have an adjudicatory function.

18         And so we believe that there's no need for an

19  evidentiary hearing in this case.  And the courts

20  generally have in the (c)(2)(A) context when addressing

21  this evidentiary -- the question of an evidentiary

22  hearing has almost uniformly said no evidentiary hearing

23  because the point of today is not to have a mini trial

24  on the merits of the underlying case.  This is the --

25  the point of the hearing today is for the relator to

22

have an opportunity to be heard, for the United States
to put forth its reasons for dismissal, and for the
Court to ensure that there is no, maybe, constitutional
issues with -- with the dismissal.

And the constitutional issues we don't
believe are present in this case, your Honor.  The
fourth footnote in the *Polansky* decision does reference
the possibility that -- in trying to determine what's
required by a hearing, when the underlying rule that has
been adopted allows dismissal upon notice, the Court
posited that it may be for purposes of the Court to
confirm that there's no constitutional harm to the
relator affected by this dismissal.  And it identifies
equal protection and due process as potential issues.  I
don't think that anyone has raised an equal protection
challenge to the United States's dismissal here.  And
the United States believes it has complied with all due
process requirements pursuant --

THE COURT:  Does Rule 24 impact the
government's right to intervene and the ability to show
good cause as relator argues?

MR. GILLINGHAM:  No, your Honor.  The Rule 24
analysis is really separate and apart from the
intervention and the False Claims Act.  The False Claims
Act provides its own basis for intervention by the

23

1  government in these situations.  Rule 25 is a more

2  general rule --

3           THE COURT:  Twenty-four, you mean?

4           MR. GILLINGHAM:  So sorry.  Yes, your Honor.

5  Rule 24 is the general rule for intervention in general

6  civil litigation.  This is a more -- the False Claims

7  Act has its own specific rules that apply to the

8  United States seeking to intervene.  And that's --

9  that's why we're moving under 3730(c)(3) and (c)(2)(A).

10  And, your Honor, for instance, in the *Polansky* decision

11  when the Court was determining what the standard for

12  intervention -- whether or not it was allowed in the

13  standards -- it never looked to Rule 24.  And the Court

14  imposed the burdens under Rule 3730(c)(3).  So the

15  United States's view is that 24 -- although a general

16  rule on intervention -- doesn't apply here.

17           THE COURT:  With regard to evidentiary

18  hearings, I understand it, among other things -- you

19  talked about cause -- you did make some statements that

20  the government felt that the vaccine was effective.

21  Some people disagree with that.  Some people think it's

22  even harmful.  But -- and I state that just having read

23  a newspaper or two over the last few years.  But the

24  real issue here is that Ms. Jackson claims that she saw

25  some variations in the testing protocol when they were

24

1  testing that -- you know, maybe they didn't -- they may

2  have given the vaccine to someone when they were testing

3  it, but they didn't wait the full allotted time watching

4  the person to see if they had a reaction or they

5  didn't -- when they injected it in the test people, that

6  they didn't necessarily have it at the right temperature

7  or things of those nature.  Those are factual claims

8  that she's making.

9          Your position on this evidentiary situation

10  is that given the procedural nature of the case, with

11  your motion to intervene and your motion to dismiss,

12  the -- an evidentiary hearing on the ripeness of her

13  claim is not really what we do here.  It's simply the

14  government, in this instance, has evaluated her claims

15  and determined in the government's view that her claims

16  are not worthy of pursuing in a court of law.  And for

17  that reason, it's the government's claim -- because it

18  was the government that was purportedly defrauded by

19  these defendants over here -- and you all don't want to

20  pursue that, and you have the right under the statute to

21  intervene and dismiss the case.

22          Have I basically summed up what you're saying

23  on the evidentiary hearing aspect of this?

24          MR. GILLINGHAM:  Absolutely, your Honor.

25  These are -- the United States is always the real party

1  in interest.  The case law makes very clear that our

2  interests are always predominant.  And as *Polansky* said,

3  if the government offers a reasonable argument that the

4  burdens of continued litigation outweigh the benefits,

5  the Court should grant the motion.

6            THE COURT:  Okay.

7            MR. GILLINGHAM:  That's exactly our position,

8  your Honor.  So for those reasons, and then the fact

9  that there's no requirement for an evidentiary hearing

10 in the statute, it'd be consistent with Rule 41(a)(1)(A)

11 and, frankly, the legislative history of the False

12 Claims Act.  We don't believe an evidentiary hearing is

13 required.  We think the hearing requirement probably

14 could have been satisfied on the papers, but it is

15 definitely satisfied here today.

16            And I think the -- the final issue, your

17 Honor, is just to touch on -- go back to these

18 constitutional concerns.  Again, no equal protection

19 violation, procedural due process.  I think that the

20 notice, the briefing, this hearing satisfy all of that.

21 And there's no substantive due process concern because

22 the decision the government's making is not arbitrary in

23 a constitutional sense.  We have offered a well-reasoned

24 opinion -- a reasoned basis for our decision.  It's not

25 arbitrary in the constitutional sense; and, therefore,

26

1   there's not going to be any due process issues.

2              THE COURT:  Okay.  Anything further?

3              MR. GILLINGHAM:  No, your Honor.  If your

4   Honor has any further questions, I'm happy to address

5   them.  But, otherwise, we'd sit down.  -

6              THE COURT:  I'm sure you probably feel like

7   you've had enough questions from me already.

8              MR. GILLINGHAM:  Your Honor, I'm always happy

9   to assist the Court in any way I can.

10             THE COURT:  If I think of another one, I'll

11  let you know.

12             MR. GILLINGHAM:  Thank you, your Honor.

13             THE COURT:  All right.  Okay.  Now, did

14  you -- I was going to let Mr. Barnes respond to the

15  government's motion.  But do you want to --

16             MR. WESSEL:  If I might, your Honor, just a

17  few points that I would add to the government's motion.

18  It might make sense logically to hit those now.

19  Obviously --

20             THE COURT:  Well, I guess I might as well let

21  the defendants -- let their load -- unload on you, and

22  then you can respond to all of it when -- when I give

23  you a chance, okay?

24             Yes, sir.  Go right ahead.

25             MR. WESSEL:  Thank you, your Honor.  Good to

27

1   see you again.  Carl Wessel on behalf of Pfizer.

2   Pfizer's position is that its motion to dismiss under

3   12(b)(6), 12(b)(1) is really mooted in light of the

4   government's motion.

5          THE COURT:  Well, that was going to be one of

6   the first questions.

7          MR. WESSEL:  Yes.

8          THE COURT:  Now, if I deny the government's

9   motion, then I will need to make an opinion -- a

10  decision on all of your motions to dismiss.  If I grant

11  the government's motion, then all of your motions to

12  dismiss will be essentially moot because --

13         MR. WESSEL:  Essentially.  And I can parse

14  through that.  There's a little subtlety there because

15  of the retaliation claim.

16         THE COURT:  I was going to ask you about

17  retaliation because that's the one thing that -- the

18  government cannot dispense with her claim for

19  retaliation -- she was fired, as I recall the facts,

20  like a day or two after this event.  I may be off a

21  little bit on my facts -- but shortly after.  Maybe even

22  that day.  I don't remember exactly.  But that -- you

23  don't -- you're not moving to dismiss that, are you?

24         MR. WESSEL:  Yeah.  I believe, your Honor --

25  and obviously that's a claim against Ventavia.  Pfizer

28

```
 1   is not named in that claim.

 2           THE COURT:  Right.

 3           MR. WESSEL:  But -- I will -- you know, just

 4   to assist the Court, you know, our sense is that claim

 5   will remain, that cannot be dismissed by the

 6   government's motion --

 7           THE COURT:  Regardless of what happens with

 8   the government's motion or with all of your motions?

 9           MR. WESSEL:  That's correct.

10           THE COURT:  Okay.

11           MR. WESSEL:  That's correct.  And maybe just

12   to run through briefly, your Honor, if it's helpful.  So

13   Counts One through Four, these are the False Claims Act,

14   the qui tam claims, right?  And they're against Pfizer,

15   Icon, and Ventavia.  These would be gone if you grant

16   the government's motion.  So those go.  And that ends

17   all of the claims against Pfizer and Icon, so, again,

18   unnecessary to address our 12(b)(6), 12(b)(1) motion.

19           THE COURT:  Well -- now, hold on.  I'm going

20   to have the relator respond to the motion to dismiss,

21   and then I'm going to go ahead and have a hearing on

22   y'all's motions to dismiss since you're all here.  I

23   wouldn't want to have everybody come back, if necessary,

24   for another time.  I mean, it's expensive for everybody

25   to fly here and all of that.  I want to go ahead and get
```

29

1   that portion of the hearing done.  Whether or not we

2   ultimately decide -- need to decide on that, we'll see.

3               MR. WESSEL:  Yes.  That's certainly fine.  If

4   the Court wishes to proceed that way, that's fine with

5   Pfizer.  I don't think there -- as you know, we spent a

6   lot of time discussing the issues there, the *Harman*

7   case, et cetera back in March.  Those are essentially

8   the same issues.  We can talk a little bit about that.

9               THE COURT:  Yeah.

10              MR. WESSEL:  But just to, kind of, finish it

11   out, I do think that if -- if you grant the government's

12   motion, all of that is moot.  The Counts Five and Six,

13   those retaliation claims, you know, which are brought

14   under the False Claims Act in state law, they would

15   apply to relator's former employer Ventavia.  And,

16   obviously, I'm going to let their counsel address those

17   because -- those are still live and, you know, probably

18   could benefit from argument.

19              THE COURT:  Sure.

20              MR. WESSEL:  But if I might, your Honor, just

21   a couple of points on the government's motion because I

22   just think it's important to -- you know, that that's

23   obviously an essential piece of the litigation here.

24   And I think -- I mentioned the *Harman* case, and you and

25   I discussed that at length back -- I guess it was a

1  little more than a year ago.  And that obviously -- the

2  essential issue in there is that materiality issue, but

3  there are other issues in there that I think are -- are

4  quite significant to this litigation.

5          So if I might just -- you know, if you, kind

6  of, boil down the relator's objections to the

7  government's motion and, sort of, put aside the

8  inflammatory rhetoric and things of that nature, it's

9  really a disagreement about, you know, the safety and

10  efficacy of the vaccine.  The FDA has a position that

11  the vaccine is safe and effective and saves lives, and

12  the relator obviously strongly disagrees with that.  But

13  that's not really relevant to the motion, right?  We

14  talked, and the government spoke -- spoke very well

15  about what the law is, and that's the essential issue

16  here.

17          But the -- and the reason why I raised that

18  *Harman* case is the Fifth Circuit -- so, obviously, you

19  have the *Polansky* precedent, which was discussed, I

20  think, very effectively there.  But -- but in the *Harman*

21  case, the Fifth Circuit also addresses a very, very

22  similar issue.  When they went through, sort of, a

23  survey of the case law, they quote from a First Circuit

24  case called *D'Agostino*, very approvingly in that case,

25  and that case was postured in a similar way.  And in

31

 1  that case, this is what -- the *Harman* -- the

 2  Fifth Circuit said about the First Circuit.  It talked

 3  about the First Circuit affirming a dismissal in that

 4  case under 12(b)(6).  And what the -- the *D'Agostino*

 5  court, the First Circuit said is:  The fact that the

 6  Centers for Medicare/Medicaid Services have not denied

 7  reimbursement -- and this was a device case, not a

 8  vaccine.

 9           THE COURT:  Okay.

10           MR. WESSEL:  But, obviously, a lot of

11  similarities --

12           THE COURT:  And it's a 12(b)(6) case --

13           MR. WESSEL:  Yes.  Both 12(b)(6).  But, I

14  think -- again, what it, kind of, circles back on is

15  this whole disagreement between the relator and the

16  government, which I think the Fifth Circuit is, sort of,

17  warning against.

18           THE COURT:  Okay.

19           MR. WESSEL:  So what the First Circuit said

20  is:  The fact that the Centers for Medicare and Medicaid

21  Services have not denied reimbursement for the device in

22  the wake of the relator's allegations casts serious

23  doubt on the materiality of the fraudulent

24  representations that the relator alleges.  This is this

25  whole materiality issue we talked about at length.  Then

1  the Court goes on to say:  Allowing the False Claims Act

2  claim to go forward -- and now here it's quoting from

3  the First Circuit -- would be to turn the False Claims

4  Act into a tool with which a jury of six people could

5  retroactively eliminate the value of FDA approval and

6  effectively require that a product be withdrawn from the

7  market even when the FDA itself sees no reason to do so.

8            And, basically, what the Fifth Circuit says

9  is these cautions remain forceful on the materiality

10 context -- in the materiality context.  The False Claims

11 Act exists to protect the government from paying

12 fraudulent claims, not to second guess agencies'

13 judgments about whether to rescind regulatory rulings.

14 So -- so I think in a lot of ways, even though the

15 *Harman* case really addresses materiality at various

16 stages in the litigation -- and we talked at length

17 about this, your Honor.  I don't want to go --

18            THE COURT:  I see how you're connecting --

19            MR. WESSEL:  Yes.  Yes.  Exactly.  And you'll

20 recall, you know, the conclusion of the *Harman* case,

21 what the Fifth Circuit said is:  For the demands of

22 materiality, adjust the tensions between the singular

23 private interest and those of the government and cabin

24 the greed that fuels it.  As the interests of the

25 government and the relator diverge, this congressionally

1  created enlistment of private enforcement -- that's the

2  False Claims Act -- is increasingly ill served when the

3  government, at appropriate levels, repeatedly concludes

4  it has not been defrauded, it is not forgiving a fraud,

5  rather it's concluding that there was no fraud at all.

6        THE COURT:  So as a general principal, under

7  Fifth Circuit authority that I'm duty bound to follow,

8  as well what you're saying is Supreme Court authority,

9  which I'm obligated to follow, even if a lot of people

10 might disagree with the decision to prove -- to approve

11 a medical device or the decision to evaluate the testing

12 protocols of a vaccine and -- that later determined that

13 whatever variations there were, were not material to the

14 ultimate decision to approve the drug, which is really

15 the gist of the fraud claim.

16        You know, that's to say these defendants,

17 your client, kind of tricked the FDA into approving this

18 because they didn't use proper test protocols.  I know

19 the government denies that.  They say it's not true.

20 But that decision to say, no, we're satisfied with the

21 government's decision -- we're satisfied with the test

22 protocols and -- that -- a lot of people may disagree

23 with that decision.  But these cases are saying if

24 that's what the agency has decided and if the government

25 has decided they don't want to pursue this for the

```
 1   reasons he described, they can have a case dismissed.
 2            MR. WESSEL:  That's correct, your Honor.
 3   That's what the Fifth Circuit said relying, again, on
 4   First Circuit precedent.  And effectively getting to the
 5   government's motion, that's what Polansky -- you know, I
 6   know there are separate issues of materiality in the
 7   government's motion to dismiss.
 8            THE COURT:  Right.
 9            MR. WESSEL:  But really -- really those two
10   precedents are binding on the Court.
11            THE COURT:  Okay.  That's interesting.  I
12   hadn't really -- in coming out here today, I hadn't
13   really -- I remembered your arguments on materiality,
14   but I didn't really -- I wasn't focused on those.  It's
15   probably good to --
16            MR. WESSEL:  It was some time ago,
17   your Honor, and I think we were here for hours.  So I
18   had to go back and refresh myself.
19            One other quick point on our motion to
20   dismiss because I know you -- you wanted to, you know,
21   hear that in case --
22            THE COURT:  Well, I wanted to hear the motion
23   to dismiss after --
24            MR. WESSEL:  That's fine.  I'll save that and
25   just --
```

35

1          THE COURT:  I think it would be cleaner.

2          MR. WESSEL:  No problem.  Happy to do that.

3   You know, just a couple of points on -- on -- just to

4   highlight some of the things --

5          THE COURT:  And the reason I want to do it --

6   still have it is I want to hear arguments on the

7   government's motion to dismiss.  And I'm going to

8   consider that separate and apart from the defendants'

9   motions to dismiss.  If, obviously, I agree with the

10  relator, then I need to then consider what the arguments

11  are on the motions to dismiss.  And I don't want to have

12  to have everybody come back again if -- in that

13  eventuality to hear -- to have y'all do it.  I want to

14  have it one-stop shop and get it all done today.

15          But by the same token, if -- even though you

16  will have argued the motions to dismiss, should the

17  ultimate evaluation of this Court be that the

18  government's motion to intervene and motion to dismiss

19  is valid, then I think the motions to dismiss will

20  simply be -- the claims will be dismissed as -- granted

21  as moot or actually, I guess, denied as moot because it

22  really -- and you will have argued it, but so what?  You

23  know, you're prepared to do it.

24          MR. WESSEL:  We agree with that, your Honor,

25  and that seems like a sensible way to proceed to me.

36

 1              THE COURT:  Okay.  All right.  Anything else?

 2              MR. WESSEL:  Just maybe a couple quick points

 3  and just staying with the government's motion because

 4  then we can --

 5              THE COURT:  That's what I want.  That's what

 6  I want.

 7              MR. WESSEL:  -- get into some of the others

 8  the next time around.

 9              You know -- so I think there are a couple of

10  key points there.  And, obviously, I defer to the

11  government who has far superior knowledge of this area.

12  But since the Supreme Court clarified the law in

13  *Polansky*, I have not seen any case law where a District

14  Court declined to dismiss after the government filed

15  such a motion as they have here.  Also, again, since

16  *Polansky*, I have not seen any District Court hold an

17  evidentiary hearing.  So we talked about whether that

18  was necessary.  So I think those points are worth -- are

19  worth considering.

20              And as your Honor has pointed out, if you

21  grant the motion, the case -- the case is done

22  essentially.  Again, there's that subtlety around the

23  claims against Ventavia, but --

24              THE COURT:  You talked about you didn't find

25  any cases where the government moved to dismiss.  Let me

37

1  just ask you:  In qui tam cases -- and considering

2  Rule 24 -- did you find --

3            MR. WESSEL:  After -- after the *Polansky*

4  decision, the Supreme Court's decision last year?

5            THE COURT:  Well, I'm talking about any

6  before or after *Polansky*.

7            MR. WESSEL:  Yeah.  No.  No.

8            THE COURT:  You know, Courts look to Rule 24

9  to determine what is good cause.  Did you find any cases

10 in qui tam cases where you found that the government

11 didn't have good cause to intervene?

12           MR. WESSEL:  I think I'd defer to the

13 government because they're probably the experts on that

14 particular question.

15           THE COURT:  Okay.

16           MR. WESSEL:  But I'm not aware of any off the

17 top of my head.

18           THE COURT:  And I'm going to ask that

19 question to relator here in a minute because I'm curious

20 about that.  Maybe there is a case out there.  I want to

21 know about it.

22           MR. WESSEL:  Yes.  We can look at that.

23           Again, quickly -- your Honor, again, this

24 case would be gone if you grant the government's motion

25 to dismiss.

38

1          THE COURT:  Right.

2          MR. WESSEL:  And it's not only our position.

3   And all of the defendants would agree with that, and

4   obviously that's the government's position.  But when we

5   argued back in March, that was the exact same position

6   that Mr. Mendenhall took with the Court.  And, again,

7   I'm quoting from the transcript back then, Page 108,

8   where Mr. Mendenhall told the Court, "I think that,

9   first of all, if the U.S. government, if it wants this

10  case dismissed, it can come here and dismiss this case."

11  And then on the next page, 109, Mr. Mendenhall says

12  again, "And if the government wants this case gone, why,

13  they can come in tomorrow and get it gone, your Honor."

14  So --

15          THE COURT:  And that was before the *Polansky*

16  decision came out, which I think was in December.

17          MR. WESSEL:  Yeah.  This was in March, your

18  Honor.  Yes, that's correct.  Correct.

19          THE COURT:  Okay.

20          MR. WESSEL:  But that's all I have, your

21  Honor.  We obviously would support the government's

22  motion to intervene and dismiss.

23          THE COURT:  All right.  Thank you very much.

24          Does anybody else care to comment?  All

25  right.  You're saving your bullets for later then, huh?

39

1          MR. DAVIS:  On the government's motion,

2  Judge?

3          THE COURT:  Yes.  On the government's motion.

4          MR. DAVIS:  No.  We'll wait until we address

5  our own.

6          THE COURT:  I'll give you a chance.

7          All right.  Mr. Barnes, I assume -- are you

8  going to be the lead-off hitter for the relator?

9          MR. BARNES:  I will be just addressing

10 Counts Five and Six, the retaliation counts, your Honor.

11         THE COURT:  Okay.

12         MR. BARNES:  So I'll wait for that.

13 Mr. Mendenhall will be addressing Counts One

14 through Four.

15         THE COURT:  All right.  Very good.

16         MR. MENDENHALL:  Your Honor, I'm actually

17 trying to get an answer to your last question.  There --

18 it does appear that there is one case.  It's *U.S. ex*

19 *rel. Odum v. Southeast Eye Specialists*.  That was in

20 February 24th, 2021.

21         THE COURT:  Do you have a cite on that one?

22         MR. MENDENHALL:  I'm sorry?

23         THE COURT:  Do you have a cite?

24         MR. MENDENHALL:  I'll give you the case.

25 It's Case No. 3:17-cv-689, Middle District of Tennessee.

40

1          THE COURT:  Okay.  Did you get that?

2          MR. MENDENHALL:  Yeah.  I'm sorry.  I don't

3    know --

4          THE COURT:  You don't know if it was

5    published or not?

6          MR. MENDENHALL:  I don't know.

7          THE COURT:  Okay.  Well, that's pretty good.

8          MR. MENDENHALL:  Well, I knew I had it

9    because we have had this discussion in the office and it

10   was in our chat.

11         THE COURT:  Okay.  That's good.  So y'all --

12   great minds think alike then.

13         What year was that?

14         MR. MENDENHALL:  It was February 24th, 2021.

15   I'm sorry I don't have more than that, but that's -- I

16   knew we had it somewhere.

17         THE COURT:  We'll run our traps and find it.

18         MR. MENDENHALL:  Your Honor, obviously there

19   is a lot to address here.  And we're in a very

20   interesting -- I'm sorry.

21         THE COURT:  No.  I hear you.

22         MR. MENDENHALL:  We're at a very interesting

23   stage.  And one of the things that I did, which is

24   reflected in the brief, is we went back to the Senate

25   reports and the House reports on the Federal False

1  Claims Act.  And, you know, one of the things that

2  the -- there is a role that the relator plays,

3  particularly when there's this effort to dismiss a case,

4  and they say it.  They say the relator is a check on the

5  government.  You know, and who's really sovereign here

6  are the peoples.  I think that's the Senate reminding us

7  of that; that the relator is a check on the government.

8  And the other thing is -- I think good cause is being

9  brushed off as almost nothing.

10         THE COURT:  It could really be a detriment to

11  the attorneys in qui tam litigation since the government

12  could intervene at any phase in a litigation after some

13  attorneys have invested significant sums of money

14  developing a case and have it evaporate on them late in

15  the litigation.  That could be a hard pill to swallow.

16         MR. MENDENHALL:  Your Honor, I can tell you

17  how hard it is to swallow.  And I have it on appeal.  In

18  fact, they cited to one of my cases.  I will say -- and

19  that's the *Wolf Creek* case.  But I will say this about

20  the judge's opinion in *Wolf Creek*, which I thoroughly

21  disagree with there.  The judge, at least, said, look,

22  there was an issue with the reliability and trustfulness

23  of the relator.  He said there were significant

24  discovery issues in that case that were being considered

25  with NASA.  That's a NASA case.

42

1          So, at least, the judge in that case --
2    although I fully disagree and it's on appeal and briefed
3    at the Sixth Circuit Court of Appeals.
4          THE COURT:  Okay.
5          MR. MENDENHALL:  He listed the issues.  He
6    looked for reasons -- good cause reasons.  It wasn't
7    just that, oh, the government came in and wanted to
8    dismiss.  It was -- there were very specific reasons for
9    dismissal.  And if you look down at all the cases that
10   are cited -- and we did.  And I don't think we cited
11   *Harman* in our brief opposing the U.S. government's
12   motion to dismiss.  But if you look down in all of those
13   cases, there are real issues.  In *Polansky*, for example,
14   what happened is they had set up a discovery schedule.
15   They were deep into discovery.  And the judge actually
16   intervened to limit the discovery, to cabinet.  They set
17   up a plan.  They had very particular data requirements
18   and controls.
19          And guess what?  The relator and their
20   lawyers, I guess, in that case completely ignored the
21   directions of the judge and the agreements that they had
22   met with the U.S. government to limit discovery and make
23   sure that it was not a burden on the U.S. government,
24   that discovery.  The other thing the relator did in that
25   case was had 14,000 pages that the relator had not

1   turned over in the discovery, which came late and

2   completely upended the Court's schedule and everything

3   that had been planned along with the U.S. government and

4   the defendant.  So *Polansky* has a very interesting

5   history.

6              One other thing I want the Court to be aware

7   of in that history in *Polansky*, the judge both

8   considered the government's motion to dismiss, but also

9   went on to rule on the defendant's motion to dismiss.

10  So it was not an either-or proposition.  The judge did

11  not moot out the defendant's -- the defendant's

12  positions and, in fact, ruled on those motions to

13  dismiss.  The Court felt that that would be very helpful

14  in that case.  And I think that -- you know, I just want

15  the Court to be aware that that case has some very

16  particular facts.

17             You know, the *Carver* case is another one

18  that's interesting.  And what happened in *Carver* -- the

19  relator got a default judgment against the defendant,

20  and then the Court, you know, apparently notified the

21  relator that they hadn't finalized the judgment.  And

22  then the U.S. government and the relator were in a

23  negotiation over what that judgment would consist of,

24  what was within the scope of the False Claims Act, and

25  what was actually in the scope of a criminal case that

44

1   was going in parallel.  Had the relator, again, worked

2   with the government, they would have had a default

3   judgment entry and had an award.  Instead, that relator

4   behaved in such a way that that relator was

5   noncooperative with the federal government and was

6   disrupting the federal government's ability to collect

7   against the defendants.

8           So every case we've looked at where there is

9   a dismissal, we see things that, yeah, you know,

10  arguably -- even in *Wolf Creek* arguably -- are good

11  cause.  And -- but good cause is not no cause.  It's not

12  that, oh, the federal government wants to come in and

13  dismiss.  That's not appropriate.  That eliminates the

14  relator's role as a check, as the Senate sought.  That

15  eliminates the Court's role to adjudicate what is or is

16  not good cause in this case.  Those are the concerns

17  that we bring up.

18          Now, the other thing that I think is

19  critical -- you know, there's actually a lot that I

20  agree with in terms of the government's motion.  And

21  I'll try to get into some of that, but what we're facing

22  right now is the decision that was made by the EPA based

23  on what we contend are lies.  That's the problem.  It's

24  not about safety --

25          THE COURT:  Excuse me.  The EPA?

1          MR. MENDENHALL:  The FDA.  Did I say EPA?

2    I'm sorry, your Honor.

3          THE COURT:  That's what I thought you said,

4    yeah.

5          MR. MENDENHALL:  Too many agencies that we're

6    suing, I guess.  But the FDA -- we considered that what

7    was said to the FDA, and we've alleged, that they are

8    lies.  Everything that they talk about in the JAMA

9    article, in their brief is based on the lies that we're

10   contesting.  Clinical trials that put false data before

11   the decision-makers.  Clinical trials that did not

12   reflect the all-cause mortality -- the reality of

13   all-cause mortality.  Clinical trials that were designed

14   to obscure and call people unvaccinated even after they

15   had had one or two shots.  They were unvaccinated until

16   after it got 14 days or whatever past the second shot.

17          So that's the way this was designed.  So the

18   data is completely flawed by clinical trial design.  Our

19   regulators made a decision based on that, and they're in

20   here defending saying they saved millions of lives for a

21   product that we know -- and I have submitted -- we have

22   submitted to the Court a bunch of scientific articles,

23   expert testimony, experts that would come here to this

24   court to testify.  And I'll proffer that to the Court,

25   by the way, your Honor.  I think that, you know, we

46

1  are -- we greatly appreciate you having the hearing and

2  hearing us out.  That does not happen in every court.

3  So I just want to tell the Court how much we appreciate

4  that.

5        But we also would like to offer to the Court

6  that we will proffer every expert that is in -- in those

7  articles that we have submitted to the Court, we will

8  proffer that.  They're -- they would be willing to come

9  here and talk about the injuries, the deaths, the

10 disabilities, and other problems that have occurred from

11 this vaccine.  They would be willing to talk about how

12 the JAMA article is fundamentally flawed in its

13 analysis.  There's a whole another analysis when you go

14 back and look at the clinical trial data that show

15 adverse events, deaths, and no overall effectiveness and

16 all kinds of safety signals that were obscured from the

17 FDA -- see, I almost did it again -- the FDA in its

18 decision-making.  That's what we're concerned about.

19        The latest travesty that occurred is the --

20 is the release of the myocarditis report.  I think I

21 have it down here.  148 pages that was issued by the

22 CDC.  148 pages all redacted.  Where are we as a public,

23 as a people supposed to get our information in an

24 emergency?  We are -- this is an emergency.  The most

25 crucial thing in an emergency is to tell the truth, have

1  facts, and have our society make decisions about what

2  should be happening there.  We don't --

3           THE COURT:  Let me ask a question.  You've

4  indicated various studies that vaccine -- the vaccine

5  has caused serious illness, perhaps death of

6  individuals.  There is litigation against drug

7  manufacturers all the time regarding a problem with a

8  drug that causes death or injury.  Why can't these

9  things be brought out by representing an injured

10 plaintiff or a deceased plaintiff and go against Pfizer

11 for having a bad drug essentially is what you're saying.

12 That's one group of facts and claims and what have you.

13 But here ours is not so much concern because Ms. Jackson

14 fortunately didn't become ill or didn't die.

15          She claimed she saw discrepancies in the

16 testing in some sites here in Texas.  Therefore, she

17 reported that.  She was fired.  And she says those

18 discrepancies that she saw caused the -- had they been

19 considered, the FDA would not have approved the drug.

20 And since -- because that happened, the government was

21 duped into paying so much money per vial and that's a

22 huge sum of money.  And that's money that was -- this is

23 really that the government has been defrauded.  It's not

24 so much because of the testing protocol and what have

25 you.

48

1          Now, whether or not the drug itself is a bad

2     drug, hurts people, kills people -- I mean, that -- if

3     that's true, it may have its place in court, but

4     wouldn't it be more in terms of a pharmaceutical

5     liability case and those can be filed.

6          MR. MENDENHALL:  Your Honor, my greatest wish

7     is that there would be a court that would consider those

8     claims.  What we have now is the Countermeasures Injury

9     Program.  It's called the CICP, Countermeasures

10    Compensation Program.  That program has been the most

11    paltry response to major vaccine injury that I've ever

12    seen in my life.  I think the average award at that

13    court has been $3,000.

14          I can tell you that I have clients right now

15    that are injured.  We're going after worker's

16    compensation, that's one possibility.  We're looking at

17    disability claims in social security.  We're looking at

18    disability claims in private insurance.  Those are

19    paltry responses to the extent of the injury that's

20    occurring here.  You know, we have people -- I have a

21    client with transverse myelitis, your Honor.  She's in

22    her forties.  She -- I have to help her stand up if she

23    wants to give a talk somewhere.  In fact, her heart is

24    failing.  You know, so, no -- the answer is no.  There

25    is not an adequate compensation for them.  There is not

49

1   adequate liability, and we need to make sure that the

2   PREP Act, which I believe is unconstitutional, is either

3   overturned or changed so that people can get

4   compensation against these companies.

5          THE COURT:  But what I'm -- in this case, the

6   measure of damages sought is not the value of a human

7   life that's been lost because of an adverse reaction to

8   the vaccine or something like that.  It's that -- it's

9   like $20 a vial or some -- whatever the cost was --

10  times however many vials it was.  And that's in the

11  document.  That's -- that's what this lawsuit's about.

12         MR. MENDENHALL:  That's right.

13         THE COURT:  And whether or not -- this may

14  sound harsh to say, but whether or not the vaccine hurt

15  somebody or killed somebody or somebody had an adverse

16  reaction to it, is not really what this lawsuit is

17  about.  It's about getting that $20 a vial.

18         MR. MENDENHALL:  Well, your Honor, that does

19  add up to a considerable sum in the hundreds of billions

20  of dollars.

21         THE COURT:  It does.

22         MR. MENDENHALL:  And, additionally, we

23  believe that penalties of over $20,000 per -- per

24  administration of the shot and that adds up to

25  somewhere at this point I think over $4 trillion, which

50

1  would bankrupt and cause -- cause Pfizer to be

2  bankrupted and sold off in bankruptcy court.

3          So the damages and the penalties are very,

4  very substantial here.  And the damage to the

5  taxpayer -- that's what we're addressing here.  The

6  damage to the taxpayer is in the hundreds of billions of

7  dollars because we have paid for essentially a bullet

8  that blows up in your face and injures some percentage

9  of the people who shoot it.  And it's not an

10  insignificant number.

11          So the product that's been provided to the

12  Department of Defense is flawed, faulty, ineffective,

13  and unsafe and is injuring our troops and it's injuring

14  our citizens.  And it is not providing effectively for

15  the national defense.  So that's a serious problem.  And

16  we think that this is literally in the mine-run of

17  qui tam False Claims Act cases dealing with military

18  procurement where we got faulty blankets and shoes with

19  cardboard soles and bullets that didn't work.  You know,

20  so it's in the mine-run, but we have to change how we

21  think about it.  We have to remember this is a defense

22  contract that gave us a product that's blowing up in our

23  faces.  And we have got to hold those defense

24  contractors like Pfizer accountable for that.  And

25  that's -- you know, that's our position on that.

51

```
1          THE COURT:  But -- and back to the issue.
2   Without all of the scientific evidence that you want to
3   proffer about the ineffectiveness of the drug or even
4   the dangers of the drug, the real issue here is were
5   test protocols followed so that the FDA approval was
6   valid.  That's really what this case is about.  And also
7   she reported it and got fired and she has a retaliation
8   claim -- let's don't lose sight of that -- and that is
9   also a part of this lawsuit.  That's really what this
10  lawsuit is all about.
11          MR. MENDENHALL:  Again, it falls right down
12  the mine-run of defense department cases where the
13  improper testing of whatever military equipment went on
14  and then the military equipment failed in the field.
15  And they run it back to see what happened with the
16  testing.  It was bad, faulty, inappropriate.
17          Did you have something --
18          I'm sorry, your Honor.  I've got such
19  esteemed colleagues here.
20          THE COURT:  Right.  Everybody wants to get in
21  on that.  Well, I'm sorry.  I probably got you out of
22  your stride.  I'm going to let you get back into your
23  argument.  I'm going to listen more.  You probably -- do
24  you have some more you want to argue?
25          MR. MENDENHALL:  I just want to make sure I
```

52

1   go through a couple of other --

2               THE COURT:  Go ahead.  I'll listen.

3               MR. FRIEDMAN:  Can I just respond to the

4   question that you asked?

5               THE COURT:  Is this like a good wrestling

6   match?  You tag-teaming here?

7               MR. FRIEDMAN:  Is that okay?

8               THE COURT:  Tag team.

9               MR. FRIEDMAN:  Okay.  Thank you, your Honor.

10              The proffer of proof about bringing in

11  experts to show that this thing is causing injuries and

12  it's ineffective, that's part of what we're saying the

13  evidence would be.  But the Cureus article that was

14  authored in part by Peter McCullough doesn't just go to

15  the fact that it's caused all this harm.  He goes into

16  all of the proof of what Brook Jackson and what our case

17  says, which is they committed clinical fraud because the

18  clinical trials are very well controlled, very adequate.

19  They're supposed to be.  And if you have a drug that's

20  going to cause injury, the clinical trials will catch

21  it.  You can't just lie about one little thing.  The

22  clinical trials have cross-checks to make sure that if

23  this vaccine doesn't protect against infection and if

24  this vaccine causes injury, then the clinical trial will

25  show that.

53

1        So the only reason why people got injured by

2   taking this is because Pfizer was lying in their

3   clinical trials to get the emergency use authorization.

4   So that's where the connection is.  We're not suing on

5   the injuries to the people.  We're suing for the

6   clinical fraud that allowed those injuries to happen.

7   And if those clinical trials were conducted correctly,

8   this thing never would have happened.  And that's why

9   they're trying to cover it up.  That's why the

10  Department of Justice -- the Department of Justice is

11  not saying that there was some sort of reason why we

12  should allow clinical trial fraud.  They're saying the

13  vaccine is safe and effective.  What's their evidence?

14  The clinical trials.  They're relying upon the clinical

15  trials to support their opinion that it's safe and

16  effective.

17        So we presented a lot of evidence about how

18  the vaccine is causing injury, but that wasn't to show

19  what our case is about.  That's -- those injuries came

20  about because of the fraud in the clinical trials.  And

21  even the Department of Justice's position before this

22  court right now that it's safe and effective and it has

23  saved millions of lives, that depends upon the integrity

24  of those clinical trials.

25        THE COURT:  Okay.  Thank you very much.  I

54

1   appreciate that.  And, by the way, I will, as is
2   customary, give the movant an opportunity to make a
3   response.  But I do feel like Mr. Gillingham may want to
4   address that.  At least I would ask him to address that.
5            Assume everything they say is true and I
6   know -- perhaps you just assume it's true -- bad test
7   protocol that ultimately led to a drug that is
8   dangerous.  Just assume that's true.  Given the
9   procedural case that we're in now, a qui tam action to
10  recover for fraud on these vials that were sold to the
11  Department of Defense, if the government can evaluate
12  all that evidence and still say we don't want to pursue
13  it, is that really under Supreme Court precedent?  Is
14  that really what the law is?  I'll give you a chance to
15  respond in a moment, but I think that -- maybe given
16  what we've heard, that is perhaps the question that we
17  need to hear a response to.
18           All right.  Go ahead.
19           He's checking his notes.  You've got him off
20  his tracks.
21           MR. MENDENHALL:  No.  No.  No.  Jeremy, I
22  always appreciate -- you can't imagine the hours we've
23  spent discussing these issues, your Honor.
24           You know, just in closing -- you know,
25  this -- this -- the FDA seems to be requesting, you

55

1  know, basically carte blanche to dismiss.  You know,

2  that their own motion to dismiss is the reason to come

3  in.  I just think that is not what *Polansky* was about.

4  *Polansky* didn't really get to good cause anyway.  It's

5  just on the 41(a).  But once -- and once they're in the

6  case, you know, I get the 41(a) and they're leading

7  it -- so once they're let in, you know, they do gain

8  control, your Honor.

9          THE COURT:  Well, what is good cause in your

10 opinion under 31 U.S.C. § 3730(c)(3)?

11         MR. MENDENHALL:  Well, it's not to make a

12 claim on health policy that goes right to the issue of

13 whether the data the health policy is based on is

14 fraudulent or not.  That's certainly not it.  It's not

15 to dismiss.  I think there has to be some reason.  They

16 have to show that the federal government has some

17 burdens that are beyond just the normal burdens of

18 observing a case go on, on its own.  You know, the

19 burdens that we've seen in the other cases.  And I think

20 maybe it is a case-by-case analysis.  Every case we

21 looked at had a burden.  It had a relator who wouldn't

22 agree to -- to what the penalties were.  It had a

23 relator who messed up the discovery.  It had a relator

24 who messed up the trial -- the court process.  You know,

25 it had relators that the government also had tried to

1   work with.  We haven't had any -- you know, any

2   involvement with the government.  We've required nothing

3   of them.

4           And they're not having to work on discovery

5   or anything with us at this point.  Furthermore, your

6   Honor, I want to point this out:  We actually -- we

7   recognize that the United States has an important role.

8   They may want to intervene.  This is just not the time.

9   And they may want to intervene later, but they haven't

10  shown any burdens right now.  Maybe we do become

11  burdensome on the government later.  I believe that's

12  possible.  And if we do become burdensome and they have

13  good cause at that point because we've created a burden

14  or there's a real problem that we've created in our

15  litigation, I think that's -- I think it's perfectly

16  reasonable for them to come back to this Court and say,

17  hey, we have this problem with discovery, the relator

18  won't let up on us and they don't even need it and boom,

19  boom, boom.  So there are things that I think could come

20  in later.

21          So a dismissal today, you know, I think,

22  anyway, would be a dismissal -- would be a dismissal

23  without prejudice.  I think if they had evidence that

24  there was a burden and the judge would have to be the --

25  you know, your Honor would have to be the arbiter of

1  where that threshold is -- you know, they could come in

2  later actually and move to dismiss the case.

3          THE COURT:  As you know, courts are not

4  political.  Decisions by an agency, decision to -- by

5  the Department of Justice, Department of Defense to

6  pursue an action may be political in nature.  How can a

7  court even interfere with what might have some -- a

8  political component to it?  In fact, if there is

9  criticism of the government for its decision with regard

10  to the vaccine, isn't that really a political decision

11  and citizens are free to do whatever they do politically

12  to address that?  But it's not in the purview of the

13  courts to get involved in that.

14          MR. MENDENHALL:  Well, your Honor, I agree.

15  The Court should look at it as not political.  And the

16  relator's --

17          THE COURT:  I mean, I'm stuck with Supreme

18  Court decisions and rules of procedure and -- I mean,

19  that's what the law is, you know.

20          MR. MENDENHALL:  But I'm going back to the

21  Senate report, and Senator Grassley has been very clear.

22  You know, he helped pass the statute when it originally

23  passed.  You know, and they left flexibility for the

24  government to intervene later.  They left flexibility

25  for the government to get involved in these cases later,

58

1    but they didn't leave it without a check and a balance.

2    And the first check is the relator, and the second check

3    is your Honor.  And they have to have good cause before

4    they dismiss this case.  And if they have good cause

5    later, they can come back in.  But I tell you it's not

6    good cause today, your Honor.

7                    THE COURT:  Okay.  All right.  Mr. Barnes,

8    did you want to say anything?

9                    Anybody else want to say something on this

10   side?

11                   MR. BARNES:  Just briefly, your Honor, to the

12   Court's question.

13                   THE COURT:  Yes.

14                   MR. BARNES:  I think the interest is where

15   could good cause come into play.  The Seventh Circuit

16   talked about it in one case.  It's what happens when the

17   government's reason to dismiss isn't in the interest of

18   the American people or the American taxpayer.  And in

19   the Seventh Circuit, they raised what if the reason is

20   they want to protect the reputation of a particular

21   businessman?  Well, here we have a situation where --

22                   THE COURT:  Do you know the specific case?

23                   MR. FRIEDMAN:  The spelling is

24   C-i-m-z-n-h-c-a.

25                   THE COURT:  It's in your brief?

1          MR. FRIEDMAN:  It's in our brief, including

2   the sur-reply --

3          THE COURT:  I'll look for it.  Go ahead.

4          MR. BARNES:  Thank you, your Honor.

5          The -- here we have a situation where there's

6   no -- because going to the Court's question about

7   politics.  Unfortunately, I think politics may have

8   contaminated the decision here.  I think the Court's

9   role is to keep politics out of it.  The Court's role is

10  to look at this and say, okay, have you given me a

11  reason that has a nexus to the qui tam's public

12  policies, the policies it serves?  In other words, okay,

13  you've identified a change of fact or law that makes it

14  unlikely that this case is going to succeed or you've

15  got a relator that's impossible to work with that's

16  going to make it more costly, more risky than reward to

17  get the benefit, but it needs to relate to the public

18  policy of the statute.  As opposed to here we have a

19  situation where the fact -- for example, the government

20  hadn't submitted any declarations under penalty of

21  perjury.

22          There's nothing from the FDA saying we have

23  evaluated Brook Jackson's allegations and we have

24  concluded they're true but we don't care.  Or we've

25  evaluated Brook Jackson's allegations and we've

60

1  concluded factually they didn't happen.  We have none of

2  that.  No evidentiary submission has been made at all by

3  the government.  It also goes to the Court's question

4  about when might an evidentiary hearing be necessary.  I

5  think when there is a question about the basis for which

6  the government is asserting good cause.  The government

7  says they're entitled to it.  I think their phrase is

8  "virtually entitled."  That isn't what the Senate report

9  shows.  That isn't what the statute itself says.  That

10 isn't what the Federal Rules of Civil Procedure provide

11 for.  Nor is it --

12             THE COURT:  The statute is silent as to good

13 cause.

14             MR. BARNES:  It is, your Honor.

15             THE COURT:  Uh-huh.

16             MR. BARNES:  So what does that mean?  I think

17 if the intention of the Senate and the Congress was to

18 have no limitations, it would have had no limitations.

19 It wouldn't have had any role for the Court.  It would

20 have said the government can intervene any time it wants

21 without any reason or basis given.  That no -- like, for

22 example, when we see the phrases "notice and to hear it"

23 in the statute, well, that comes within the broader

24 context of procedural due process.  And we look at

25 what -- what do we mean by that?  Normally we mean

61

```
 1   notice and a hearing on the merits and a hearing that
 2   has evidence if, as the Court mentioned, what if there's
 3   facts in dispute.
 4             THE COURT:  How much due process is due?  A
 5   full trial in front of a jury?
 6             MR. BARNES:  Only, I believe, if the
 7   evidence -- if it there is a factual dispute.  The Court
 8   pointed out a very good question the government can
 9   answer or address in a minute.  But here it appears the
10   government is disputing the facts.  In other words, the
11   government is saying we don't want anyone to believe
12   that the vaccine is not safe or not effective or a
13   vaccine.  And the -- not because they fully have any
14   testimony that they've researched our allegations and
15   found them to be untrue or immaterial.  Solely because
16   there's an official public policy of the current
17   administration that states that.  That doesn't sound
18   like good cause.  That doesn't have a nexus to the
19   underlying qui tam's public policy purposes.  That
20   sounds like there's people with a lot of reputations
21   that would be damaged if the world found out they
22   vouched for and mandated even a vaccine that wasn't a
23   vaccine, wasn't safe, and wasn't effective.  That's the
24   kind of thing the Seventh Circuit is talking about.
25   What if the motivation doesn't relate to the qui tam
```

62

1  motivation.

2          In other words, are they moving to dismiss

3  because it doesn't serve the American taxpayer's

4  interests for this case to move forward?  That's what

5  every single case where any dismissal has ever happened

6  in the qui tam -- that's been the government's good

7  cause.  This is not in the taxpayer's interests because

8  it's not worth the risk reward.  And I -- I recognize

9  what the Court says that that decision is something that

10 the judicial branch defers to the executive branch for,

11 but that isn't what they've said here.  What they've

12 said here is we have an official public policy that says

13 we can't have that public policy exposed as being based

14 on bad data, bad science.  That's not what the qui tam

15 is about.

16         The qui tam isn't about protecting the

17 reputation of people in power or that they currently be

18 there or to help them or hurt them in an upcoming

19 election.  It's what is the benefit to the American

20 taxpayer?  And here, going to Mr. Mendenhall's last

21 point, the Court can deny their motion to intervene at

22 this point without prejudice.  They can come in and give

23 a roadmap to the government because this is somewhat

24 unprecedented -- this kind of basis for a motion to

25 dismiss -- and say here's what good cause is, provide an

1  evidentiary foundation for it.  And then I believe if

2  there's disputes between us on that evidence, then

3  evidentiary hearing on that limited question as to does

4  this serve the taxpayer's interests because here they

5  haven't even given any evidence at all that it does.

6  And that's why we say it doesn't meet good cause, your

7  Honor.

8         THE COURT:  All right.  Thank you very much.

9         MR. BARNES:  Thank you, your Honor.

10        THE COURT:  Anything further?

11        All right.  Oh, yes.  Okay.  Come forward,

12  Mr. Friedman.

13        MR. FRIEDMAN:  I'm sorry.  It ties in with

14  what Mr. Barnes was saying.  If you're going to look at

15  the question of good cause to intervene to dismiss in

16  this case, you need to see it in the context of what the

17  False Claims Act is trying to achieve.  Nothing would

18  undermine the False Claims Act more than telling the

19  other future "Brook Jacksons" of the world, if you know

20  about fraud in the development of these drugs, don't

21  come to us, we don't want to hear about it because our

22  government stands behind vaccine manufacturers.

23        The dismissal here that the DOJ is asking for

24  is an attempt to try to send a signal to everybody else,

25  that despite the fact that you might have a meritorious

1  False Claims Act case, don't come forward.  And what

2  Mr. Mendenhall said is that -- we refer to the letter

3  that Senator Grassley wrote to the Department of Justice

4  saying that your assertion of an unfettered right to

5  dismiss cases, which is very similar to this unfettered

6  right to intervene to dismiss any time we want, that is

7  the worst thing you could do for -- not you, your Honor,

8  what the Department of Justice would do, to hurt the

9  functioning of the False Claims Act.

10          When they made those changes in the

11  amendments in 1986, they transformed this law that had

12  remained dormant from 1944 to 1986 because there was a

13  government knowledge defense.  If the government knew

14  about the information of the fraud, you couldn't bring a

15  lawsuit.  And they said that's not good because there

16  are people who know about fraud and they don't want --

17  they'll never come forward if what they think is they'll

18  come forward and nothing will ever happen.  So you'll

19  never encourage the relators to come forward with

20  knowledge of the fraud if you have a rule that says if

21  the government doesn't want to pursue it, don't come

22  forward.  And so that's why the qui tam provisions make

23  an assignment directly from Congress to Brook Jackson.

24          It's not an assignment to the Department of

25  Justice to then hire Brook Jackson and her lawyers.

1  It's an assignment to Brook Jackson and other relators
2  to enforce this action on behalf of the United States.
3  The government has an amazingly important role in that;
4  that they can intervene to dismiss when good cause
5  exists, when there's a good reason.  And even if they're
6  already part of it as part of the intervention as of
7  right, they still have to have a good reason.  It can't
8  just be we want it dismissed because our politicians
9  have decided that we want to support this.  So in terms
10 of the good cause standard and Mr. Barnes's argument
11 that it needs to be interpreted and consistent with the
12 False Claims Act, that would require a denial of this
13 motion.
14         THE COURT:  I have a question for you.  Under
15 313 U.S.C. § 3730(c)(1), it's still -- the statute says,
16 I think, that the primary responsibility for pursuing an
17 action is the government's, not the relator.  Do you
18 agree with that?
19         MR. FRIEDMAN:  I agree that once the
20 government is a party, they have primary responsibility.
21 So they first have to be able to get into the case and
22 then they have primary responsibility.
23         THE COURT:  Okay.  If they get into the
24 case --
25         MR. FRIEDMAN:  If they get in the case, then

1  they have primary responsibility --

2          THE COURT:  And then if they decide, hey,

3  these defendants over here haven't answered yet, they

4  have a motion to dismiss on file, we're going to cashier

5  this case.

6          MR. FRIEDMAN:  In the mine-run of cases, yes,

7  your Honor.  However, this is not the mine-run of cases.

8  And all of the courts, including *Polansky* in Footnote 4,

9  says that there is a constitutional floor.  And, you

10 know, the Department of Justice lawyers say there's due

11 process and equal protection.  But that's not the only

12 provisions of the constitution.  In fact, the First

13 Amendment protects the right to petition, just like it

14 protects the right to free speech.  In fact, they

15 correlate together.  The same rules about free speech

16 apply to freedom of petition because your right to

17 petition is an exercise of speech rights in a court or

18 in some other adjudicatory process.

19         So in this case -- for example, I posit this

20 question:  Could the government say, Brook Jackson,

21 don't go into the public square and say that Pfizer

22 committed fraud in the clinical trials because we think

23 the Pfizer vaccines are great and we're not going to

24 allow you in the public square to articulate your

25 opinion that these -- clinical trial fraud is

67

1  responsible for all this harm?  And the answer is, no,

2  they can't do that.  The First Amendment protects it.

3  How is this any different?  They're going into this

4  court and saying we're not allowing Brook Jackson to

5  express her opinion in this case that Pfizer committed

6  clinical trial fraud to make this thing happen, make

7  this debacle happen, and the attempt to try to cut --

8  terminate her right to petition the government on this

9  theory because of the content of her, because of the

10  viewpoint of her, and because it's her.  And we know the

11  government doesn't like what she has to say because it

12  undermines what they've done with this vaccine.

13          So, yes, your Honor, the government does have

14  a predominant interest once they are a party.  However,

15  they first have to have good cause to come in at this

16  late stage to become that predominant interest.  But

17  even if they had intervened early on, if they decided to

18  terminate it in violation of the First Amendment or the

19  separation of powers, which -- the Department of Justice

20  didn't even address the separation of powers.  We -- we

21  put an opposition -- that's the Seventh Circuit with the

22  difficult name to pronounce -- that said you have to

23  consider the separation of powers.  It should weigh

24  heavily in any good cause determination if what the

25  reason why they're trying to terminate a case is because

1  it's going to embarrass or expose some sort of financial

2  interest in some executives.

3          So this separation of powers argument is

4  extremely important even with the government having a

5  predominant interest.  And the Department of Justice has

6  waived their argument in opposition at this stage.  If

7  the motion is denied without prejudice, they can bring

8  it again, they can put in actual evidence, and we would

9  then petition for an evidentiary hearing to prove the

10 things that we've offered.

11         THE COURT:  Okay.  All right.  Thank you very

12 much.

13         MR. FRIEDMAN:  Thank you.

14         THE COURT:  I'll give the government a chance

15 to respond.

16         MR. GILLINGHAM:  Thank you, your Honor.  I'll

17 try and respond to the tag team here.  I mean, Eastern

18 District of Texas, as you know, one riot, one ranger, so

19 I'll -- you'll be stuck with me.

20         A few points, your Honor.  The purpose of the

21 False Claims Act is to protect the government from

22 fraud.  This is not a general purpose statute to

23 litigate any concerns outside of that.  I think we heard

24 from Mr. Mendenhall of FOIA issues regarding the

25 myocarditis report.  That's a FOIA issue.  That can be

1   litigated in FOIA.  That has no bearing on what's

2   happening here.

3           Whether or not he believes the PREP Act is

4   unconstitutional.  Again, these are not issues that need

5   to be litigated here.  The False Claims Act is not the

6   ultimate entry point for any litigant to address

7   concerns they have with the government's actions.  And

8   that's exactly what's happening here.  It seems like

9   there's an attempt to usurp the False Claims Act and

10  move it away from what it is, which is an effort for the

11  government to protect itself from fraud, from paying for

12  something it shouldn't have paid, into a general attack

13  on the COVID vaccine.

14          I think Mr. Mendenhall mentioned that there's

15  no burden on the government.  They haven't imposed a

16  burden on us at this point.  And that may be true.  This

17  is early, but we have had to come in and file a

18  statement of interest, your Honor.  And even in the

19  earlier hearing -- I believe it was back in March --

20  Mr. Mendenhall himself argued that we need discovery --

21  we also need discovery from the federal regulator and

22  the FDA and talk to them about what their standards are.

23  That's on Page 108, Line 18 through 109, 1, your Honor.

24          This isn't some, like, mere possibility in

25  the future.  I could go through plenty of statements in

1   the briefing and -- you know, setting aside all of the

2   public -- the public statements on social media and

3   otherwise.  The relators are coming after the government

4   here.  They're arguing that we're corrupt, that we're in

5   bed with Pfizer, attacking our individual attorneys

6   saying they're going to need discovery to prove all

7   this.  Again, your Honor, the False Claims Act is

8   designed to prevent our interests and that our interests

9   are predominant.  And here we've done the kind of cost

10  benefit analysis that we -- I think Mr. Barnes said, you

11  know, that generally this is an issue where there's some

12  sort of cost benefit analysis in these cases that hasn't

13  been done here.

14         I think that the problem is, your Honor --

15  and I would invite you to look at Page 7 of our motion

16  to dismiss.  Yes, the concluding line on that references

17  that the government shouldn't be forced under these

18  circumstances to pursue a case that's inconsistent with

19  its public health policy.  And I agree with that.  But

20  the preceding paragraph talks about the concerns about

21  the viability of the case given what the FDA knew and

22  what it's continued to see through things that happened

23  after the EUAs ended and also the burdens of litigation,

24  which are very clearly going to be coming.  I guarantee

25  you that if this goes into litigation, we're going to

71

1   get buried by -- by not only the defendants, but now

2   apparently in addition to defending discovery from the

3   defendants, we have to prove that we're not corrupt?

4   No.  For a case that we've evaluated has little chance

5   of success and these burdens coming, this is exactly the

6   sort of thing that does establish good cause for the

7   United States to say enough is enough.

8           I think -- you know, a couple of other

9   points, your Honor.  We heard about the right to

10  petition.  You know, the Footnote 4 in *Polansky* talked

11  about constitutional concerns.  It identified due

12  process and equal protection.  I work in the False

13  Claims Act space, and I have never heard of a court

14  concerning a First Amendment right to pursue a False

15  Claims Act case.  And it really doesn't make sense, you

16  know.  If you go back and look at *Blackstone* or *Stevens*

17  and talk about the limited assignment of rights to a qui

18  tam relator, they're -- those would have derived from

19  what the government's right as the real party in

20  interest were.  And the government doesn't have a

21  First Amendment right to petition, and Ms. Jackson is

22  not prevented from petitioning.

23          THE COURT:  Well, this is not the public

24  square.  This is a courthouse.

25          MR. GILLINGHAM:  It's not the public square.

72

1  It's not a courthouse.  And from the -- from what we see

2  in the courthouse today, clearly Ms. Jackson has not

3  been prevented from putting her message out there.  She

4  can pursue other avenues.  As your Honor hinted at

5  before -- I mean, if she's concerned about the decision

6  on the EUAs, the proper procedure to challenge final

7  agency action is through the Administrative Procedures

8  Act.  And, believe me, we have seen multiple APA cases

9  involving all aspects of COVID since -- since this has

10  taken place.  If there's concerns about what the FDA is

11  doing, there are citizen petition rights.

12          But, again, the False Claims Act is not a

13  catchall for people who want to voice concerns about the

14  government policy.  It simply doesn't apply here.  As

15  for separation of powers, I'll mention it briefly.  We

16  didn't spend a lot of time addressing this in the brief.

17  I think that the courts have considered separation of

18  powers issues.  You know, this was not an issue for the

19  Supreme Court there.  And some of these arguments --

20  both the right to petition and the separation of powers

21  issues, these would be exceptions that swallow the rule.

22          If -- if the government moving to dismiss,

23  which is provided for by Congress in the statute somehow

24  was violating the First Amendment or the separation of

25  powers in a way that it shouldn't be allowed to, then

73

1   that would read those out of the rule, your Honor.  And

2   I haven't seen any cases, including the *Polansky* case,

3   where the Court found that the separation of powers

4   issue was something that prevented the government from

5   proceeding there.  And also, your Honor, we have to keep

6   in the back of our mind that, you know, the executive

7   was assigned in the constitution, the take care clause,

8   to take care that the laws were enforced.

9        And, of course, cases like *Heckler v. Chaney*

10  say that the government's decisions in terms of whether

11  or not to prosecute or how its administrative priorities

12  are done are ill-equipped for the courts to handle, and

13  they should -- the Court shouldn't second-guess whether

14  or not something is prosecuted.  And that's similar to

15  this.  You know, we didn't choose for this case to be

16  filed.  We investigated it, dealt with it, and now we've

17  decided to end it.  Much like the courts can't step in

18  and tell the prosecutors down in the Beaumont office,

19  like, hey, you have to go prosecute this particular

20  person.  It's a similar concern here, your Honor.

21       And, you know, I hear the concern that we --

22  that this dissuades relators, your Honor.  I don't

23  really know how to -- exactly the way to respond to

24  that.  You know, relators know what they're getting into

25  when they file the case.  They're eventually going to

74

become public that they filed the case, and there is

always a chance the government steps in to dismiss.

It's not a surprise.  It's in the statute.  And, your

Honor, before assuming my current position, I was in a

firm as a civil enforcement attorney.  It's all I did.

Relators were essentially my clients.  Like, we love

relators.  We want them to bring the cases because they

help afford the government the ability to do what it

does in protecting itself from fraud.

The last -- the last thing, I think, I -- you

know, I'll try to address your Honor's hypothetical.

This -- I want to be very clear.  I think that the

government very much disagrees with the premise there.

But I believe your Honor asked us -- and maybe if you

restated it, it would help me just to make sure I'm

addressing it properly.  I think the idea was if we

assume that everything is a lie, would the government do

something different?  Is that close?

THE COURT:  If all of the complaints that

Ms. Jackson has about the process and about the dangers

of the -- of the vaccine were true -- given all that --

just accept it as true -- could the government still

decide on their own we don't want to pursue this action

and we want -- it's our case and we want to dismiss it?

MR. GILLINGHAM:  Yes, your Honor.  And I

1    think that in this case actually Ms. Jackson did voice

2    her concerns to the FDA prior to the EUA.  They had that

3    -- they were aware of that.  They put out the EUA But I

4    think it's important to remember this case is not

5    limited to what Ms. Jackson learned in her two weeks at

6    one or two locations.  The clinical trial was much

7    bigger than that.  The Ventavia locations were a mere

8    small subset of the overall data that was considered by

9    FDA.  They considered that data, and they actually

10   considered -- were able to consider what Ms. Jackson put

11   forth.  But the clock doesn't stop there, your Honor.

12            The FDA continues to monitor these things.  I

13   think if -- you know, even in the Danco oral argument

14   that counsel cited in their brief, the solicitor general

15   talked about how the FDA continues to monitor the

16   environment and look for adverse -- adverse events and

17   can always take -- make changes to the regulatory

18   landscape.  This isn't some sort of switch that turned

19   off once the EUA was granted.  And going back to the

20   JAMA article, which, again, you know, according to

21   relators, it's all false and based on lies.  The FDA has

22   access to everything the relators have access to.

23   Ms. Jackson ended her tenure at Ventavia a long time

24   ago.  There's no new information that she came out of

25   that was, like, a hidden source that she has provided to

1    the government.

2           Most of the data at issue came from FOIA

3    requests to the government.  It's the government's data.

4    We have access to our databases and all of the studies

5    that are cited.  These aren't hidden studies that they

6    just published for purposes of this litigation.  These

7    are studies that are in the public domain.  The FDA has

8    access to this.  It simply doesn't have the same

9    conclusion.  And I think that the case law is clear that

10   if the government has an argument -- a good argument for

11   why it should be dismissed, even if there is a vigorous

12   defense and even if the relator may have a different

13   position, the question is whether or not the government

14   should be able to dismiss because it's pursuing its

15   interests.

16          And here we think that the government has

17   established good cause because of the concerns about the

18   merits of this weighed against the burdens.  And given

19   that, the government believes it's time to stop the

20   case from going forward, intervene pursuant to

21   31 U.S.C. § 3137(c)(3), and dismiss this case over

22   relator's objections pursuant to (c)(2)(A), your Honor.

23          THE COURT:  Okay.  All right.  Thank you very

24   much.  The Court is going to take this matter under

25   advisement.  And we're going to take a brief ten-minute

1  break -- a comfort break for everyone.  And then we will

2  pick up with the defendants' motions and -- I think -- I

3  would hope you can be very concise in your arguments.

4  And -- and then -- I don't know if you want to change

5  tables.  That's -- it is a bit interesting to see the

6  visual here because in most qui tam actions the

7  government is sitting with the relators.  And here

8  they're with the alleged defrauders.  In any event, that

9  kind of speaks volumes.

10              All right.  We're in recess.

11              (Recess taken.)

12              THE COURT:  Thank you.  And please be seated.

13              All right.  And now we will hear from

14  Ventavia, correct?

15              MS. MCDONALD:  Yes, your Honor.  I think we

16  decided that -- whether to retread all the grounds

17  that's been discussed previously and fully briefed --

18  I'm going to discuss retaliation first because your

19  Honor referenced earlier that that claim would

20  potentially stand were the case dismissed by the

21  government.

22              THE COURT:  Okay.  Thank you.

23              MS. MCDONALD:  So I'm going to go ahead and

24  discuss retaliation, which is a claim that only pertains

25  to Ventavia as Ms. Jackson's former employer, but which,

1  even as amended in the second amended complaint, fails

2  as a matter of law.  And I will discuss the reasons why.

3        First, your Honor, as to Count Five, I'll

4  discuss the False Claims Act retaliation claim.  And you

5  previously dismissed that claim on two independent

6  bases.  One was that Ms. Jackson failed to allege she

7  engaged in protected activity within the meaning of the

8  statute, the False Claims Act; and, two, she failed to

9  allege that Ventavia knew she was engaged in protected

10  activity.  And so those are the two bases on which you

11  previously dismissed this claim.

12        She then amended the claim in her second

13  amended complaint, but nothing has changed with respect

14  to those two independent bases on which this Court

15  dismissed her prior claims.  And so they must be

16  dismissed again.  I'm going to try to be brief.  I know

17  we're short on time.  So as we explained in our brief,

18  the Fifth Circuit has run a clear line between the kinds

19  of internal reports that give rise to a retaliation

20  claim under the False Claims Act and that are, quote,

21  protected activity under the statute.  In order to be

22  protected activity, the relator must have actually

23  raised concerns about false claims for government

24  payment, not nearly criticize the company's business

25  practices or even discuss regulatory violations,

1   et cetera.  And this Court previously dismissed her

2   retaliation claim on this bases.

3           Ms. Jackson did not cure this issue in her

4   second amended complaint.  In fact, her factual

5   allegations have not really changed.  She continues to

6   say, as you'll see in her second amended complaint, that

7   she engaged in protected activity through internal

8   complaints about participant safety and regulatory

9   protocol and HIPAA violations, just as she stated in her

10  first amended complaint.  But these allegations, again,

11  fall short as a matter of law under Fifth Circuit

12  precedent of rising to what constitutes protected

13  activity under the False Claims Act.

14          Further, on the second basis that this --

15  these claims were previously dismissed, as before

16  Ms. Jackson fails to allege that Ventavia knew she was

17  engaged in protected activity, which is also required

18  under the False Claims Act retaliation provision.  And

19  for both of these reasons, Ms. Jackson's FCA retaliation

20  claim must be dismissed on the same basis as the Court

21  previously dismissed it.

22          And now when Ms. Jackson amended her

23  complaint for a second time, she added a state law

24  retaliation claim.  And that one is Count Six in the

25  second amended complaint, and that claim also fails as a

1  matter of law for reasons I'll briefly discuss.  First,

2  your Honor -- I guess before I get to that, were you to

3  dismiss the entire complaint, either because -- grant

4  the government's motion or our motions, we would -- we

5  would first argue that you should decline to exercise

6  supplemental jurisdiction over the standalone state law

7  claim in that instance.  So that would be our primary

8  argument.

9          But second and most importantly, the state

10  law retaliation claim also fails and must be dismissed

11  as well.  And that is also on two independent bases.

12  First, the state law retaliation claim is based on

13  Section 161.134 of the Texas Health and Safety Code,

14  which does not apply to Ms. Jackson or to Ventavia as a

15  matter of law because Ventavia is not the type of

16  healthcare facility governed by that statute.  And we

17  explained this in detail in our brief, and it is --

18  there is quite a bit written on that.  But

19  Section 161.134, which is the provision under which she

20  brought her retaliation claim, appears in a narrow

21  subchapter related to, quote, abuse, negligent, and

22  unprofessional or unethical conduct in healthcare

23  facilities.  That chapter defines abuse and negligent by

24  references to a Federal Protection and Advocacy for

25  Individuals With Mental Illness Act and addresses

1  misconduct against patients receiving chemical

2  dependency, mental health, or rehab services.

3         And so taking that in context, that section's

4  retaliation provision protects only the employees of

5  three types of healthcare facilities; hospitals, mental

6  health facilities, and treatment facilities.  None of

7  these apply to Ventavia.  Ms. Jackson alleged in her

8  opposition to our motion to dismiss that Ventavia is a

9  treatment facility under the statute, but it's not.  The

10 term "treatment facility" is defined by reference to

11 Section 464.001, which lists facilities like hospitals,

12 outpatient facilities, halfway houses, end quote, and

13 any other facility that offers or purports to offer

14 treatment.  And then treatment is defined as a planned,

15 structured, and organized program designed to initiate

16 and promote a person's chemical-free status or to

17 maintain the person free of illegal drugs.

18        And so under those definitions, Ventavia is

19 not a treatment facility because it undisputedly does

20 not provide programs that promote chemical or drug-free

21 status.  And not only does the plain reading of that

22 statute defy her interpretation that it is a treatment

23 facility, but there is some case law interpreting the

24 statute that disagrees with her interpretation.  There's

25 at least two cases we mentioned in our brief that have

1  held the term "treatment facility" in the statute is

2  plainly limited to those that provide some form of

3  chemical dependency or addiction treatment program.

4           And even if the statute did apply to

5  Ventavia, which we don't believe it does, Ms. Jackson

6  has not sufficiently alleged the type of violation of

7  law contemplated by that section.  The statute lists

8  three types of violations; a violation of this chapter,

9  a rule adopted under this chapter, or a rule of another

10 agency.  And relator's second amended complaint alleges

11 none of these.  And so on those bases, your Honor, we

12 would respectfully request that you grant our motion to

13 dismiss and dismiss for retaliation claims both under

14 the False Claims Act and Count Six under the state law.

15          And then, your Honor, she does request leave

16 to amend yet again in order to plead a new common law

17 claim for wrongful termination and additionally to cure

18 any further deficiencies, and we would respectfully ask

19 that that request should be rejected with prejudice.

20 You know, she's had several opportunities to plead a

21 viable claim, if she has one.  As you noted this

22 morning, you know, her original complaint has been

23 filed -- was filed three years ago, first amended in

24 February '22.  After this Court's dismissal, she was

25 given another opportunity to amend.  And she could have

83

1   alleged the wrongful termination claim at common law if

2   she had that claim at that point.  And, in fact, her --

3   I think her -- her opposition actually states on Page 28

4   that it would be based on the same facts she's had, your

5   Honor.  So we would ask that you dismiss her retaliation

6   claim, Count Five and Count Six, against Ventavia with

7   prejudice and deny her motion to file an amended

8   complaint.

9              THE COURT:  All right.  Thank you.  Anything

10  else?

11             MS. MCDONALD:  No, your Honor.

12             THE COURT:  Thank you very much.

13             Yes.  Come forward, please.

14             MR. DAVIS:  Your Honor, Scott Davis on behalf

15  of Icon.  Your Honor, despite the extraordinary breadth

16  of the discussion which you've had so far today, I

17  believe I can be brief, as the Court requested, because

18  the reality is the issue that brings us here today is

19  actually quite simple.  The Court may recall you've

20  already dismissed this complaint once.  Counts Two,

21  Three, and Four of the second amended complaint were

22  included simply to preserve them for appeal.  They're

23  not at issue today.  And, by the way, that determination

24  that the claim should be dismissed and lacked merit in

25  the Court's prior ruling is a fact which clearly

84

supports the United States's determination regarding the

likelihood of ultimate success here and is consistent

with their determination that the claim should be

dismissed.

         But in the event you choose not to dismiss as

the United States has requested, you should still

dismiss Count One -- and that's the only count at issue

except with regard to Ventavia.  For Pfizer and for

Icon, Count One is the only issue.  It was a fraudulent

inducement claim.  And the Court granted the relator

leave to file that claim to potentially cure some of the

deficiencies which led to the prior dismissal of the

other counts.  And in response, the relator added 20

paragraphs relating to that count to the second amended

complaint.  That's it.  Those 20 paragraphs are all that

are at issue in this motion to dismiss.

         Those 20 paragraphs do not meet the

particularity requirements of Rule 9(b).  They don't

specify particular fraud by any of the defendants.  They

certainly don't specify fraud as to my client Icon,

which I'll elaborate on in just a moment.  But just as a

reminder, the United States attorney mentioned this,

there really can't be fraudulent inducement in this

particular scenario because all of the allegations which

Ms. Jackson makes today were allegations which she

1  provided to the FDA prior to the issuance of the EUA

2  They were aware of these allegations.  There was no

3  concealment.  There was no fraud.  And, thus, there is

4  nothing that can be pled even theoretically that would

5  satisfy the requirements of the False Claims Act case.

6          And as you mentioned, Judge, this is not a

7  personal injury case.  It's not a political discussion.

8  It's a fraud claim.  It's a claim involving fraudulent

9  statements made with fraudulent intent for the purpose

10 of securing payment.  And in regard to my client, that

11 standard can never be met.  As a reminder, Icon did not

12 contract with the government.  Icon was not paid by the

13 government.  Icon did not make submissions requesting

14 payment from the government.  Icon did not -- did not

15 act in concert with Pfizer for the purpose of its

16 submitting payments to the government.  Icon was not

17 in a position that it could ever be subject to a

18 False Claims Act.  And the relator apparently knows this

19 because they've never even tried to make specific

20 allegations that would satisfy the requirements of the

21 False Claims Act and the particularity requirements of

22 Rule 9(b) in regard to Icon.

23          At our previous hearing in March, I walked

24 you through in some great detail all of the allegations

25 that involved Icon.  None of them involved statements at

1    all or representations.  None of them involved falsity.

2    None of them involved sinister.  When they amended their

3    complaint following that dismissal in Count One, they

4    added those 20 paragraphs I mentioned a minute ago.

5    They don't mention Icon.  None of them are specific to

6    Icon.  They just get lumped in together with the

7    defendants, but there are no specific allegations made

8    regarding Icon.  In the entirety of the claim, if you

9    look at Pages 29 and 30 of their response, in their

10   effort to summarize their False Claims Act allegations

11   against Icon and, for that matter, Ventavia, again, none

12   of them involve actual representations.  None of them

13   involve actual falsity.  None of them involve actual

14   fraudulent intent and, thus -- and none of them, in

15   fact, involve request for payment.  And, thus, none of

16   them, in regard to either Icon or Ventavia, could

17   possibly qualify for recovery under the False Claims

18   Act.

19            In essence, Judge, what the relator is asking

20   you to do today is to ignore your own prior ruling

21   regarding the merits of this claim, the DOJ's evaluation

22   of the merits of this claim, the clear Supreme Court

23   precedent in *Polansky*, and the determination that was

24   made by the FDA and continues to be made by the FDA with

25   full knowledge of the allegations that Ms. Jackson

1    brought to them at the time and today as a result of

2    this litigation.  None of that is warranted.  If we

3    focus on the issue, the simple question, did they

4    satisfy Rule 9(b) for pleading the necessary elements of

5    the False Claims Act in Count One of their complaint,

6    the answer is clearly, no, they didn't.  They didn't

7    even come close.  They didn't as to any of the

8    defendants, and they certainly didn't as to mine.  And

9    that failure, together with this Court's prior

10   dismissal, is a clear demonstration of the merits of the

11   DOJ's determination that the costs of this litigation

12   will ultimately outweigh the benefits.  And, therefore,

13   we would ask that the case be dismissed either by virtue

14   of the government's dismissal or by virtue of our own

15   motion to dismiss under 12(b)(6).

16           Thank you.

17           THE COURT:  Thank you very much, Mr. Davis.

18           And Pfizer is next.

19           MR. WESSEL:  Your Honor, I'll be very brief

20   because I know we spent quite a bit of time last year

21   talking about the motion to dismiss.  And really,

22   your Honor, the issues are identical here.  Your Honor

23   has allowed amendment to -- for the relator to add a --

24   bring a fraudulent inducement claim.  The issues of

25   materiality are precisely the same as they were back

88

1    when we talked about this in March.  And they -- the

2    governing precedent there is the Fifth Circuit's *Harman*

3    case.

4              The only thing that's changed, frankly, your

5    Honor, is the government's motion to dismiss.  So I

6    think that the lack of materiality has become even

7    stronger since we filed our motion and since we talked

8    about this last year.  I'm happy to answer any questions

9    you might have about that, but that's our position

10   there.

11             I'd like to just briefly address -- and I'm

12   not going to get into a lot of point-by-point rebuttal

13   of relator's allegations.  Today is not the first time

14   they've made unsubstantiated allegations against my

15   client and they've made unsubstantiated allegations

16   against many people -- other people in this courtroom.

17   But, you know, this -- we talked about this is not the

18   place for a mini trial.  But I do think it's important

19   to just put on the record that if this case does go

20   forward, Pfizer is prepared to rebut each and every one

21   of those allegations point by point.  And it is very

22   confident it will be able to do so.  The company is very

23   proud of having developed the lifesaving vaccine in

24   record time during a pandemic.  That -- you know, as the

25   government talked about in its submission here, along

89

with other vaccines, saved tens of millions of lives.
So I just want to state that for the record.  Again, I'm
not going to get into a tic for tac on all of that.

We -- I'll mention briefly -- we talked about
the materiality.  Your Honor mentioned this issue of
standing, Justice Thomas's dissent, in the *Polansky*
case.  I found it to be a very intriguing argument.  We
briefed it in our brief.  And, you know, we still take
the position that there's an Article II issue there with
even allowing qui tam actions.  And, again -- but
that -- that you see in our brief and I don't need to
spend a lot of time on it unless your Honor has any
questions about that.

But in conclusion, we would ask the Court to
follow the Supreme Court precedent in *Polansky* and grant
the government's motion to dismiss.  And if it declines
to do so, to follow the Fifth Circuit precedent in
*Harman* and grant our motion under 12(b)(6) and 12(b)(1)
and dismiss Counts One through Four of the complaint.

THE COURT:  All right.  Thank you.

Anything further from the defendants?

Okay.  All right.  From the relator?

MR. MENDENHALL:  Thank you, your Honor.  And
just to let the Court know, Attorney Barnes is going to
address the 3730(h) part of the argument.

1          THE COURT:  All right.

2          MR. MENDENHALL:  But I will -- I will attempt

3   to address some of the other issues that have arisen

4   here.  You know, it is very interesting -- you know, the

5   statement of interest that was submitted by the

6   United States last year.  And, in fact, the Court's

7   ruling on -- incorporating the ideas of the statement of

8   interest.  And the fact that we had mentioned fraudulent

9   inducement, but this Court directed us that there was

10  a -- a better way to insert that into our complaint

11  and -- and we greatly appreciated the opportunity to add

12  the fraudulent inducement count to the complaint.  And

13  we followed the roadmap laid out by the United States.

14  I think that may be what's happening here.  Because, you

15  know, Pfizer and the defendants do not agree with that

16  roadmap.  They do not believe there could be fraudulent

17  inducement when you lie and cheat the FDA.  But the

18  United States does not want to give that -- that up.

19          They are -- they are backing that theory of

20  the case that there can be a fraudulent inducement to

21  the FDA if bad data is submitted.  And we really have

22  seen -- you know, it's been such an interesting process

23  because this has gone on for years.  And we've got the

24  most remarkable public effort by experts and citizens to

25  understand the data that keeps coming out day after day

1    after day showing the inefficiency and effectiveness and

2    harm that these, quote-unquote, vaccines are causing.

3    And every bit of data has been borne out and shows that

4    that clinical trial data is not being reflected in the

5    populations around the world.  It is not being reflected

6    here in the United States.

7                And, in fact, the injuries that were covered

8    up, the deaths that were covered up, the effectiveness

9    that was obscured to show it was effective, all of that

10   has now been verified by public -- you know, by

11   scientists operating in the public interest, operating

12   independently, operating pro bono, and they verified all

13   of the -- all of what we knew because of the falsity in

14   the clinical trial.  So it shows how important this

15   clinical trial data is, and it shows this remarkable

16   effort that I think that the United States unfortunately

17   has not -- is not respecting what has happened here.

18                So I want to go back up here.  You know,

19   we've listed -- I'm not going to go through the listing

20   of failures.  I think that's on Page 7 of the second

21   amended complaint.  But, you know, there's about a page

22   of the failures including, you know, the unblinding, the

23   high adverse events in the control arm didn't look

24   right.  And then we saw the data come out initially in

25   the first three months of these shots.  There were

1  93,000 adverse events that occurred in the first three

2  months that these shots were, you know, issued into the

3  public.

4          There were over 300 strokes.  One percent of

5  the population had facial paralysis.  You know, over 500

6  people had neurological damage.  We had 38 people that

7  had MS and 11 that had adverse myelitis.  This is in the

8  public data that was supposed to part of the remainder

9  of the trial -- the phase three trial, which, as your

10 Honor knows, was truncated by vaccinating them way back

11 in December of 2020.  So the design of this trial,

12 this -- this design was -- was set up in a way to show

13 an effectiveness that was never there and it was to

14 obscure the problems that were emerging among the trial

15 participants and it obscured the impact on the public.

16         They destroyed the control group in December,

17 like I said.  They didn't report adverse events, and

18 they falsely counted the vax as unvax.  And I've gone

19 over this a little bit before.  But, you know, all I'm

20 trying to say is we amended the complaint based on the

21 federal government's guidance, based on this Court's

22 guidance, to go after fraud in the inducement.  That's a

23 theory that the federal government actually backs.  I

24 don't think they want a ruling on that.  I think that's

25 why they've come in and have moved to dismiss at this

93

1  time.

2             And I'll let Bob follow up on the 3730(h)

3  retaliation part.

4             THE COURT:  Yes.  Okay.  Thank you.

5             MR. BARNES:  Thank you, your Honor.  I

6  appreciate that the Court afforded this generous hearing

7  as it did before so that all parties could be heard.

8             It was interesting what the government said

9  earlier when it suggested that there were other places

10 and mechanisms of suit.  But point in fact, if you're

11 injured or harm is caused from this drug because there

12 was -- Dr. Davis submitted to the government -- you

13 can't sue under the PREP Act.  Everybody is immune.  So

14 if you're injured, out of luck.  If -- the government

15 suggested, well, they could always sue under the APA.

16 Well, I would know something about that because I filed

17 a suit against the FDA on behalf of Robert Kennedy and

18 Children's Health Defense.  And what was the

19 government's position?  Oh, no, actually, you can't.  No

20 standing to sue and to challenge the FDA's ruling.

21            And now they say you can't sue even when you

22 found the fraud and were the first to find it like

23 Brook Jackson.  This just leaves us with one little thin

24 effort at the petition of redress of grievance as

25 preserved under the First Amendment for Brook Jackson

94

1  and that is her retaliation claim against Ventavia.

2  There's -- we amended the facts of the complaint because

3  the Court originally noted there wasn't a connection --

4  there was no fraud inducement claim originally brought;

5  and, thus, there was no connection between her protected

6  activities and the fraud claim.  That has been remedied

7  by the amendment.

8        Now, everything she was -- why did she get

9  fired?  It's kind of obvious.  She reports it to the

10  FDA.  She tells them the day before she's going -- this

11  can't continue.  That they can't continue to enroll

12  people.  They've agreed not to enroll people.  She goes

13  to the FDA.  That afternoon she's fired after she

14  reports to the FDA.  The connection to the false claim

15  is that they were falsifying information to the FDA for

16  the fraud and the inducement to get the money.  The

17  Court's point was that that connection wasn't originally

18  in the complaint -- in the first amended complaint.  It

19  now is in the second amended complaint.

20        So under the very liberal standard afforded

21  pleadings, we've alleged sufficient facts to at least

22  reach the discovery stage of the case as it concerns

23  3730(h).  Secondly, as to the Texas Health and Safety

24  Code, I would note that the provisions --

25        THE COURT:  Let me interrupt just a second.

1          MR. BARNES:  Yes, your Honor.

2          THE COURT:  I think in their motion, they --

3  they're saying that you didn't specify the fraudulent

4  acts as to each of the individual defendants.  Do you

5  have a response to that complaint?

6          MR. BARNES:  Yes, your Honor.

7          THE COURT:  That issue they raise?

8          MR. BARNES:  Yes, I do.  I don't think that

9  would relate to the retaliation claim.  I think that

10  would relate to the other --

11          THE COURT:  Yeah.  Well, it really does.  But

12  when you said that, it made me think about that.

13          MR. BARNES:  Yes, your Honor.  Understood.

14  The -- there is specific allegations, but here you have

15  three parties working together to submit the emergency

16  use authorization information in order to get payment

17  under the contract.  So our allegation is -- is specific

18  to individual -- individual defendants when it's

19  applicable, but in many cases they're acting jointly.

20  And they're acting for joint benefit and for joint

21  objective and they're involved in joint fraud.  And

22  there are supervisory relationships between them.  There

23  are other agency relationships between them that we

24  allege.  But if the Court goes back to what this Court

25  discussed last time, which was what Justice Thomas said

1  in *Aguilar* -- said if you're trying to figure out if

2  there's a fraud, look at the essence of the bargain.

3  Don't worry too much about the formalities and

4  technicalities.  What's the essence of the bargain?  The

5  essence of the bargain is the defendants joined together

6  and promised to the defense department that they would

7  deliver something specific; a safe, effective vaccine

8  for the prevention of COVID-19.  Not as a diagnostic,

9  not as a therapeutic, but as a true inoculation.  And

10  that's what's repeated throughout the defense

11  department's statement of work.  That's what's in the

12  defense department contract.  And they are collectively

13  working to achieve that.  They're making arguments

14  about, well, Pfizer is the one that technically asked

15  for the money and then we got paid from Pfizer.  Or

16  Ventavia was actually doing the clinical trials and

17  Pfizer was just supervising.  But they're acting

18  collectively for a joint effort, for a joint benefit

19  from the government.

20          And the problem is we look at the essence of

21  the bargain.  Why is this fraud?  If we're just -- we

22  get away from all the technicalities and formalities.

23  It's they promised to deliver a safe, effective vaccine

24  for the prevention of COVID-19.  And what they

25  delivered, because they doctored the clinical trial data

1  to get the false emergency use authorization, is a

2  dangerous, ineffective drug that doesn't inoculate

3  against anything.  So it's not even a vaccine, and it

4  doesn't prevent COVID-19.

5          The whole essence of the bargain -- the

6  reason why the defense department was offering this

7  incredibly lucrative billions of dollars project was for

8  this extraordinary delivery at speed and scale of a

9  vaccine that most people thought couldn't be delivered

10 and still be safe and still be effective and still be a

11 vaccine and prevent COVID-19.  Coronavirus is notorious

12 for evading vaccines.  What Brook Jackson figured out

13 was that they knew they couldn't deliver that.  That's

14 what she was witnessing.  She didn't realize that.  She

15 spent almost 20 years trying to make sure we had safe,

16 effective medicine; safe, effective vaccines.

17         She gets there and all of the rules are being

18 thrown out.  You have bags with needles sticking out of

19 them.  You have people's private medical information

20 plastered on the walls for anybody to read.  You have

21 people being rolled out in the hallways and not even

22 being monitored.  You have people being completely

23 unblinded.  The whole basis of all clinical trial

24 success is protection of blinding at all costs.  Here

25 you have everybody being unblinded.  Anybody can see

98

what's happening.  You have people bringing in their
friends and their family members and other people and
paying them under the table.  Why?  Because they
couldn't deliver at speed and scale what they were
promising the government they could.  But there were
billions of dollars on the line.  And that's a mighty
temptation.

And when she brought up -- Brook Jackson
said:  We've got to fix this.  Let's just stop
enrollment.  Let's just fix this.  She wasn't trying to
undermine it, trying to prevent it, trying to preclude
it.  She just said:  Let's make sure we can fix it so we
do the clinical trial data right so the world can have
confidence that this will be safe, that this will be
effective, that this will work.  And as she kept
documenting it, you know, with photographs, texts, and
other information -- when she brought it in, they were
shocked at how much documentation she had.  They had
been slow rolling her for weeks.  And then they were
like:  What have you done?  How in the world did you
take photos?  Like, we've just got to focus on
delivering what we've promised everyone we're going to
deliver.  And that's when they said:  Well, maybe you
need to go home, but didn't terminate her or anything
else.

1        So she reaches out to FDA and says, you know,

2   here's the problem, basically we can't deliver a safe,

3   effective vaccine at speed and scale because we can't

4   even honor the very basic limits of honest clinical

5   trial data.  We can't deliver it, details it.  That

6   afternoon she's fired.  That afternoon she's terminated.

7   And then she risks her entire future and career to bring

8   this to the attention of the United States Government.

9   Who for more than a year told this Court that they were

10  seriously and sincerely investigating the allegations,

11  that they were doing a thorough review of it.  We still

12  never seen what the product of that thorough review is.

13       But now when they come in and step in late

14  and ask for it all to be dismissed and for the very last

15  case -- the very only case that can ever get any remedy,

16  any truth for the American people is this case.  Because

17  of all the immunities, because of all the standing

18  limitations, because of all the special provisions

19  applicable to this very unique public health

20  controversy, this is the only case the American people

21  have a chance for the judicial branch to have a role.

22  Because without it, we are stuck in a situation where

23  the American people are left in the dark.  The American

24  people are left out.  The American people, who the

25  qui tam law is supposed to be there to protect and

1   enforce, is the very law used to abandon them in the end

2   if the government is to have its way.

3            She provided under the same Texas Health and

4   Safety Code, your Honor -- it's very broad.  It talks

5   about treatment facilities.  It talks about any facility

6   where medical treatment takes place.  That is the

7   definition of a clinical trial location.  That's why

8   there are doctors there.  For example, one of the issues

9   she raised was what about people that could have an

10  allergic reaction to something in the vaccine.  They

11  have to have special protocols to treat those people on

12  the scene -- to diagnosis it and treat it.  That sounds

13  like a treatment facility.  They attempt to borrow from

14  other statutes and suggest that maybe this is a very

15  narrow statute.

16           If you have any doubt about what the Texas

17  state position is on whether or not what's been

18  happening here is relevant under Texas state law, the

19  attorney general of the State of Texas is currently

20  suing Pfizer over the falsification of information and

21  false public marketing of the vaccine as safe and

22  effective when it was neither.  So that's the official

23  position of the state government.  This law is here to

24  protect anybody in the healthcare context.  If you see

25  something wrong, you can report it without being fired.

1   It's an exception to the at will provision by statute.

2           Now, if this Court concludes that that

3   statute is narrow and not as broad as we suggest, that

4   is the only reason we request the -- a move to amend to

5   add the general public policy exception to termination.

6   It says wrongful termination, violation of public

7   policy, if they're trying to force you to do something

8   illegal, that is outside the at will doctrine.  We

9   believe the Texas Health and Safety Code statute already

10  specifically addresses this.  But if the Court doesn't

11  believe it does so, we're only asking for leave to

12  amend.  Not to change any facts, but simply to change

13  the legal theory by which remedy can be afforded because

14  the Texas courts do allow that remedy.

15          It is not a case where federal law and Texas

16  law completely shuts out the ordinary American from

17  getting relief and remedy when they expose one of the

18  biggest frauds and scandals in the history of American

19  public health.

20          Thank you, your Honor.

21          THE COURT:  All right.  Thank you very much.

22  All right.  Nothing like teamwork.

23          MR. FRIEDMAN:  And not only that, I hope that

24  we can keep in mind what Mr. Barnes said as the final

25  statement because that's a closing.  That's a closing.

102

1   I just wanted to point out two issues just to make sure

2   to complete the record.

3              THE COURT:  Yes.

4              MR. FRIEDMAN:  One of your questions was how

5   are the allegations specific to the other defendants

6   including, I imagine, Icon.  In this case we definitely

7   alleged a lot of very specific issues about what Icon in

8   its role in this -- and they're summarized -- I won't go

9   over them, but they're summarized on Page 29 and 30 of

10  our opposition to the brief.  But Icon was responsibile

11  for data management.  And the data manipulation is

12  exactly what this case is about.  So not only is Pfizer

13  responsible and Ventavia was the one that was performing

14  the work, but Icon was the one that was responsible for

15  making sure the data integrity and they were responsible

16  for looking for the red flags and they failed.

17             The other issue I wanted to talk about is

18  materiality.  And that is -- their argument is if the

19  FDA decided that it was -- met the EUA standards, then

20  that's the end of it.  And it -- and they can still look

21  at it.  So it doesn't matter what she has to say.  If

22  they listen to what Brook Jackson had to say and they

23  made a decision that it is -- that it meets the EUA

24  standards, that's enough.  As if one single lawyer at

25  the FDA gets to make the decision as to whether or not

1    Congress's standards have been met.  And that is

2    incorrect.

3            In the EUA statute, it sets forth not a

4    subjective standard, but an objective standard.  And I

5    think a lot of the people in the -- in America that's

6    following this case and following the problems with

7    the -- with the -- and with Pfizer's defenses, which is,

8    no, it only takes approval from one person and that's

9    good enough.  They don't understand the way the law

10   works the way some lawyers do.  And lawyers see the

11   statute.  And the statute says that the decision to

12   issue the EUA has to be based on a totality of

13   scientific evidence available to the secretary,

14   including data from an adequate and well-controlled

15   clinical trial, if available.  It is reasonable to

16   believe that the product may be effective in preventing

17   the disease and that the known and potential benefits of

18   the product when used to prevent outweigh the known and

19   potential risks.

20           That is reason to believe.  It's not enough

21   that some bureaucrat says I believe it.  There has to be

22   a reasonable basis.  That's Congress's way of telling

23   lawyers and judges that we are looking for objective

24   basis.  Not subjective basis.  And so the falsities that

25   Brook Jackson has revealed and that when we filed the

statement of interest roadmap that led us to this

lectern today, it's because those evidence is the

objective basis for the EUA.  And that's what they lied

about.  So even if they could convince the FDA even

today to want to have this case dismissed, that's not

consistent.  Congress wanted objective standards to be

applied in this circumstance.

But, please, keep in mind, Judge,

Mr. Barnes's concluding because he's the closer.

THE COURT:  I understand.

MR. FRIEDMAN:  Thank you.  Very good.

Any further response?

MS. MCDONALD:  Your Honor, just briefly I

wanted to address Mr. Barnes's comments about the

retaliation claims.  Mr. Barnes argues that essentially

because they believe they've cured the pleading

deficiencies as to the fraud claims under the FCA that

similarly the deficiencies as to the retaliation claim

have been cured.  But that's just simply not the case.

The retaliation provision isn't concerned with the

validity of a False Claims Act theory.  The question is

really, as you pointed out in your original order

dismissing, whether relator internally reported concerns

about false claims to the government for payment.  And

in the Fifth Circuit, it makes no difference what the

1  relator believed.  It's whether she reported it to her

2  employer, and they do not allege such a report.

3          Similarly, as to -- Mr. Barnes discussed her

4  report to the FDA, but they never allege in their second

5  amended complaint that Ventavia knew about her FDA

6  report before she was fired.  And, in fact, it did not.

7  And as to the state statute, you know, any position the

8  State of Texas has with respect to the COVID vaccine and

9  any of the defendants is not relevant to this

10 retaliation provision in the state statute.  It is not a

11 broad statute.  It's a very narrow statute as you'll see

12 by reading the cases referenced in our brief, which

13 specifically addresses this issue.  And, your Honor,

14 they could have included the common law claim as an

15 alternative legal theory had they wanted to when they

16 filed the second amended complaint and they did not.

17          So with that, your Honor, I respectfully

18 request that you grant our motion.

19          THE COURT:  All right.  Thank you very much.

20          Any further comments from the defendants?

21          Okay.  Is there anything else at this

22 juncture that needs to be brought to the Court's

23 attention?

24          MR. BARNES:  Not from the relator, your

25 Honor.

1          THE COURT:  Not from the defendants,

2   Mr. Carroll; is that correct?

3          MR. CARROLL:  No, your Honor.

4          THE COURT:  The government?

5          MR. GILLINGHAM:  Nothing from the government,

6   your Honor.

7          THE COURT:  All right.  Well, I want to thank

8   you all for coming.  Everyone has done an outstanding

9   job as always.  The lawyers in this case are always very

10  well prepared, and the Court appreciates that.  And I

11  also notice there are a number of folks here who have

12  been listening very intently.  I would love to invite

13  you to come back to be jurors some day because you're

14  good listeners and we always need good listeners in the

15  jury box.

16          But with that, with no further business, we

17  are now adjourned.

18          (Proceedings adjourned at 4:42 p.m.)

19                    *       *       *

20

21

22

23

24

25

1              <u>COURT REPORTER'S CERTIFICATION</u>.

2                   I hereby certify that on this date,

3    June 6, 2024, the foregoing is a correct transcript of

4    the record of proceedings in the above-entitled case.

5

6    _____
     APRIL D. HARGETT
7    Certified Realtime Reporter
     Eastern District of Texas
8    Beaumont, Texas

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25